## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

FAITH MILLER and MICHAEL J.
IANNONE, JR., individually and on behalf of
all others similar situated,

      Plaintiffs,

v.                                                                  Case No. 2:19-cv-02779-MSN-tmp

AUTOZONE, INC.,

      Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

This matter comes before the Court on Defendant AutoZone, Inc's ("AutoZone") Motion to Dismiss Plaintiffs' Class Action Complaint.  (ECF No. 25.)  For the reasons set forth below, Defendant's Motion to Dismiss is **DENIED**.

## I.  BACKGROUND

Faith Miller and Michael J. Iannone Jr. filed this lawsuit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, on behalf of AutoZone Inc.'s 401(k) Retirement Savings Plan (the "Plan") in which they participate, as well as on behalf of other similarly situated participants (together "Plaintiffs").  AutoZone is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and is a named fiduciary under the Plan and 29 U.S.C. § 1102(a). Prudential serves as the recordkeeper for the Plan and Prudential Bank and Trust, FSB serves as trustee. Prudential also provides the investment platform for the Plan and the GoalMaker investment allocation service, which is described in more detail below.

A.  The AutoZone Inc. 401(k) Retirement Savings Plan (the "Plan")

The Plan is a defined-contribution retirement plan funded through employee contributions and matching contributions from AutoZone.  As of December 31, 2018, 15,398 employees participated in the Plan, and the Plan had $548,562,798 in assets.  (ECF No. 1 at PageID 8.)  The Plan is set up such that participants can select from two investment approaches: (1) a "do it yourself" option whereby participants choose from a menu of twelve investment options to construct their own investment portfolios; or (2) elect GoalMaker, an asset allocation service[1] offered by Prudential, that allocates the participant's assets in a model portfolio based on his or her retirement goals and risk tolerance.[2]  (*See* ECF No. 25-1 at PageID 144–45.)  Participants who do not actively select an investment approach are placed into the GoalMaker option by default. (ECF No. 25-1 at PageID 144.)

The Plan's investment menu includes a mix of options including eight to ten mutual funds, three to four separate accounts,[3] a handful of passively managed index funds,[4] and a stable value

---

[1] Asset allocation is an investment strategy that aims to balance risk by dividing assets among major investment vehicles such as stocks, bonds, and cash. U.S. Sec. Exch. Comm'n, *Asset Allocation*, INTRODUCTION TO INVESTING, https://www.investor.gov/introduction-investing/getting-started/asset-allocation (last visited Sept. 18, 2020).

[2] According to AutoZone, GoalMaker rebalances each portfolio on a quarterly basis, keeping it on target with participants' retirement timeline and risk tolerance.  (ECF No. 25-1 at PageID 145.)

[3] "Separate accounts are generally commingled investment vehicles, similar to mutual funds, that aggregate assets from more than one investor to achieve economies of scale. These investment vehicles are made available through contracts issued by [an] insurance company to qualified retirement plans, like 401(k) plans, and governmental plans."  (ECF No. 1 at PageID 22 n.15.)

[4] An index fund is a portfolio of stocks or bonds designed to mimic the composition and performance of a financial market index (e.g. S&P 500).  U.S. Sec. Exch. Comm'n, *Index Funds*, INTRODUCTION TO INVESTING, https://www.investor.gov/introduction-investing/investing-basics/investment-products/mutual-funds-and-exchange-traded-4 (last visited Sept. 18, 2020). The key advantage index funds have over their actively managed counterparts is a lower management expense ratio.  *See id.*

fund[5]—the Guaranteed Index Fund ("GIF").  (ECF No. 1 at PageID 22.)  The Plan's passively managed fund options include Vanguard index funds, with investment fees ranging from 0.03% and 0.07% as of 2019, while the actively managed fund options charge between 0.39% and 1.15%.[6] (ECF No. 25-1 at PageID 145.)

GoalMaker invests participants' money in actively managed investment options available in the Plan, including the GIF, separate accounts, and mutual funds.  (*Id*.)  AutoZone is responsible for the selection of GoalMaker funds. (ECF No. 33 at PageID 394). Participants who choose GoalMaker do not pay investment fees separately; rather, the cost is covered by the fees of the funds in which GoalMaker invests on a participant's behalf.  (ECF No. 25-1 at PageID 146.) According to Plaintiffs, a majority of participants' retirement savings in the Plan were being allocated by GoalMaker and "[t]he [GIF] was the Plan's single largest investment with between $50 and $100 million in participants' retirement savings, equal to 15 to 20 percent of the Plan's total assets."  (ECF No. 1 at PageID 15, 24.)

Prudential serves as the Plan's recordkeeper and is responsible for administrative tasks such as "maintaining account records; processing contributions, rollovers, and transfers;

---

[5] A stable value fund is a portfolio of bonds that are insured through "wrap" contracts with banks or insurance companies to protect the investor against a decline in yield or a loss of capital.  *See* Karen Wallace, *Unpacking Stable-Value Funds*, MORNINGSTAR (Aug. 12, 2015), https://www.morningstar.com/articles/710877/unpacking-stable-value-funds.  Stable value funds are popular with investors that have low risk tolerances (such as persons nearing retirement) and are commonly found in defined contribution plans such as company 401(k) plans. *Id.* The appeal of stable value funds is that they remain just that—stable.  In times of recession or market volatility, stable value funds are guaranteed. The insurance aspect of stable value funds makes them nearly as safe as money market funds.  *Id.*  However, the characteristic insurance protection means stable value funds come with extra management costs and fees which can dampen the already low yields that these investments offer due to their low risk.  *Id.*

[6] Compared to passively managed funds, active funds tend to have higher management fees in order to pay the fund's managers and research team.  Also, active management is often associated with higher portfolio turnover, which causes more trading and associated costs.

generating account statements; executing fund transfers and exchanges; and mailing communications to participants." (ECF No. 25-1 at PageID 146.) Prudential's recordkeeping costs are bundled into the fees of the investment options that participants select through the Plan. (ECF No. 25-1 at PageID 146.) Prudential then is compensated via payment of a portion of those fees through revenue sharing arrangements that it entered into with some of the funds included in the Plan. (*Id.*) In other words, the mutual fund company pays a portion of the fees it charges investors to Prudential for its recordkeeping services. (*Id.*)

B. Plaintiffs' ERISA Allegations

Plaintiffs' one-count Complaint, taken as a whole, alleges AutoZone breached its fiduciary duties in violation of ERISA by: (1) retaining GoalMaker, which allegedly steers participants into high-cost investment options to the benefit of Prudential and against the best interests of Plan participants; (2) by failing to monitor and remove the GIF as an investment option; (3) retaining mutual funds and separate accounts that charge exorbitant management fees and have hidden trading costs; (4) failing to invest in lower-cost share classes; (5) failing to monitor exorbitant recordkeeping fees; and (6) failing to "provide participants with the complete and accurate information they required to make adequately informed investment decisions," and by knowingly participating in breaches by other Plan fiduciaries. (*See* ECF No. 1.)

AutoZone disputes all allegations raised by Plaintiffs and seeks dismissal of the entire Complaint. In its Motion to Dismiss, AutoZone requested an opportunity to present oral argument. (ECF No. 25.) The Court granted AutoZone's request and heard oral argument from both parties on August 28, 2020. (ECF No. 50.) For the reasons outlined below, the Court finds Plaintiffs have alleged sufficient facts to state a claim to relief that is plausible on its face.

## II. **STANDARD**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  Using this framework, the court determines whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  A complaint need not contain detailed factual allegations; however, a plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  In other words, the "[f]actual allegations must be enough to raise a right to relief above [a] speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  If a court decides in light of its judicial experience and common sense, that the claim is not plausible, the case may be dismissed at the pleading stage. *Iqbal*, 556 U.S. at 679.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 556.

## III. DISCUSSION

"To state a claim for breach of fiduciary duty, 'a plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan.'" *Meiners v. Wells Fargo & Co.,* 898 F.3d 820, 822 (8th Cir. 2018) (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009); 29 U.S.C. § 1109).  For purposes of this

Motion, AutoZone concedes that the Complaint appropriately pleads the first and third elements. Instead, the gravamen of AutoZone's Motion to Dismiss is that Plaintiffs have not properly alleged violations of the fiduciary duties imposed by ERISA. After stating the applicable standard, each of Plaintiffs' claims will be addressed in turn.

A.  ERISA Prudent Person Standard of Care

ERISA imposes upon fiduciaries the duties of loyalty and prudence in managing the plan's assets, requiring them to act "solely in the interest of [plan] participants and beneficiaries" and to carry out their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

Here, only the duty of prudence is at issue. A fiduciary's investments are prudent if he "[h]as given appropriate consideration to those facts and circumstances that . . . are relevant to the particular investment . . . involved . . . and [h]as acted accordingly." 29 C.F.R. § 2550.404a-1(b)(1). "Appropriate consideration" includes "[a] determination by the fiduciary that the particular investment . . . is reasonably designed . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain," in addition to consideration of the portfolio's diversification, liquidity, and projected return relative to the plan's funding objectives. *Id*. (b)(2)(i)–(ii). In addition, "under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). Prudence generally requires "diversifying the investments of the plan so as to minimize the risk of large losses . . . ." 29 U.S.C. § 1104(a)(1)(C).

Importantly, the duty of prudence is an objective standard that focuses on the fiduciary's decision-making process, not the results of the process. Thus, "a plan's mere underperformance

is not actionable so long as the fund administrators acted prudently." *Martin v. CareerBuilder, LLC,* No. 19-cv-6463, 2020 U.S. Dist. LEXIS 115002, at *9 (N.D. Ill. July 1, 2020) (internal citations omitted). "To show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or performance of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018).

ERISA plaintiffs, however, "generally lack the inside information necessary to make out their [imprudence] claims in detail unless and until discovery commences." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). At the pleadings stage, courts should employ a "holistic evaluation of an ERISA complaint's factual allegations" and "draw reasonable inferences in favor of the nonmoving party as required" to effectively serve ERISA's remedial purpose. *Id.*

B. GoalMaker

Plaintiffs first allege AutoZone breached its fiduciary duty under ERISA by retaining GoalMaker, the asset allocation service offered by the Plan's provider, Prudential. According to Plaintiffs, "AutoZone knew or should have known that GoalMaker was designed to steer Plan participant's retirement savings to investment options that paid investment management fees and kickbacks to Prudential" at the expense of participants. (ECF No. 1 at PageID 15–16.) Plaintiffs also allege that "AutoZone did not have a viable methodology for monitoring the expenses of the GoalMaker funds." (*Id.* at PageID 22.)

Plaintiffs further allege that AutoZone, which is responsible for the selection of GoalMaker funds, imprudently kept high-fee, low-performing funds in GoalMaker's pool while excluding low-fee index funds, such as the Vanguard index funds already present in the Plan's investment menu. (ECF No. 1 at PageID 16, 22.) In response, AutoZone argues Plaintiffs' comparison of

actively managed GoalMaker funds to passively managed Vanguard index funds, is like comparing "apples [to] oranges" and does not raise an inference of imprudence on AutoZone's part.  (ECF No. 25-1 at PageID 150–54.)  (ECF No. 25-1 at PageID 143 ("Because Plaintiffs pit funds with very different investment strategies against one another, there can be no inference of imprudence.").)  AutoZone offers two primary citations supporting this proposition. First, in *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir 2018), the Eighth Circuit affirmed dismissal of an ERISA action premised on alleged underperformance of Wells Fargo target date funds ("TDFs").  The Eight Circuit held that Meiners' comparison of Wells Fargo TDFs to one Vanguard fund failed to create a reasonable inference of imprudence because the Vanguard fund was an improper benchmark.  *Id.* at 823.  Second, in *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478 (8th Cir. 2020), the Eighth Circuit affirmed the dismissal of plaintiffs' claim that defendant retained several underperforming investments in its plan for too long.  These investments included the TIAA Real Estate Account, CREF Stock Account, and a fixed-annuity contract.  *Davis*, 960 F.3d at 484–87.  To support their allegations, the *Davis* plaintiffs compared the performance and costs of these funds to passively-managed index funds.  *Id.*  After engaging in a detailed discussion about the similarities and differences between the above funds and the alleged benchmark index funds, the Eight Circuit affirmed dismissal of one of plaintiffs' claims because the plan's funds and alleged index fund benchmarks ultimately "have different aims, different risks, and different potential rewards that cater to different investors."  *Id.* at 485.

AutoZone further argues that retirement plan fiduciaries are not required by law to pick the best performing fund or "the lowest-cost fund."  Rather, ERISA requires plan administrators to offer a variety of investment options.  (ECF No. 25 at PageID 150–54.)  While AutoZone is correct

that "no authority requires the fiduciary to pick the best performing fund," *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir 2018), that is not the allegation made here.

In addition, AutoZone's argument that the Court should give limited weight to fee comparisons between actively managed GoalMaker funds and low-cost Vanguard index funds invites the kind of factual analysis that is inappropriate at the pleading stage. Contrary to *Davis* and *Meiners*, this Court declines to rule on the reasonableness of comparing actively-managed funds to passively-managed index funds on a motion to dismiss. While Plaintiffs must allege more than inapt investment comparisons to make the necessary inference of imprudence to survive a 12(b)(6) motion, at the pleading stage, taking all factual allegations in Plaintiffs' favor, the Court finds the Complaint sufficiently states a claim for breach of fiduciary duty based on AutoZone's selection and management of GoalMaker funds. Furthermore, the parties' dispute over the propriety of comparing actively-managed funds to index funds raises questions of fact and law that have not been addressed by the Sixth Circuit. As such, this Court finds dismissal would be inappropriate at this point. AutoZone's Motion to Dismiss Plaintiffs' claims regarding GoalMaker are therefore **DENIED**.

C. Stable Value Fund—GIF

Next, the Complaint alleges AutoZone breached its fiduciary duty to the Plan and participants by failing to monitor and remove the GIF as an investment option.

A stable value fund is a contract-based investment vehicle designed to preserve principal and generate steady rates of return, while allowing participants to make withdrawals at contract value (principal plus accrued income), regardless of market conditions.[7] In the context of a retirement plan, a stable value fund is similar to a money market fund in that it provides liquidity

---

[7] *See supra* n. 5.

and principal protection, and similar to a bond fund in that it provides consistent returns over time. (ECF No. 1 at PageID 25.)  A stable value fund differs from both in that it seeks to generate returns greater than a money market and equivalent to a short–to intermediate–term bond fund.  (*Id.* at PageID 25–26.)  Stable value funds are able to do this because the amount of money invested in the account is relatively stable over time.  (*Id.* at PageID 26.)  This enables fund providers to offer better crediting rates[8] (the rate of return that a participant will receive base on contributions and accrued interest) and to guarantee participants will not lose money by guaranteeing the fund transacts at book value.  (*Id.*)  Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with bond funds.  (*Id.*)

Stable value funds are common in large 401(k) plans and are typically structured as: (1) an insurance company general account; (2) an insurance company separate account; or, (3) a synthetic fund.  (ECF No. 1 at PageID 25.)  A synthetic stable value fund is a diversified portfolio of fixed income securities and is insulated from interest rate volatilities through wrap contracts[9] with insurers.  Synthetic stable value funds are generally the least risky because principal is guaranteed by multiple wrap providers and plan participants own the assets of the underlying funds.  (*Id.* at PageID 26.)  Plaintiffs contend that since the credit crisis of 2008–2009, most large 401(k) and

---

[8] A crediting rate is the interest rate earned on the contract value (principal plus accrued income) expressed as an effective annual yield. The crediting rate also acts as a stabilizing mechanism by amortizing investment gains and losses so that participants are protected from short-term changes in market.  Leela Scattum & Nick Gage, *Stable Value Crediting Rates: How They Work, How They Calculated*, STABLE VALUE ANALYST INSIGHTS, (2015), https://www.galliard.com/assets/edocs/stable-value-crediting-rates-march-2015.pdf.

[9] *Supra* n. 5.

403(b) plans have divested themselves of general account and separate account products in favor of synthetic stable value funds because of credit risk concerns.  (*See* ECF No. 1 at PageID 27.)

In a separate account product, the assets of the underlying funds are held in the separate account of an insurance carrier and are riskier because there is only one "wrap" provider.  As a result, these funds offer higher crediting rates—higher risk, higher reward.  (ECF No. 1 at PageID 26.)  Unlike synthetic stable value products, however, separate account investors do not actually own the underlying assets in the separate account.  (*Id.*)

With a general account product, the investment funds are deposited by an insurance company in its general account.  The insurance company then generates revenue by investing said funds in instruments with a higher yield than what it guaranteed to its contract holders. The resulting "spread" (i.e., the difference between the crediting rate and the returns earned by the insurance company) is kept by the insurance company.  (*See* ECF No. 1 at PageID 27.)  In contrast to the other types of investment products, general account products do not have a stated expense ratio.[10]  Rather, the fees charged are typically implicit and may be used to cover investment management expenses, insurance fees, administrative costs, and any revenue sharing that has been built into the product.

As with separate account products, the general account investors own the contract but not the underlying investments.  Assets in a general account product would be available to the insurance company's creditors in the event said insurance company became insolvent.  As a result, general account products, such as the GIF, are the riskiest type of stable value fund and consequently must offer the highest credit rates.  (*See generally*, ECF No. 1 at PageID 26.)

---

[10] Brian A. Montanez, *A Guide to Retirement Plan Fees & Expenses*, Multnomah Group White Paper (July 2017), https://www.multnomahgroup.com/a-guide-to-retirement-plan-fees-expenses.

Plaintiffs also posit that general account products create uncertainty as to management fees because the retirement plan owns only a contract rather than the underlying assets. (*Id.*)

In the Complaint Plaintiffs contend the GIF was an imprudent investment because it charged excessive spread fees, subjected participants to single entity credit risk and rates established at the discretion of a single provider (i.e., Prudential), and was undiversified. (ECF No. 1 at PageID 19–27, 65.) Plaintiffs further assert that comparable stable value funds were available from other providers with higher crediting rates, and that an identical product was available from Prudential with higher crediting rates and lower spread fees—(the "Guaranteed Investment"). (ECF No. 1 at PageID 28.) "The Guaranteed Investment is a fixed income account invested in the General Account of Prudential Retirement Insurance and Annuity Company." (ECF No. 1 at PageID 70.) Plaintiffs support this allegation with a chart and table comparing the crediting rate of the GIF to the crediting rate of similar general account products offered by Prudential to other plans. (ECF No. 1 at PageID 29.) Plaintiffs' chart and table show that crediting rates for the GIF were, on average, 2.20% less than the crediting rates of the Guaranteed Investment. (ECF No. 1 at PageID 29.) (*See also* ECF No. 33 at PageID 396.)

With respect to spread fees, Plaintiffs assert the GIF "consistently charged . . . AutoZone employees 200 basis points more and, consequently, returned 200 basis points less than the very same type of [stable value] fund offered by Prudential to other similarly situated retirement plans." (*Id.*) Furthermore, Plaintiffs allege the excessive spread fees generated by the GIF resulted in a windfall to Prudential, whose compensation AutoZone failed to monitor. (ECF No. 1 at PageID 31.)

Plaintiffs also contend the GIF was imprudent because it subjected participants to single entity credit risk and rates established at the discretion of a single provider and was undiversified. Plaintiffs explain:

> [T]he [GIF] is a contract, a piece of paper, subject to the single entity credit risk of Prudential, the issuer of the contract. Further, the returns of the [GIF] depend on the crediting rates set at the discretion of a single provider, Prudential. The crediting rate . . . is not tied to the performance of a diversified pool of assets in which investors in the fund have an interest as with a separate account or synthetic stable value fund. Following the high-profile failure or near failure of a number of stable value providers during the credit crisis of 2008–2009, the trend among fiduciaries in large plans is to avoid general account stable value funds because of credit risk concerns and to select more diversified stable value products. There are circumstances under which it may clearly be prudent not to diversity the assets of a plan invested in a stable value fund, but this is not such a case. Here, Prudential pocketed more than 200 basis points in excess fees and failed to provide the rate of return that would ordinarily compensate for the Plan's failure to fully diversify its investments.

(ECF No. 1 at PageID 32.)

Additionally, Plaintiffs point out that "because the [stable value] product's performance over a given period is declared six months in advance, the plan fiduciary [generally] knows six months in advance what the returns will be." (ECF No. 1 at PageID 30.) Again, a defining feature of a stable value fund is its stability. Thus, according to Plaintiffs, a stable value product that is underperforming generally continues to perform poorly in a stable manner. (*Id*. at PageID 31.) Plaintiffs also contend that, had AutoZone monitored the GIF in appropriate six-month intervals, it would have seen that the GIF was consistently underperforming and elected to replace it. (ECF No. 1 at PageID 31.)

In the Motion to Dismiss, AutoZone asserts Plaintiffs once again rely on an apple to oranges comparison because the Guaranteed Investment's credit rate does not account for fees whereas the GIF's credit rate does. (ECF No. 25-1 at PageID 148–49.) Specifically, the Guaranteed Investment's returns are prior to deduction of administrative fees of the WEA Trust.

(ECF No. 25-1 at PageID 148.)  According to AutoZone, the Guaranteed Investment is actually more expensive than the GIF because "the WEA Trust charges its participants an annual administrative fee of 0.35% of assets invested in the plan, capped at an extraordinarily high $500 per participant per year."  (*Id*.)  In addition, AutoZone points out that the GIF guarantees a 1.5% minimum credit rate whereas the Guaranteed Investment guarantees only 1.0% credit rating.  This means investors in the GIF will always earn 1.5% whereas investors in the Guaranteed Investment could earn less.  (ECF No. 25-1 at PageID 149.)

Plaintiffs reply that AutoZone should have known the GIF was performing poorly because its crediting rates averaged 1.50% over the class period, which was less than the 2.0% rate of inflation over the same period.  (ECF No. 33 at PageID 396.)  Plaintiffs further assert the Guaranteed Investment is an appropriate benchmark for the GIF because both: "(1) are general account stable funds; (2) from the same investment provider; (3) with the same portfolio allocation; (4) the same duration; and (5) the same high-yield credit risk."  (ECF No. 33 at PageID 397.)

In reply, AutoZone contends the Guaranteed Investment is an inappropriate comparator to the GIF because the two funds have different risk profiles.  According to AutoZone, the Guaranteed Investment holds riskier investments than the GIF, "and with increased risk comes the opportunity to earn greater return."  (ECF No. 36 at PageID 420.)  In addition, AutoZone contends Plaintiffs' diversity argument fails because (1) Plaintiffs do not allege any loss attributable to investing in the GIF because there are no allegations of a default or actionable reduction in the crediting rate; and (2) the Complaint contains no factual allegations about the GIF's underlying investment portfolio.  (ECF No. 36 at PageID 421.)

Taking the entire Complaint into consideration and drawing all reasonable inferences in favor of Plaintiff, the Court finds that Plaintiffs' allegations give rise to a plausible inference that AutoZone's process for selecting and monitoring the GIF was deficient.

Here, AutoZone spends much of its time attacking the accuracy of Plaintiffs' comparison of the GIF to the Guaranteed Investment.  However, a motion to dismiss is not meant to resolve arguments regarding the truth of Plaintiffs allegations or the accuracy of their statements.  Instead, the Court must take Plaintiffs' well-pleaded factual allegations as true and draw every reasonable inference from them in their favor.  *See Nicolas v. Trs. of Princeton Univ.*, No. 17-3695, 2017 U.S. Dist. LEXIS 151775, at *12 (D.N.J. Sept. 19, 2017) (holding "Defendant raises factual questions about whether the alternative funds Plaintiff suggests . . . are apt comparisons—and, therefore, whether the underperformance Plaintiff depicts is an accurate portrait . . . Such questions do not warrant dismissal—to the contrary, they suggest the need for further information from both parties.").

At this point, the complaint only needs to provide the Court enough to infer from what is alleged that AutoZone's retention of the GIF was imprudent.  Plaintiffs have met this mark.  Therefore, AutoZone's Motion to Dismiss Plaintiffs' breach of fiduciary duty claim based on the GIF is **DENIED**.

D.  High-Cost Mutual funds and Separate Accounts

Next, the Complaint alleges AutoZone breached its fiduciary duty to the Plan and participants by retaining mutual funds and separate accounts that charge exorbitant management fees and have hidden trading costs.

In contrast to mutual funds, where the fees are disclosed as part of an investment's expense ratio, the management fee structure for separate account products is less transparent.  (*Id*. at

PageID 33–34.)  In the Complaint, Plaintiffs compare the management fees of the Plan's separate accounts and mutual funds to management fees of Vanguard index fund alternatives in a detailed chart.  (*See* ECF No. 1 at PageID 35–36.)

Trading costs result from the purchase and sale of investments such as stocks and bonds by mutual fund companies. (*Id.* at PageID 37.) These costs are not included in a mutual fund's expense ratio; however, the SEC requires a fund to disclose its "turnover ratio," a measure of how frequently a fund's assets are bought and sold.  (*Id.*)  According to Plaintiffs, "[t]he funds selected by GoalMaker had high turnover ratios and high trading and market impact costs." (ECF No. 1 at PageID 37.)  Once again, Plaintiffs make a table comparison between the GoalMaker Funds and Vanguard index funds to prove their point.  (*See* ECF No. 1 at PageID 38.)  Based on the data shown in these two charts, Plaintiffs contend "AutoZone did not have or failed to follow a viable methodology for beating the market through the use of high-cost actively managed funds." (ECF No. 1 at PageID 44.)

AutoZone responds that Plaintiffs' claim must fail because it is premised on inappropriate comparison of actively managed funds to passively managed Vanguard index funds.  (ECF No. 25-1 at PageID 150.)  According to AutoZone, the actively managed GoalMaker funds do not employ similar operations or investment strategies to passively managed Vanguard funds. AutoZone also maintains the Plan's overall investment lineup offerings are reasonable.  (*Id.*)

AutoZone's contentions about comparing separate accounts and mutual funds to passively-managed index funds resemble their arguments about the GIF.  Accordingly, for the same reasons set forth herein in Section III(C), AutoZone's Motion to Dismiss regarding exorbitant mutual fund and separate account fees is **DENIED**.

E.  Wrong Share Class

Next, Plaintiffs allege "AutoZone, despite having access to professional advice and the responsibility to manage a $500 million retirement plan, has repeatedly failed to invest in the lower cost share classes available to it in order to properly reduce fees and costs associated with fund management, thus breaching its fiduciary duty to the Plan and its participants." (ECF No. 1 at PageID 49.)

According to the Complaint, a prudent fiduciary should have in place a methodology for taking advantage of discounts available to large investors through the purchase of institutional shares. (ECF No. 1 at PageID 49.) Because mutual funds are not static, it is important for a prudent fiduciary to monitor the Plan in the event lower cost share classes become available for the same mutual fund. Here, Plaintiffs allege that AutoZone breached its fiduciary duty by imprudently choosing to offer certain retail-class shares of mutual funds (both Vanguard and non-Vanguard) when cheaper institutional-class shares were available.[11] (*See* ECF No. 1 at PageID 52–53).

To exemplify these allegations, Plaintiffs' Complaint includes a table comparing mutual fund share options in the Plan with the readily available cheaper alternatives. (ECF No. 1 at PageID 53.) Plaintiff highlight one fund in particular that subjected Plan participants to higher-than-necessary expenses. According to the Complaint, the Plan selected the R4 version of a mutual fund called the American Europacific Growth Fund (REREX). (ECF No. 1 at PageID 53–54.) The REREX paid 25bps in 12b-1 fees and 10bps in sub-T/A fees to Prudential. (*Id.*) At the same time, the identical fund was available to the Plan in an R-6 share class, which paid no 12b-1 or

---

[11] Retail share classes possess different shareholder rights and responsibilities from institutional class shares, which are also called "R Class shares." These may include differing fee and load charges. But while the fees differ, the assets underlying the various share classes as well as their management and investment styles are identical.

sub-TA fees to Prudential, at an average cost of 0.50% per year over the Class Period, a difference of 0.35%.  (*Id.*)  According to Plaintiffs, this 0.35% difference resulted in the waste of $1.4 m of retirement savings over the class period.  (*Id.* at PageID 54.)  Plaintiffs offer identical allegations about nine other funds, with differences only in the precise expense ratios and resultant damages.  (*Id.* at PageID 53 (*See* Figure 10).)  In total, Plaintiffs allege "AutoZone wasted approximately $3.25 million as a result of selecting the wrong share class of mutual funds for the Plan's investment menu."  (ECF No. 1 at PageID 54.)

In response, AutoZone contends it retained higher-cost retail-shares classes in order to pay for recordkeeping costs through revenue sharing, thus avoiding the need to impose additional recordkeeping fees on Plan participants.  (*See* (ECF No. 25-1 at PageID 158) (ECF No. 36 at PageID 426).)  AutoZone also contends that of the ten mutual funds listed in the Complaint as being offered in the wrong share class, two were unavailable because the Plan did not meet the minimum investment requirement.  (ECF No. 25-1 at PageID 158–59.)  On this point, Plaintiffs respond that even if AutoZone is correct, the two funds relates to only $48,413.00 out of the $3,111,469.00 in share class damages. (ECF No. 33 at PageID 404–05.)

Other Circuits have held that retention of higher-cost retail-class shares over institutional-class shares does not always infer imprudence.  *See Tibble v. Edison Int'l,* 729 F.3d 1110, 1135 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015) (noting a fiduciary might choose funds with higher fees for several prudent reasons, including potential for higher return, lower financial risk, more services offered, or greater management flexibility); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (noting that retail-class funds, being open to the public, give participants a market-to-market benchmark which insures the benefits of competition).  However, none of these reasons apply in this case.

18

The fact that AutoZone concedes it retained retail-class shares to provide more basis points for revenue sharing (*i.e.*, to make sure Prudential's recordkeeping fees were paid for) supports the inference that mutual fund options were not selected based on their merits.  (*See* ECF No. 25-1 at PageID 158.)  Although this inference may turn out to be false, it is not Plaintiffs' responsibility to rebut AutoZone's purported reason for offering retail-class shares at the pleading stage.  *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009) (holding "[Fed. R. Civ. P.] 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct."); *Disselkamp v. Norton Healthcare, Inc.*, No. 3:18-CV-00048-GNS, 2019 U.S. Dist. LEXIS 129519, at *15–16 (W.D. Ky. Aug. 2, 2019) (holding that defendants' revenue-sharing defense to plaintiffs' share-class claim is not well-suited for a decision on a motion to dismiss). Plaintiffs' claim that AutoZone failed to investigate lower cost options is not a fact couched as a legal conclusion which should be stricken by AutoZone' Motion to Dismiss. Accordingly, AutoZone's Motion to Dismiss Plaintiffs' claim with respect to the Plan's methodology for selecting and monitoring share classes is **DENIED**.

## F.  Exorbitant Recordkeeping Expenses

Next Plaintiffs allege the Plan's recordkeeping expenses were too high.  (*See* ECF No. 1 at PageID 55–56.)  Specifically, Plaintiffs posit "based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by Prudential, the Plan's participant level (10,000 to 15,000 during the Class Period) and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan [should] have been no more than $50 per participant or $500,000 to $750,000 per year for the Plan (about $4.5 million total) over the six-year Class Period."  (ECF No. 1 at PageID 56.) Plaintiffs also contend that AutoZone failed to adequately monitor the Plan's recordkeeping expenses. In

selecting a recordkeeper, a fiduciary of a large plan such as AutoZone should solicit competitive bid proposals from a number of recordkeepers and regularly "benchmark" or compare a plan's present fee structure with those of competitors, Plaintiffs allege.  (ECF No. 1 at PageID 55.)

AutoZone responds that Plaintiffs' recordkeeping fee claim is "barebones" and unduly speculative.  Specifically, AutoZone contends Plaintiffs offer no "charts, graphs, or data" to support their claim that recordkeeping fees for the Plan should be no more than $50 per participant, and that "Plaintiffs do not even bother to identify the amount actually paid by Plan participants." (ECF No. 25-1 at PageID 159.)  Plaintiffs counter that AutoZone "is in sole possession of the 408(b)(2) service provider disclosures and other data necessary to discern recordkeeping expenses and has so far refused to offer said information . . . ."  (ECF No. 33 at PageID 406.)

Though the manner in which Plaintiffs calculate the benchmark for an appropriate recordkeeping fee for Plan participants lacks support from charts and data, the Court recognizes the need to conduct discovery on this issue and therefore **DENIES** AutoZone's motion to dismiss.

G.  Additional Claims

Finally, Plaintiffs allege AutoZone breached its fiduciary duty by failing to "provide participants with the complete and accurate information they required to make adequately informed investment decisions," and by knowingly participating in breaches by other Plan fiduciaries.  (ECF No. 1 at PageID 65.)  AutoZone summarily contends these allegations are unsupported by factual allegations and should be dismissed.  (ECF No. 25-1 at PageID 161.)  This Court disagrees.

ERISA fiduciaries have an obligation to convey complete and accurate information to their beneficiaries.  *James v. Pirelli Armstrong Tire Corp*., 305 F.3d 439, 452 (6th Cir. 2002).  This duty to disclose "entails not only a negative duty not to misinform, but also an affirmative duty to inform

when . . . silence might be harmful." *Id.*   Here, the Complaint alleges AutoZone provided misleading information to Plan participants about Morningstar's endorsement of GoalMaker.  (*See* ECF No. 1 at PageID 15 ("Morningstar itself did not assume any responsibility for Prudential's GoalMaker service. In fact, Morningstar specifically disclaimed any responsibility for the review or approval of the information provided to the participants in the AutoZone Plan.").  Plaintiffs also allege that literature regarding Prudential's Excessive Trading Monitoring Program was false.  (*See* ECF No. 1 at PageID 37).  Viewing these allegations in the light most favorable to Plaintiffs, and considering the complaint as a whole, the Court finds Plaintiffs have stated a sufficient claim under Rule 12(b)(6).

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, AutoZone's Motion to Dismiss is **DENIED.**

**IT IS SO ORDERED**, this 18th day of September, 2020.

 *s/ Mark Norris*_____
HON. MARK S. NORRIS
UNITED STATES DISTRICT JUDGE
