## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| MICHAEL J. IANNONE, JR. and<br>NICOLE A. JAMES, as plan<br>participants, on behalf of the<br>AUTOZONE, INC. 401(k) Plan, and<br>on behalf of others similarly situated,<br><br><br>Plaintiffs,<br><br><br><br>vs.<br><br>AUTOZONE, INC., as plan sponsor,<br>BILL GILES, BRIAN CAMPBELL,<br>STEVE BEUSSINK, KRISTIN<br>WRIGHT, MICHAEL WOMACK,<br>KEVIN WILLIAMS, KRISTIN<br>WRIGHT, and RICK SMITH,<br>individually and as members<br>of the AutoZone, Inc. Investment<br>Committee, and NORTHERN<br>TRUST CORPORATION and<br>NORTHERN TRUST, INC.,<br>as investment fiduciaries,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 2:19-cv-02779<br>)     Class Action<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 2

II.  THE PLAN AND THE PARTIES ....................................................................... 8

    A.  THE PLAN .......................................................................................................... 8
    B.  THE PARTIES ..................................................................................................... 9
        1.  The Plan Sponsor ....................................................................................... 9
        2.  The Investment Committee ........................................................................ 9
        3.  The Fiduciary Investment Advisor ............................................................ 9
        4.  Statutory "Parties-In-Interest" ................................................................ 11
        5.  Plaintiffs and Standing ............................................................................ 11

III.  JURISDICTION AND VENUE ....................................................................... 12

IV.  FIDUCIARY DUTIES ..................................................................................... 12

    A.  FUNDAMENTAL FIDUCIARY PRINCIPLES ....................................................... 13
    B.  SPECIFIC FIDUCIARY DUTIES ........................................................................ 14

III.  THE FIDUCIARY BREACHES ..................................... ERROR! BOOKMARK NOT DEFINED.

    A.  AUTOZONE DID NOT HAVE A PRUDENT INVESTMENT POLICY ...................... 25
    B.  THE GOALMAKER SCHEME ............................................................................ 29
        1.  AutoZone Touted the Benefits Of GoalMaker To Participants ............... 29
        2.  Why Expenses Matter .............................................................................. 32
        3.  The High-Fee GoalMaker Funds ............................................................. 34
        3.  The Tilt Towards High-Fee Funds ........................................................... 37
        4.  The Failure To Benchmark GoalMaker Portfolios .................................. 39
        5.  The Correction ......................................................................................... 41
    B.  THE STABLE VALUE FUND: SPREAD FEES ..................................................... 42
        1.  Prudential's Excessive Spread Fees ........................................................ 45
        2.  Failure to Submit RFP's .......................................................................... 50
        3.  Northern Trust Designated the Wrong Benchmark for the Stable Value Fund ...................... 51
        4.  Failure to Diversify ................................................................................. 53
    C.  NORTHERN TRUST'S HIGH-FEE ACTIVELY MANAGED STRATEGY ................ 54
        1.  High Investment Management Fees .......................................................... 54
        2.  Transaction Costs: Hidden Fees .............................................................. 57
        3.  The Fees Chasing Excess Returns ........................................................... 60
        4.  Active Management Was A Risky Bet In The Designated Asset Classes ............. 62
        5.  The GoalMaker Funds Consistently and Severely Underperformed .................. 65
        6.  A Prudent Fiduciary Would Have Replaced The High-Cost Actively Managed Funds With Index Funds ....................................................................................... 70
        7.  Northern Trust's Conflict of Interest ....................................................... 73
        8.  The Termination of Northern Trust and the Replacement of the High Fee Funds ................. 74
    D.  THE KICKBACKS TO PRUDENTIAL ................................................................. 75
        1.  Northern Trust Links Investment Selection to Payments To Prudential ............. 75
        2.  Northern Trust Links Investment Selection to Payments To Prudential ............. 76
        2.  Proprietary Funds .................................................................................... 78
        3.  Share Class .............................................................................................. 79
    D.  FAILURE TO MONITOR ADMINISTRATIVE EXPENSES .................................... 86

V.  THE DAMAGE DONE ...................................................................................... 91

IV.  CLASS ACTION ALLEGATIONS ................................................................. 93

V.  PLAN WIDE RELIEF ................................................................................................ 97

VI.  COUNT ONE:  BREACH OF FIDUCIARY DUTY .................................................... 98

VII.  PRAYER FOR RELIEF ...........................................................................................102

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| MICHAEL J. IANNONE, JR. and ) | |
| NICOLE A. JAMES, as plan ) | |
| participants, on behalf of the ) | |
| AUTOZONE, INC. 401(k) Plan, and ) | |
| on behalf of others similarly situated, ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| vs. ) | Case No. 2:19-cv-02779 |
| ) | Class Action |
| ) | |
| AUTOZONE, INC., as plan sponsor, ) | |
| BILL GILES, BRIAN CAMPBELL, ) | |
| STEVE BEUSSINK, KRISTIN ) | |
| WRIGHT, MICHAEL WOMACK, ) | |
| KEVIN WILLIAMS, KRISTIN ) | |
| WRIGHT, and RICK SMITH, ) | |
| individually and as members ) | |
| of the AutoZone, Inc. Investment ) | |
| Committee, and NORTHERN ) | |
| TRUST CORPORATION and ) | |
| NORTHERN TRUST, INC., ) | |
| as investment fiduciaries, ) | |
| ) | |
| Defendants. ) | |

### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Michael J. Iannone, Jr. and Nicole A. James as plan

participants, on behalf of the AutoZone, Inc. 401(k) Plan (the "Plan"), and as

representatives of a class of participants in and beneficiaries of the Plan pursuant to 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3) state their Complaint against Defendant AutoZone, Inc. ("AutoZone" or "AZ");[1] Bill Giles, Brian Campbell, Steve Beussink, Kristin Wright, Michael Womack, Rick Smith, and Kevin Williams individually and as members of the AutoZone Investment Committee (the "Committee" or the "Investment Committee"); and, Northern Trust Corporation and Northern Trust Investments, Inc.,[2] as investment fiduciaries to the Plan (collectively, "Northern Trust" or "NT"); for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"):

## I.    INTRODUCTION

1.    Plaintiffs were participants in an ERISA defined contribution plan sponsored by their employer, AutoZone.  As of December 31, 2019, the Plan had approximately $675 million in assets and 18,000 participants with account balances.

2.    Defined contribution plans have become America's primary means of saving for retirement.  This is the result of a shift from traditional, defined benefit "pension" plans to defined contribution plans.  The United

---

[1] The term "AutoZone" is the clearer of the two abbreviations, but because AutoZone's own documents sometimes refer to AutoZone as "AZ," Plaintiffs will use both terms.

[2] Northern Trust Investments, Inc. is the entity identified as Investment Manager in the August 31, 2009 Amendment to the Investment Management Agreement and in subsequent amendments.

States Supreme Court explained the difference in *Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615 (2020):

> [i]n a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions. By contrast, in a defined-contribution plan, such as a 401(k) or 403(b) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions.

*Id.* at 1618. Thus, in a defined contribution plan, the participants – and not their employer – bear the risks of the employer's imprudent investment decisions.

3.    AutoZone, as plan sponsor, the members of the Committee AutoZone appointed to administer the Plan, and Northern Trust, the Plan's investment advisor, each owed fiduciary duties to the Plan and its participants to manage the assets of the Plan prudently and to not waste money. Defendants breached these fiduciary duties by failing to monitor the fees and performance of the Plan's investments and the excessive fees paid to Prudential and other service providers.

4.    AutoZone did not have a formal investment policy, much less a prudent one. In the absence of clearly defined goals and objectives, AutoZone's decision-making process was haphazard and many of the decisions AutoZone made were not in the best interest of the Plan and its participants.

5.    The centerpiece of the investment menu for AutoZone's 401(k) re-tirement plan was the GoalMaker® asset allocation service furnished by Prudential Insurance Company (together with its various subsidiaries and affili-ates, "Prudential"). Although Prudential supplied GoalMaker, AutoZone and Northern Trust accepted responsibility for GoalMaker's implementation and are liable for the resulting losses.  Prudential did not accept fiduciary respon-sibility for GoalMaker nor provide benchmarks against which to measure the performance of the GoalMaker fund portfolios.

6.     AutoZone's de facto investment policy, to the extent it had one, was GoalMaker.

7.    AutoZone recommended GoalMaker to each of its employees as a service that would "guide you to a model portfolio of investments available, then rebalances [sic] your account quarterly to ensures your portfolio stays on target," and that "GoalMaker®'s ideal allocations are based on generally accepted financial theories that take into account the historic returns of dif-ferent asset classes."[3]

8.    What AutoZone told its employees about GoalMaker was false. The funds Defendants selected for GoalMaker paid excessive investment management fees to Prudential and its affiliates and consistently underper-

---

[3] *See* 2019 AutoZone 401(k) Plan Booklet.

formed their benchmark indices and lower-cost index fund alternatives.  Iron-ically, AutoZone had low-cost index funds in the Plan's investment menu, but these funds were excluded from GoalMaker allocations. GoalMaker func-tioned not so much as an investment service maintained for the benefit of em-ployees as a kickback scheme that allocated the employee's retirement sav-ings to funds that paid excessive fees to Prudential.

9.    Defendants breached their duties to the AutoZone employees and the Plan by failing to monitor the GoalMaker investment scheme.  Specifically, (1) Defendants failed to monitor and to replace an obscenely overpriced Pru-dential stable value fund, the primary investment option to which GoalMaker allocated  employee's retirement savings; (2) Defendants failed to monitor and replace high-cost GoalMaker funds when there was no reason to believe that their performance would justify their additional costs; and, (3) Defend-nats failed to monitor the Plan's fees and expenses, including excessive stable value fund spread fees, investment management fees, sub-account charges, transaction costs, distribution fees, and administrative expenses. As a result, the Plan kicked back payments to Prudential from the retirement savings of AutoZone's employees in excessive amounts.

10.    AutoZone, advised by Northern Trust, could easily have stopped the kickbacks by replacing the high-fee, chronically underperforming GoalMaker funds with the reliable, low-fee Vanguard index funds already in the Plan.  Year after year, Defendants retained the existing GoalMaker funds

and excluded the low-cost index funds from use by GoalMaker. From a fiduciary standpoint, GoalMaker, which Defendants touted as a model asset allocation service, was really a model of retirement plan mismanagement.

11.     AutoZone itself had concerns about GoalMaker and the fees and performance of the GoalMaker funds but received bad advice from Northern Trust. Northern Trust had a vested interest in promoting the high-fee, actively managed funds utilized by GoalMaker because Northern Trust was itself in the business of active management.

12.     Northern Trust's conflict of interest stemmed from its role as investment manager of the AutoZone pension plan's actively managed funds. Northern Trust received approximately $1 million in fees a year from the active management of the assets of the pension plan and had a serious conflict of interest in advising the Investment Committee on the use of actively managed funds for the 401(k) Plan. This conflict of interest was not disclosed to the participants in the Plan.

13.     Among the mistakes that AutoZone and Northern Trust made was the linking of the selection of investment options to the fees paid to Prudential.  AutoZone, as advised by Northern Trust, breached its fiduciary duty to select investments based on the merits of the individual investment options and to pay only reasonable investment management and administrative fees.

14.     AutoZone ultimately terminated Northern Trust as its investment advisor and replaced Northern Trust with Willis Towers Watson plc

6

("Willis Towers" or "WTW").  The Committee, advised by Willis Towers, de-
cided to replace GoalMaker with target date funds and to replace the high-fee
actively managed GoalMaker funds with a core lineup of low-cost passive in-
dex funds.  AutoZone severed the link between investment selection and ad-
ministrative expenses, which allowed AutoZone to reduce administrative fees
and to disclose the costs of administering the Plan in a transparent manner.
But, these changes were made only after this lawsuit was filed and after a sub-
stantial delay. In the more than six-year period leading up to the filing of this
lawsuit, the Plan and its participants suffered losses resulting from the mis-
management of their retirement savings in excess of $60 million.  These
losses have and will continue to accrue until the Plan and participants are
made whole by AutoZone and Northern Trust.

15.    Plaintiffs <u>are not</u> merely second-guessing Defendant's invest-
ment decisions <u>with the benefit of hindsight</u>. The information Defendants
needed to make informed and prudent decisions was readily available to them
when the decisions were made.

16.    This is not a case where fiduciary liability is really in question.
The Committee's meeting minutes show that the Committee knew that it had
made a mistake in the selection of the Plan's investment options and the man-
ner in which the Plan provided for the payment of administrative expenses.
The Committee chose to correct this mistake, to break the link between in-
vestment selection and the payment of administrative fees, because it was

better to own up to its mistakes than to continue wasting money on the payment of excessive fees.

## II.   THE PLAN AND THE PARTIES

### A.   The Plan

17.   The Plan is a defined contribution, individual account, employee benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).  The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a).

18.   The Plan provides for the retirement savings and income of employees of AutoZone.  The retirement savings and income of the employees participating in the Plan depend upon contributions made by or on behalf of each employee, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of the investment management fees and administrative expenses charged to the participants' individual accounts.

19.   Superficially, the Plan is structured as a self-directed plan in which participants choose investment options for their individual accounts from the Plan's investment menu. However, it was a Plan for which AutoZone and Northern Trust set the menu; participants were captive investors whose choices were limited to the investment options selected for them by AutoZone and Northern Trust.  Participants were, moreover, encouraged to utilize an

investment allocation service that placed their retirement savings in the most expensive and worst performing investment options.

### B.    The Parties

#### 1.    *The Plan Sponsor*

20.    Defendant AutoZone, a corporation based in Memphis, Tennessee, is the Plan Administrator under 29 U.S.C. § 1002 (16)(A)(i) and is a named fiduciary under the Plan and 29 U.S.C. § 1102(a).  As such, AutoZone has fiduciary responsibility for the Plan's investments and administrative expenses.

#### 2.    *The Investment Committee*

21.    Defendants Bill Giles, Brian Campbell, Steve Beussink, Michael Womack, Kevin Williams, Kristin Wright, and Rick Smith (the "Committee"), were fiduciaries to the Plan who served as members of the Plan's Retirement Committee. The members of the Committee were directly responsible for making fiduciary decisions regarding the management of the Plan and its investment options.  The activities of the members of the Committee were recorded in the Committee Meeting Minutes.

#### 3.    *The Fiduciary Investment Advisor*

22.    Defendants Northern Trust Corporation and Northern Trust Investments, Inc.  are headquartered in Chicago, Illinois.  Defendant Northern Trust Corporation is the parent company to its subsidiary, Northern Trust Investments, Inc. Collectively, they do business as "Northern Trust" and

9

"Northern Trust Asset Management," the Plan's ERISA 3(21) investment advisor and a fiduciary to the Plan.[4]  Northern Trust was responsible for providing the advice and making the recommendations on which the management of the Plan and its investment options depended. Specifically, the scope of Northern Trust's services included: (i) the design, evaluation and review of any investment policies, objectives, and guidelines; (ii) recommending and monitoring the performance and fees and expenses of the Plan's investment options; (iii) monitoring the Plan's service providers and their fees and compensation; (iv) review of the information provided by service providers; (v) review of the information provided to participants and the disclosures made to participants; (vi) providing quarterly reports on the Plan's fees and investments; and, (vii) advising the decisions made by the Investment Committee.

23.    Prior to filing this Amended Complaint, counsel for Plaintiffs served Northern Trust with a subpoena issued from this Court on December 4, 2020, and again on January 13, 2021, followed by a letter on January 20, 2021.  On January 22, 2021, counsel for Plaintiffs spoke with Cathleen Carlson, a representative of Northern Trust, who stated that Northern Trust would comply with the subpoena for production of documents. Despite numerous subsequent phone calls, Northern Trust never complied, and Plaintiffs sent a

---

[4] Reference is hereby made to Northern Trusts Investment, Inc.'s Form ADV, Part 2 dated June 4, 2020. Northern Trust Investments, Inc. is registered with the United States Securities and Exchange Commission as an investment advisor.

final letter on March 11, 2021.  The lack of compliance with the subpoena prejudiced the Plaintiffs' ability to ascertain the activities of more potentially responsible parties, so to the extent additional evidence arises reflecting the need to amend their Complaint again, Plaintiffs reserve their right to do so.

24.    Northern Trust was an ERISA 3(21) investment advisor, not an ERISA 3(38) investment manager. AutoZone retained and the Committee exercised the discretionary authority to make investment management decision. Thus, AutoZone is liable both for Northern Trust's breaches of fiduciary duty and for the decisions the Committee made based on Northern Trust's advice and recommendations.

### 4.    *Statutory "Parties-In-Interest"*

25.    Non-party Prudential Bank and Trust, FSB held the assets of the Plan as trustee, and its affiliate corporation, non-party Prudential Retirement Insurance and Annuity Company (collectively, "Prudential"), provided recordkeeping and other services. Under 29 U.S.C. § 1002(14), Prudential was a "party-in-interest" to the Plan, whose services and compensation AutoZone had a duty to monitor.

### 5.    *Plaintiffs and Standing*

26.    Plaintiff Nicole A. James resides in Billings, Montana.  She is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan. 29 U.S.C. § 1002(7).

27.    Plaintiff Michael J. Iannone, Jr. resides in Hope Hills, North Carolina.  He is a participant in the Plan because he and his beneficiaries are eligible to receive benefits under the Plan.  29 U.S.C. § 1002(7).

28.    During the Class Period, Plaintiffs James and Iannone both participated in AutoZone's "GoalMaker" asset allocation service.  GoalMaker allocated their retirement investments to the (i) stable value option; (ii) international, domestic small-cap, domestic large-cap, and domestic large-cap growth stock fund; and (iii) bond funds.

## III.   JURISDICTION AND VENUE

29.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

30.    This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where a defendant may be found.

## IV.   FIDUCIARY DUTIES

31.    Defendants AutoZone, the members of the Committee, and Northern Trust were fiduciaries to the Plan and the participants under ERISA.

## A.   Fundamental Fiduciary Principles

32.   The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (*citing* Restatement (Second) of Trusts § 2 cmt. b (1959)).

33.   ERISA's statutory standard of care encompasses the traditional fiduciary duties of prudence and loyalty.   *See, e.g., Pledger v. Reliance Trust Co.*, 240 F. Supp. 3d 1314, 1321 (N.D. Ga. 2017).   Under ERISA, a plan fiduciary must:

> discharge his duties . . . *solely* in the interest of the participants and beneficiaries and
>
> (A) for the *exclusive* purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104 (emphasis added).

34.   The fiduciary duties imposed by ERISA are "derived from the law of trusts" and "[i]n determining the contours of an ERISA's fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (internal citations omitted). In particular, the Supreme Court has instructed lower courts to look to the Restatement (Third) of Trusts

13

(Am. Law Inst. 2007), the Uniform Prudent Investor Act (1995) ("UPIA"), and

leading trust law treatises, among other authorities.  *Id.*

35.    The Uniform Prudent Investor Act summarizes a key aspect of fi-

duciary duty plainly,  "'Wasting beneficiaries' money is imprudent."  UPIA at

§ 7 cmt.

36.    In determining whether an ERISA fiduciary breached its duty of

prudence, courts focus on:

> whether the fiduciary engaged in a reasoned decision-making
> process, consistent with that of a prudent man acting in a like ca-
> pacity. . . . ERISA requires fiduciaries to employ appropriate
> methods to investigate the merits of the investment and to struc-
> ture the investment as well as to engage in a reasoned decision-
> making process, consistent with that of a prudent man acting in a
> like capacity.

*Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014) (inter-

nal punctuation and citation omitted).

### B.    Specific Fiduciary Duties

37.    **The duty of competence.**  A principal duty of an ERISA fiduciary

is to be competent.  *See* 29 U.S.C. § 1104 (a fiduciary shall discharge his duties

with "care, skill, prudence, and diligence").  "A trustee's lack of familiarity

with investments is no excuse: under an objective standard trustees are to be

judged according to the standards of others 'acting in a like capacity and fa-

miliar with such matters.'"  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)

(applying ERISA).  Where the trustee lacks the requisite knowledge and experience, the trustee may engage professional advisors.  *See, e.g.,* Restatement (Third) of Trusts § 90 cmt. d.

38.    **The duty of prudent delegation.** A trustee is not required personally to perform all aspects of the investment function but must not abdicate its responsibilities and must not delegate unreasonably. *See* Restatement (Third) of Trusts § 90  cmt. j.

> As in other matters of delegation, the trustee must not abuse the discretion to delegate. . . .  In deciding what as well as whether to delegate and in selecting, instructing, and supervising or monitoring agents, the trustee has a duty to the beneficiaries to act as a prudent investor would act under the circumstances. The trustee must exercise care, skill, and caution in establishing the scope and specific terms of any delegation, and must keep reasonably informed in order to monitor the execution of investment decisions or plans.

*Id.*

39.    Here, AutoZone engaged Northern Trust as a 3(21) ERISA fiduciary to provide investment advice and recommendations. AutoZone did not delegate responsibility to Northern Trust to manage the assets of the Plan under ERISA 3(38).  *AutoZone is and remains liable for any breach of fiduciary duty by Northern Trust.*

40.    **The continuing duty to monitor investments and to remove or replace imprudent investments.**  The United States Supreme Court held in *Tibble*: "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." 135 S.

15

Ct. at 1828. "The trustee must systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Id.* Thus, to discharge this duty, AutoZone, the Committee, and Northern Trust had to have a prudent process and method for selecting, monitoring and retaining prudent, cost-effective investments for the Plan, and for removing imprudent investments.

41.     Here, AutoZone relied heavily on the GoalMaker asset allocation service furnished by Prudential. Prudential, however, did not accept fiduciary responsibility, for among other things, providing complete and accurate information and accepting only reasonable compensation. The Committee, acting on the advice of Northern Trust, was responsible for monitoring the fees and investment performance of the GoalMaker funds to make sure that they were prudent and satisfied the needs of the Plan and its participants.

42.     **The duty to justify high-cost active management strategies.** The Plan was invested primarily in "actively managed" funds. Active managers try to identify and exploit market inefficiencies.[5] *See* Restatement (Third)

---

[5] In "efficient" markets, "available information is rapidly digested and reflected in the market prices of securities." *See* Restatement (Third) of Trusts § 90 General Note on Comments e through h. There is an academic debate as to how efficient certain markets really are. The Restatement takes no position on this. Trust law is concerned only with the practical question whether an asset classes consistently provides a reasonable opportunity for active mutual fund managers to generate excess returns over time. As a matter of procedural prudence, this can be evaluated by comparing the track records of the fund managers.

of Trusts § 90 cmt. h(2) (active management involves "searching for advantageous segments of a market, or for individual bargains in the form of underpriced securities."). Active managed funds try to beat the market. The search for potential market inefficiencies requires research and analysis, which increases investment management costs. *See id.*

43.     While prudent investment principles allow for active management strategies in appropriate circumstances, the additional risks and costs involved "must be justified by realistically evaluated return expectations." *Id.* Additionally, "[a] trustee's approach to investing must be reasonably supported in concept and must be implemented with proper care, skill and caution." Restatement (Third) of Trusts cmt. f. Thus, in deciding whether to pursue an active management strategy, a fiduciary should determine that "gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks." *Id.* at cmt. h(2). The burden is on the investment fiduciary to prove these things, not on the plan participant to disprove them. Controlling costs is a primary responsibility of an ERISA fiduciary, who has the burden of proving that higher costs are justified.

44.     In the context of an ERISA defined contribution plan, prudence requires a fiduciary to have a realistic expectation that an active management

strategy will generate net returns equal to or greater than reasonable alternatives, such as investing in low-cost index funds[6] (a "passive" strategy).[7]

45.    In sum, before deciding to pursue an active management strategy, especially one that seeks to find bargains in markets where active managers do not have a good track record, a prudent fiduciary must determine that:

a)    gains from the course of action in question can reasonably be expected to compensate for its additional costs and risks;

b)    the course of action to be undertaken is reasonable in terms of its economic rationale and its role within the trust portfolio; and

c)    there is a credible basis for concluding that the trustee – or the manager of a particular activity – possesses or has access to the competence necessary to carry out the program and, when delegation is involved, that its terms and supervision are appropriate.

Restatement (Third) of Trusts § 90 cmt. h(2).[8]

---

[6] An index fund is a portfolio of stocks or bonds designed to mimic the composition and performance of a financial market index (e.g. S&P 500). U.S. Sec. Exch. Comm'n, *Index Funds*, INTRODUCTION TO INVESTING, https://www.investor.gov/introduction-investing/investing-basics/investment-products/mutual-funds-and-exchange-traded-4 (last visited Sept. 18, 2020).

[7] A passive management strategy "aim[s] to maximize returns over the long run by not buying and selling securities very often.  In contrast, an actively managed fund often seeks to outperform a market (usually measured by some kind of index) by doing more frequent purchases and sales."  U.S. Sec. and Exch. Comm'n, *Investor Bulletin: Index Funds* (Aug. 6, 2018).

[8] The theoretical question of active versus passive strategies is not at issue here.  The question here is whether as a practical matter AutoZone and Northern Trust acted prudently by approving the high fees charged by actively managed funds in light of the expected returns of those funds. A prudent fiduciary will avoid actively managed investment that are not reasonably expected to generate incremental returns in excess of the

46.     Here, Defendants failed to perform the due diligence necessary to implement an actively managed strategy successfully. Defendants consistently bet on high-fee actively managed funds in asset classes where such funds were low percentage bets. When faced with overwhelming evidence that the funds chosen did not perform as expected, Northern Trust advised the Committee that it needed to consider factors other than the merits of the investments, including the payment of fees to Prudential.  By linking investment selection to factors unrelated to the prudence of the investments, Defendants breached their duties to the Plan and participants. As a result, the Plan not only wasted participants' retirement savings on high-cost, underperforming investments, but also caused the Plan to pay excessive fees to Prudential.

47.     **The duty to delegate to competent professionals.** Plan sponsors often hire investment advisors to advise them on investment strategy and to recommend mutual funds for the plan's investment menu.  Here, AutoZone hired Northern Trust, which in turn recommended GoalMaker and the GoalMaker mutual funds.  When a plan sponsor chooses to engage an advisor and pursue an active management strategy, the sponsor must determine "there is a credible basis for concluding that [the advisor] possesses or has

---

returns of the relevant market in amounts sufficient to cover the additional investment costs.

19

access to the competence necessary to carry out the program and, when del-
egation is involved, that its terms and supervision are appropriate." *Id*.

48.    Numerous studies have concluded that only a small number of ac-
tively managed funds are able to beat the market consistently.  *See* Restate-
ment (Third) of Trusts § 90 cmt. h(2).[9]("fiduciaries and other investors are
confronted with potent evidence that . . .  efforts to 'beat the market' . . . ordi-
narily promises little or no payoff, in fact, often a negative payoff").

49.    As S&P Global (formerly, Standard and Poor's) reports:

> [R]esearch tells us that relatively few active managers are able to out-
> perform passive managers over any given time period, either short-
> term or long-term. But the true measure of successful active manage-
> ment is whether a manager or strategy can deliver above-average re-
> turns consistently over multiple periods. Demonstrating the ability to
> outperform repeatedly is the only proven way to differentiate a man-
> ager's skill from luck. Through research published in our Persistence
> Scorecards, we show that relatively few funds can consistently stay at
> the top.[10]

Similarly, a comprehensive study published in the *Journal of Finance* sur-
veyed investment advisors having a 91% share of the U.S. consulting market
and found "no evidence" that the advisors' recommendations of funds added

---

[9]  The theoretical question of active versus passive strategies is not at issue here.  The
question here is whether as a practical matter AutoZone and Northern Trust acted pru-
dently by approving the high fees charged by actively managed funds in light of the ex-
pected returns of those funds. A prudent fiduciary will avoid actively managed invest-
ment that are not reasonably expected to generate incremental returns in excess of the
returns of the relevant market in amounts sufficient to cover the additional investment
costs.

[10]  S&P Dow Jones Indices, SPIVA Statistics & Reports (June 30, 2020),
https://www.spindices.com/spiva/#/reports/regions.

value, "suggesting that the search for winners, encouraged and guided by investment consultants, is fruitless."[11]

50.    While it may be prudent in certain limited circumstances for a plan sponsor to engage investment professionals to pursue an active management strategy, prudence requires the sponsor to determine that the professionals are competent to do so successfully. Retirement plans are not hedge funds that pool money from wealthy, sophisticated investors to pursue short-term, high-risk high-cost strategies.  Their purpose is to pool the retirement savings of everyday workers in cost-efficient, long-term investment vehicles. Before committing the life savings of workers to a high-cost, high-risk strategy, a prudent sponsor must at a minimum confirm that the Plan's investment advisor has a track record of choosing actively managed funds that justify their costs and outperform low-cost low risk alternatives.

51.    Here, AutoZone's reliance on Northern Trust was blind.  AutoZone never asked and Northern Trust never provided a track record demonstrating that Northern Trust had the ability to pick mutual funds that generated excess returns consistently.  Indeed, the actively managed funds in the

---

[11] Tim Jenkinson *et al.*, *Picking Winners? Investment Consultants' Recommendations of Fund Managers*, 71 The Journal of Finance 2333, 2333 (October 2016).  For the purpose of the Complaint, it matters only that picking winners is difficult (which is beyond dispute) and that AutoZone and Northern Trust were unable to execute such a strategy in a prudent manner for the 401(k) Plan.

designated asset classes consistently underperformed their benchmarks and low cost alternatives.

52.     The advice Northern Trust gave AutoZone, to select high-cost actively managed funds known to underperform index fund alternatives in the mostly efficient markets in which the Plan was invested, was incompetent. Further, Northern Trust's advice to link investment choice to the payment of revenue shares, under circumstances where Northern Trust had a financial interest in recommending the use of actively managed funds, was disloyal. The imprudent, conflicted advice Northern Trust gave resulted in the loss of tens of millions of dollars of participants' retirement savings.

53.     **The duty to defray reasonable administrative expenses.**  The day-to-day operation of an ERISA plan requires certain basic administrative functions, such as recordkeeping and accounting, and other discretionary services, such as customer service, online account management, and educational programs.[12]  The fees for these services, as well as the fees charged by investment advisors to the plan, are components of administrative expenses. ERISA specifically requires a plan sponsor to defray reasonable administration expenses.  *See* 29 U.S.C. § 1104(A)(ii).  The Uniform Prudent Investor Act provides, "[i]n investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable . . . ."  UPIA at § 7.    Thus, "[i]n

---

[12] *A Look at 401(k) Plan Fees, supra,* at 3.

devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." *Id*. at cmt.

54.    **The duty of loyalty.**   A fiduciary is obligated to act solely in the best interest of the plan and its participants. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142–43 (1985).  This includes the avoidance of conflicts of interest.  *Id*.;  *Deak v. Masets, Mates and Pilots Pension Plan*, 821 F.2d 572, 580 (11th Cir. 1987).

55.    Here, Northern Trust had a serious conflict of interest that was never properly addressed by AutoZone or disclosed to participants.  Northern Trust received more than $1 million in fees *annually* from actively managed funds held by the AutoZone defined benefit pension plan. Northern Trust had a vested interest in the pursuit of a high-cost actively managed strategy. Northern Trust, therefore, had a conflict of interest in advising the defined contribution 401(k) plan regarding the selection of low-cost index funds as alternatives to high-cost actively managed funds. Had Northern Trust given appropriate consideration to low cost index fund strategies for the 401(k) plan, it would have put the $1 million in fees it earned from actively managing the assets of the AutoZone pension plan at risk.

56.    **The duty to disclose information to participants.** Plan administrators have a duty to provide participants with material information respecting the plan, investment options and fees and expenses, on a regular basis.

The Eleventh Circuit held in *Jones v. American General Life and Accident Insurance Co.*, 370 F.3d 1065 (11th Cir. 2004) "that an ERISA participant has a right to accurate information, and that an ERISA administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty." *Id.* at 1072 (citation omitted).[13] Plan participants are due to be informed, for example, when investments do not meet the criteria of the plan's investment policy, when an investment is not accurately described in the investment menu, or when the benchmark chosen to measure the investment is wrong.

57.    Although there was no investment policy statement for the Plan, itself a breach of fiduciary duty (*see discussion infra*), there remained a duty to accurately disclose that investment returns fell below their benchmarks and that both Northern Trust and Prudential had conflicts of interest with respect to the GoalMaker funds in which the participants were encouraged to invest.

58.    Here, the disclosures Defendants made to participants regarding GoalMaker were misleading at best and fraudulent at worst. AutoZone touted GoalMaker as a roadmap to prudent investing when its true purpose was to

---

[13] *See also Brannen v. First Citizen Bankshares Inc. ESOP Plan*, No. 6:15-cv-30 (S.D. Ga. Aug. 26, 2016), at 20 ("Courts have concluded that ERISA plan participants may state a cause of action for breach of fiduciary duty based on a failure to disclose information to plan participants" though they are "reluctant to require disclosure in cases based on inside information."). Plaintiffs do not allege that AutoZone or Northern Trust withheld non-public, "inside," information. Rather, Plaintiffs allege AutoZone and Northern failed to disclose and, indeed, tried to cover up, the excessive fees being charged participants, as well as their own imprudent practices and methodology in administering the Plan.

funnel money to Prudential through the use of funds that paid excessive revenue share to Prudential and to exclude the use of prudent, low cost index fund alternatives. Defendants never properly investigated the GoalMaker allocations. Nor did Defendants benchmark the performance of the GoalMaker portfolios. While the use of asset allocation services such as GoalMaker, prudently implemented, can be beneficial, AutoZone and Northern Trust's implementation of GoalMaker was a disaster.

59.     Neither Prudential nor Northern Trust have responded to subpoenas requesting information on any commissions or other incentive payments that Prudential may have made to Northern Trust as a result of the use of Prudential services or products, which justifies an inference that they are withholding information damaging to their position.[14]

## III.   THE FIDUCIARY BREACHES

### A.     AutoZone Did Not Have A Prudent Investment Policy

60.     AutoZone, advised by Northern Trust, did not have, much less follow, a prudent process for administering the Plan and its investment options.

---

[14] As set forth below, Northern Trust received advisory fees from the Plan over the class period (in addition to the more than $6 million from the AutoZone pension plan) and Prudential received some $26 million in recordkeeping fees, investment management fees, and spread fees.  The information Northern Trust and Prudential are withholding was paid for by participants from their retirement savings. AutoZone itself has the authority to direct Northern Trust and Prudential to provide the information. Despite owing participants an ongoing duty to provide them with information relevant to the management of the Plan and its assets, the information has not been provided.  The withholding of this information, under these circumstances, is unwarranted.

61.   The Committee and Northern Trust were responsible for the creation and implementation of the Plan's investment policies.

62.   The foundation of a prudent fiduciary process in a well-run retirement plan is the adoption and implementation of written Investment Policy Statement ("IPS"). "[T]he term 'statement of investment policy' means a written statement that provides the fiduciaries who are responsible for plan investments with guidelines or general instructions concerning various types or categories of investment management decisions .... A statement of investment policy is distinguished from directions as to the purchase or sale of a specific investment at a specific time ...." 29 C.F.R. § 2509.94–2(2)

63.   Typically, an IPS outlines the roles of the parties involved with the plan investment process and details their investment responsibilities.  It also sets forth objective guidelines and criteria for measuring and monitoring the fees and performance of the Plan's investment options to verify that they satisfy the Plan's investment objectives.

64.   During Northern Trust's tenure, AutoZone did not have an investment policy statement.

65.   Although an ERISA plan is not *required* to have an IPS, it is generally considered a *best practice* to have one. "The maintenance by an employee benefit plan of a statement of investment policy designed to further the purposes of the plan and its funding policy is consistent with the fiduciary obligations set forth in ERISA § 404(a) (1)(A) and (B)...." 29 C.F.R. § 2509.94–2(2);

*see also Liss v. Smith*, 991 F. Supp. 278, 295-96 (S.D.N.Y. 1993) (failure to have IPS, under circumstances, was breach of fiduciary duty).

66.     It is extraordinary for a large, well-run plan not to have an IPS. In fact, the IPS is one of the plan documents the Department of Labor requests when it audits a retirement plan.

67.     Northern Trust's investment reports contemplated the use of an IPS.  If fact, the implementation of such an investment policy was Northern Trust's primary responsibility:

> Northern Trust will work with the client's plan fiduciary on a con-sultative basis with respect to asset/liability studies and assis-tance in development of an **investment policy statement.**  Once the statement has been approved by the plan fiduciary and North-ern Trust has been appointed as an investment manager, North-ern Trust would be responsible for the implementation of the in-vestment policy pursuant to an investment management agree-ment.

(*See, e.g.*, Northern Trust *First Quarter Performance Review* [AZ_000374] (emphasis added)).

68.     Northern Trust did not work with AutoZone to develop a state-ment of investment policy for the Plan.  In the absence of a discernable fee and investment performance criteria, it would have been very difficult to monitor or measure the performance of the Plan's investments. In the administration of $675 million of participants' retirement savings, AutoZone was flying blind.

69.     Significantly, the Committee and Northern Trust were required by the Committee's Charter to develop an investment policy statement for the

defined benefit pension plan, but were not required to develop an investment policy statement for the defined contribution 401(k) Plan.

70.    In 2015, AutoZone submitted requests for proposal from investment advisors other than Northern Trust. One of the prospective investment advisors warned AutoZone, several times, in writing of an "**Investment Policy Failure Concern**" and that its "**Process: [was] not driven by [an] IPS (Investment Policy Statement."** (AZ_005782; emphasis in original).

71.    Northern Trust ultimately was replaced with a new investment advisor, Towers Watson. AutoZone's contract with Towers Watson required Towers Watson to develop an investment policy statement for the Plan and to monitor the performance of investments for compliance with an IPS. Specifically, WTW's services agreement provides for, "**Strategic review and update of investment policy statements: Annually**" and "**Investment performance monitoring and measurement: Quarterly.**" (emphasis in original)

72.    At the March 21, 2019 Investment Committee meeting, Willis Towers explained the review process:

> . . .This review is typically part of a formal structure review WTW completes with its new clients, including an investment belief and governance survey for committee members to complete that helps set the foundation upon which plan sponsor and fiduciary investment objectives can be constructed for the ongoing monitoring and due diligence process

"**The committee elected to omit the investment belief and governance survey due to potential fiduciary risk exposure for individual members**, and requested that WTW present a framework for menu construction based upon

28

industry best practices as well as WTW's investment beliefs . . . ." (emphasis added).

## B.    The GoalMaker Scheme

73.    The default investment option for the Plan (the investment option chosen for participants who do not chose an allocation for themselves) was an asset allocation service furnished by Prudential, GoalMaker. It purported to allocate participants retirement savings to model portfolios based upon the participant's age (or expected retirement date) and risk tolerance (high, moderate, or low).

74.    During the class period, between a third and one-half of the Plan's investments were invested in GoalMaker portfolios. All but four of the Plan's investment options were GoalMaker funds.

75.    Prudential did not accept *any* fiduciary responsibility for the GoalMaker allocations. AutoZone, acting through the Committee, and Northern Trust were *fully* responsible as fiduciaries for both the GoalMaker allocations and the selection and monitoring of the funds in which the GoalMaker participants invested.

### 1.    AutoZone Touted the Benefits Of GoalMaker To Participants

76.    AutoZone's represented to participants in its standard form GoalMaker literature that "Your retirement plan offers GoalMaker®, an op-

tional easy-to-use asset allocation program that will invest your contribu-
tions in a portfolio that matches your investor style and years to retirement";
"It guides you to a model portfolio of investments available, then rebalances
your account quarterly to ensures your portfolio stays on target"; and,
"GoalMaker®'s ideal allocations are based on generally accepted financial the-
ories that take into account the historic returns of different asset classes."[15]

77.    The use of an asset allocation service can be of benefit to a partic-
ipant in selecting a portfolio from a plan's investment menu.[16] A retirement
investor with limited time or investment experience could benefit from the
use of such a resource if a prudent fiduciary monitors it and has a reasonable
basis for determining that the portfolios created by the asset allocation ser-
vice serve the participants' best interest. Regrettably, such was not the case
with the use of GoalMaker by AutoZone and Northern Trust.

78.    AutoZone represented to its employees that the GoalMaker asset
allocation service was based on objective, scientific models developed by the
investment research and management firm Morningstar. AutoZone's
GoalMaker literature states: "Morningstar uses a holistic, total wealth ap-

---

[15] *See* 2019 AutoZone 401(k) Plan Booklet: "AutoZone 401(k) Plan Highlights –
GoalMaker Allocations."

[16] *See* "Assessing the value of advice," Vanguard Research, September 2019 and
References to article, available at https://personal.vanguard.com/pdf/assessing-value-
advice.pdf

proach steeped in research that considers an investor's unique risk preferences and risk capacity to map an investor to the most appropriate overall stock and bond mix in weights represent the optimal combination of 'accumulation-orientated' characteristics vs. given the unique profile of the investor."[17]  Although AutoZone cloaked GoalMaker in Morningstar's credibility in recommending the service, Morningstar itself did not assume any responsibility for Prudential's GoalMaker service. Morningstar specifically disclaimed any responsibility for the review or approval of the information provided to the participants in the AutoZone Plan.[18]

79.    Participants enrolled in Prudential's GoalMaker service could not change the recommended allocations without being disenrolled in the service: "Making an allocation change, however, will cause you to no longer be enrolled in the GoalMaker program."[19]  Moreover, AutoZone made GoalMaker the Plan's default investment option, such that a substantial portion of participants' retirement savings were allocated by GoalMaker.

---

[17] *See* AutoZone Plan Booklet supra.

[18] *Id.*

[19] *Id.*

## 2.    *Why Expenses Matter*

80.    The actively managed funds AutoZone selected for GoalMaker charged higher fees than passively managed funds in the same asset classes.[20] These costs, particularly investment management fees, were significant.  As the Department of Labor reports, investment management fees are "by far the largest component" of all ERISA plan fees and expenses.[21]

81.    To determine whether the additional costs were justified, the Committee, relying on advice from Northern Trust, had to understand those costs.  The best tool for that is the "expense ratio" of the mutual funds.  Expense ratios are strong predictors of performance.

82.    The SEC requires mutual funds to disclose certain of the fund's fees and expenses, which are typically expressed as a percentage of assets known as an "expense ratio."  A mutual fund's annual expense ratio is calculated by dividing the fund's operating expenses by the average dollar value of its assets.  The SEC requires every mutual fund to disclose its expense ratio in a standardized format in the fund's prospectus.

83.    To manage operating expenses, a plan sponsor must understand and continually evaluate the plan's expenses, fees and service providers.  The Department of Labor advises:

---

[20] *See A Look at 401(k) Plan Fees*, supra, at 7.

[21] *See id.* at 2.

As the sponsor of a retirement plan . . . you, or someone you appoint, will be responsible for making important decisions about the plan's management. Your decisionmaking will include selecting plan investments or investment options and plan service providers. Many of your decisions will require you to understand and evaluate the costs to the plan. . . . Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable. . . . As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing.[22]

84.    The leading mutual fund investment research and services firm, Morningstar, emphasizes the effect of expenses on fund performance and advises investors to rely on expense ratios when choosing mutual funds:

If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision.  In every single time period and data point tested, low-cost funds beat high-cost funds. . . . Expense ratios are strong predictors of performance. . . . Investors should make expense ratios a primary test in fund selection.  They are still the most dependable predictor of performance.[23]

To be clear, the very same research firm that created GoalMaker strongly recommended making expense ratios *a primary test* in fund selection.

---

[22] U.S. Dep't of Labor, Emp. Benefits Sec. Admin., *Understanding Retirement Plan Fees and Expenses,* 1-2 (Dec. 2011).

[23] Russel Kinnel, *How Expense Ratios and Star Ratings Predict Success* (Aug.  9, 2010) (emphasis added), https://www.morningstar.com/articles/347327/how-expense-ratios-and-star-ratings-predict-success.

85.     One of the first things AutoZone did after terminating Northern Trust was to make expense ratios a primary factor in fund selection.  It abandoned the policy of requiring the use of high-fee actively managed funds and appropriately paid more attention to expense ratios.

### 3.     *The High-Fee GoalMaker Funds*

86.     AutoZone, which represented to participants that its investment allocations were based on Morningstar research, did not make expense ratios a primary test in fund selection.

87.     In fact, AutoZone not only *approved* the use of high-fee, actively managed funds for GoalMaker but mostly *excluded* the use of low-fee index funds and the fund for the GoalMaker portfolios did not include any low fee funds.

88.     During the Class Period AutoZone maintained an investment platform that contained a stable value fund, eight to ten mutual funds, three to four separate account funds, and a handful of index funds.[24]

89.     *Schedule A* annexed hereto identifies the funds selected by AutoZone and the broad market indices for each investment option.  Because indi-

---

[24] Separate accounts are generally commingled investment vehicles, similar to mutual funds, that aggregate assets from more than one investor to achieve economies of scale. These investment vehicles are made available through group annuity contracts issued by the insurance company to qualified retirement plans, like 401(k) or profit-sharing plans, and governmental plans.

ces do not charge fees and are not an "apples-to-apples" comparison, an appropriate low-cost index fund from Vanguard for the same index is included in the schedule, which can be used to benchmark the fees and performance of the AutoZone funds.[25]  The expense ratios of each fund, recognized by Morningstar as the single most important consideration in fund selection, are shown, which is the starting point for analyzing the prudence of AutoZone's fund selection process.

90.    **Figure 1** compares the expense ratios of Plan's GoalMaker funds and non-GoalMaker funds to their corresponding index fund alternatives:

---

[25] There is an important distinction between a market index and an index fund benchmark. A fund's market index is the index designated by the fund manager in the prospectus. But, market index returns do not include fees.  Index fund returns, though based on the performance of the same assets as the market index, do include fees. Accordingly, index funds, for the same market index as the fund (or one very similar) make an appropriate benchmark for the comparison and evaluation of a fund's returns net of fees. An investor cannot buy a market index, but can buy an index fund benchmark.

**Figure 1:**   Expense Ratios of GoalMaker and Non-GoalMaker Funds during Class Period (in percent)

| AutoZone Fund | ER (%) | Vang'd Benchmark | ER (%) |
|---|---|---|---|
| **GoalMaker:** | | | |
| *Prudential Stable Value:* | | | |
| Prudential GIC Autozone | - | - | - |
| | | | |
| *Prudential Separate Accounts:* | | | |
| Pru Jennison Growth Z | 0.91 | Vang'd Russell 1000 Growth Idx I | 0.06 |
| PIMCO Total Return | 0.41 | Vang'd Interim Term Corp Bond Idx Inst'l | 0.07 |
| Eagle Mid Cap Growth | 0.72 | Vang'd Mid-Cap Growth Idx Adm | 0.11 |
| QMA Mid Cap Value | 0.73 | Vang'd Mid-Cap Value Idx Inv | 0.15 |
| | | | |
| *Mutual Fund* | | | |
| Loomis Sayles Value Y | 0.72 | Vang'd Russell 1000 Value Idx | 0.08 |
| Delaware Value Fund Inst'l | 0.71 | Vang'd Russell 1000 Value Idx | 0.08 |
| Lord Abbett Fundamental Equity A | 0.69 | Vang'd Russell 1000 Value Idx | 0.05 |
| Baron Small Cap Fund Inst'l | 0.89 | Vang'd Small Cap Growth Idx Inst'l | 0.07 |
| Boston Partners Small Cap Value II Inst'l | 1.10 | Vang'd Russell 2000 Value Idx Inst'l | 0.06 |
| Target Small Cap Value | 0.68 | Vang'd Russell 2000 Value Idx Inst'l | 0.15 |
| American Europacific Growth R4 | 0.84 | Vang'd International Growth Adm | 0.33 |
| Nationwide Geneva MidCap Growth Inst'l | 0.78 | Vang'd Mid-Cap Growth Idx Adm | 0.07 |
| Wells Fargo Small Company Growth R6 | 0.90 | Vang'd Small Cap Growth Idx Inst'l | 0.06 |
| Loomis Sayles Core Plus Bond A | 0.79 | Vang'd Total Bond Market Idx Inst'l | 0.05 |
| Loomis Sayles Core Plus Bond N | 0.39 | Vang'd Total Bond Market Idx Inst'l | 0.03 |
| | | | |
| ***GoalMaker Funds Weighted Average*** | **0.79** | *Benchmark* | **0.10** |
| | | | |
| **Excluded from GoalMaker** | | | |
| | | | |
| *Idx Funds:* | | | |
| | | | |
| Vang'd Developed Markets Idx Adm | 0.08 | Vang'd Developed Markets Idx Adm | 0.08 |
| Vang'd Total Stock Market Idx Inst'l | 0.04 | Vang'd Total Stock Market Idx Fund Inst'l | 0.04 |
| Vang'd Total Bond Market Idx Inv | 0.15 | Vang'd Total Bond Market Idx Inv | 0.15 |
| Vang'd Total Bond Market Idx Adm | 0.05 | Vang'd Total Bond Market Idx Adm | 0.05 |
| | | | |
| ***Non-Goalmaker Funds Weighted Average*** | **0.05** | *Benchmark* | **0.05** |

91.    Each of the GoalMaker funds on the left-hand side in the Figure 1 and in *Schedule A* to the Appendix is a high-cost, actively managed fund.  Each of the Vanguard funds on the right-hand side of the chart is a low-cost index fund, for the corresponding index, that merely seeks to mirror the market.

The index, shown in Schedule A, establishes the appropriateness of the comparison.

### 3.    The Tilt Towards High-Fee Funds

92.    As shown in Figure 1, the average annual expense ratios[26] for the Plan's funds were *six times higher* than the average expense ratios for lower-cost Vanguard index funds invested in the very same asset classes ("Vanguard comparables").[27] This information was readily available to the Committee and Northern Trust at the time the decisions were made to select or, as the case may be, retain the funds.  Every mutual fund's expense ratio and designated broad market index is published at the front of its prospectus. Thus, the allegations made here are not based upon *hindsight.*

93.    The use of Vanguard comparables to estimate the cost of investing in a designated broad market index without incurring substantial additional fees is reasonable and appropriate.[28]

---

[26]  This refers to the asset weighted average of the expense ratios.

[27] A mutual fund's benchmark is an index, not a fund.  Index returns do not take fees and costs into account and are not directly investable.  Index *fund* returns, on the other hand, account for fees and other costs.  Thus, to gauge a mutual fund's performance net of fees, it is necessary to identify a comparable product, another mutual fund invested in the same or substantially the same assets.  Plaintiffs have chosen Vanguard index funds for this comparison. Vanguard funds often are used as comparables in ERISA cases. There are many reputable, competitively priced index fund providers but because Vanguard is the largest index fund provider, Vanguard products are readily available in the vast majority of the asset classes in which retirement plans invest.

[28]  *See* Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns,* 65 The Journal of Finance, 1915, 1942-43 (Oct. 2010).

94.     In fact, after terminating Northern Trust, AutoZone, belatedly, compared the performance of the GoalMaker funds to the performance of Vanguard target date funds, among other passively managed target date index funds.   Upon making this comparison, AutoZone decided to replace GoalMaker with passively managed Vanguard target date funds.[29] By that time, millions of dollars in plan participants' retirement savings already had been wasted.

95.     *Figure 1* above compares the average annual expense ratios (ER) over the Class Period of the Plan's funds to the average annual expense ratios of corresponding Vanguard index fund benchmarks over the same period for the same asset classes. The weighted average expense ratio of each fund over the class period is compared to the weighted average of the Vanguard fund alternative. The "bottom line" of *Figure 1* shows that the plan funds were six times more expensive than readily available low-cost alternatives from Vanguard.

96.     For example, the Plan's "Prudential Jennison Growth Z" separate account had an expense ratio of 0.91% and the corresponding index fund benchmark has an expense ratio of 0.06%, for a difference, or "excess" of

---

[29] To be more precise, like all target date funds, the Vanguard funds establish the glide path at the fund-of-funds level.  The underlying mutual funds in which the Vanguard target date funds invest are passively managed.

0.85% (this may also be reported in basis points (bps) – with 1 basis point equal to 1/100th of a percent).

97. Had Northern Trust and the Committee simply compared the expense ratios of the Plan's funds with the expense ratios of the Vanguard index fund benchmarks, it would have known that it could have invested in essentially the same underlying assets simply by choosing low-cost Vanguard index funds (or similar index funds) and thereby saved the Plan participants millions of dollars.

### 4. *The Failure To Benchmark GoalMaker Portfolios*

98. Until 2009, the AutoZone 401(k) Plan had target date funds. Like GoalMaker portfolios, target date funds are not invested in individual securities. They are asset allocation funds that invest in other equity and debt funds. As with GoalMaker portfolios, the balance of growth-oriented (equity) and conservative (fixed income) assets within the target date fund is determined by its "glide path" – the changing mix of equity and debt investments, that is designed to become less risky as the participant reaches retirement. The glide path is chosen according to the target retirement date of the investor and rebalances to become more conservative as the retirement date approaches.

99. GoalMaker was introduced by AutoZone and Northern Trust as a replacement for the Plan's target date funds in the 401(k) plan. They did not, however, monitor the performance of the GoalMaker portfolios to determine

whether they performed as expected.  Specifically, they failed to benchmark the GoalMaker portfolios, as necessary to compare the fees and performance of the GoalMaker portfolios and target date portfolios.

100.   In the March 19, 2015 Investment Committee meeting, "Mike [of AutoZone] asked, didn't AZ move from Target Date with Fidelity to GoalMaker (Pru)? Rick [NT]. confirmed yes. AZ has had GoalMaker since 2009." AutoZone then asked Northern Trust to compare the performance of the high-fee GoalMaker funds to the performance of target date funds, taking into account the difference between active and passive management. "Per Bill [AZ], Northern [Trust] needs to go back and conduct a *post-mortem* on all fund changes to determine how the changes worked out compared to the forecast."

101.   The need for a *post-mortem* evaluation of the performance of funds that had been in place for six years is clear evidence of the failure of AutoZone's fiduciary investment process.  AutoZone was entitled to contemporaneous advice from Northern Trust on whether the GoalMaker funds were performing in accordance with expectations.

102.   Northern Trust failed to provide the information AutoZone had to have to perform *ex-ante* review and monitoring of the GoalMaker portfolios. Northern Trust knew or should have known that by failing to provide this information it placed AutoZone in a position that it was not able to discharge its fiduciary duty to the Plan and the participants.

40

103.    The *post-mortem* label AutoZone itself gave to this process is apt. Although Prudential itself often pretended to provide AutoZone with objective, unbiased investment advice, Prudential itself did not accept fiduciary responsibility for the GoalMaker allocations, the reasonableness of their fees, or their investment performance. Prudential also did not provide the benchmarking information sufficient to compare the performance of the GoalMaker portfolios to the performance of equivalent target date funds. That was Northern Trust's duty, which it failed to discharge. AutoZone's *post-mortem* (decide-first-evaluate-later) process was the inevitable result.

### 5.    *The Correction*

104.    AutoZone retained the GoalMaker funds for the duration of Northern Trust's tenure as AutoZone's investment advisor.  Upon Northern Trust's termination, AutoZone again considered replacing the GoalMaker portfolios with target date funds.  AutoZone's new investment advisor, Willis Towers, pointed out that: "Prudential does not share fiduciary role; plan sponsor is responsible for the asset allocations." "Participants who choose GoalMaker are required to place 100% of assets into the fund." "No benchmark provided by Prudential and performance cannot be provided to participants via a 'fund fact sheet'."

105.    So advised, the Committee made the belated decision to replace the GoalMaker funds with low-cost target date index funds.

41

## B.    The Stable Value Fund: Spread Fees

106.    The Plan's most significant investment option was a proprietary stable value fund managed by Prudential, the Prudential Guaranteed Income Fund (the "GIC"). The fund was one of the GoalMaker funds and was the Plan's single largest investment with between $50 and $100 million, equal to 15 to 20 percent of the Plan's total assets.

107.    The amount of money invested in the fund was a direct result of the manner in which the Plan was structured and of AutoZone's use of GoalMaker. GoalMaker, which AutoZone approved, made available, and recommended to participants, allocated between 0% and 21% of aggressive portfolios to stable value, 7% to 35% of moderate portfolios, and 14% to 44% of conservative portfolios to the stable value fund, depending on the investor's years to retirement. Goalmaker, as described by Willis Towers, made **"Large allocations to Prudential's Guaranteed Income Fund, even at moderate risk levels with several years to retirement."**

108.    The Prudential Guaranteed Income Fund is a type of stable value fund. Stable value funds are fairly common in 401(k) plans. In most cases, stable value products make use of special contracts known as "GICs" or "wraps" that have their own risk and return characteristics.[30] Stable value

---

[30] "The key difference between a GIC and a wrap contract is that under a wrap contract the associated invested assets are usually owned outright by the plan in a synthetic GIC structure or segregated in the plan's name in an insurance separate account wrap." https://stablevalue.org/knowledge/faqs/question/what-are-gics-and-wraps

funds generally are not mutual funds and usually are structured as an insurance company general account, an insurance company separate account, or a synthetic account.  The differences between the different types of funds are critical from a fiduciary standpoint.

109.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides liquidity and principal protection, and (ii) similar to a bond fund in that it provides consistent returns over time.  It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund.  Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time.  This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value.  Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.[31]

---

[31] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at: http://www.finweb.com/investing

/stable-value-fund-vs-money-market-fund.html#axzz44EaLfQnQ

110.     There are several different types of stable value accounts in the 401(k) marketplace.  Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers"[32] and the fund owns the assets of the underlying funds.  Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are slightly riskier, because there is only one "wrap" provider.  As a result, they offer higher crediting rates.  General account products, such as the Prudential GIC, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently offer the highest rates.

111.     Following the high-profile failure of a number of stable value providers during the credit crisis of 2008 - 2009 the trend among fiduciaries is to avoid general account stable value funds, such as the Prudential stable value fund selected by AutoZone, because of credit risk concerns.

112.     The Prudential Guaranteed Income Fund is a general account product established pursuant to a contract between AutoZone and Prudential.  The investment funds were deposited by Prudential in its general account, which enabled Prudential to earn a "spread" representing by the difference between the crediting rate and the returns earned by Prudential from

---

[32] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relies on both the value of the associated assets and the financial backing of the wrap issuer.

general account funds. As Willis Towers observed, "Prudential does not dis-close fees for this strategy and instead may earn a return from any investment earnings on assets above the interest credited to investors."  The Prudential GIC also was subject to the single entity credit risk of Prudential, the issuer of the contract.  The crediting rate, set in advance by Prudential and reset from time to time in Prudential's sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. Thus, AutoZone had the opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hind-sight.

113.    As an ERISA fiduciary, AutoZone had an obligation to monitor the fees and performance of the Guaranteed Income Fund and to remove or re-place it where a substantially identical investment option can be obtained from the same provider at a lower cost.  *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to prod-ucts the trustee has already selected.").

### 1.    *Prudential's Excessive Spread Fees*

114.    AutoZone did not have a viable methodology for monitoring the costs or performance of the Prudential GIC.  Not only were comparable prod-ucts available from other providers with higher crediting rates, but *identical*

*or substantially identical* products were available to AutoZone from Pruden-
tial and other stable value providers with higher crediting rates and lower
spread fees.  In fact, the Prudential GIC consistently charged the AutoZone
employees 200 basis points more and returned 200 basis points less than the
*very same type of fund* offered by Prudential to other similarly situated re-
tirement plans.

115.    The difference in spread frees and crediting rates in this case is
tragic. The following chart compares the crediting rate (red) of the AutoZone
stable value fund to the crediting rate (blue) of the same general account
products offered by Prudential to other plans:

**Figure 2:**    Crediting Rates Net of Spread Fees 2012-2018 (as
percentage of stable value assets).



| Fund / Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|---|---|---|
| AutoZone GIC (in %) | 1.70 | 1.50 | 1.50 | 1.40 | 1.30 | 1.40 | 1.70 | 1.71 | 1.53 % |
| Identical GIC (in %) | 4.05 | 3.85 | 3.80 | 3.80 | 3.50 | 3.15 | 3.25 | 3.00 | 3.55 % |
| Excess Spread (in %) | -2.35 | -2.35 | -2.30 | -2.40 | -2.20 | -1.75 | -1.55 | -1.29 | -2.02 % |
| Loss Before Compounding (in $) | -1.36 | -1.47 | -1.69 | -1.98 | -1.94 | -1.72 | -1.73 | -1.44 | -13.32 million |

116.    Higher spread fees result in lower crediting rates. This difference, more than 2% per year on average, is the excess spread that AutoZone failed to monitor. Taking inflation into account, the difference in real dollar terms was even more pronounced, with real (net of inflation) returns for the Auto-Zone fund near zero.

117.    AutoZone did not have to scour the marketplace to find a better performing fund, it simply had to make an effort, which it failed to make, to determine whether the same fund was available at a lower cost.  Fact sheets showing the available rates of market rate Prudential funds and similar products from other providers were readily available had AutoZone exercised even a minimal amount of due diligence.

118.    This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $13 million of participants' retirement savings. This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid.  There is a crucial distinction in evaluating a stable value product's returns against

investment returns available elsewhere, from the standpoint of how a fiduci-
ary's choice is to be evaluated.  The product's performance over the life of the
product is guaranteed for a period at the outset. The plan fiduciary knows
prior to the date the product is selected what the returns will be six months
in advance.

119.   The plan fiduciary also knows that, because of the manner in
which crediting rates are calculated, the product is less sensitive to interest
rates than bond funds. Consequently, a stable value product that performs
well generally continues to perform well, in a stable manner. A stable value
product that performs poorly, such as the AutoZone product, generally con-
tinues to perform poorly, in a stable manner.

120.   A prudent fiduciary – that is, a fiduciary that monitors the invest-
ment, understands the pricing mechanism, and informs itself of the crediting
rates and spread fees available in the market – would have known that Pru-
dential's stable value product would underperform and that being a stable
value product it would continue to underperform in a stable manner.

121.   Northern Trust, the Plan's investment advisor, did not provide an
accurate accounting of the GIC fees. Northern Trust evaluated the rate level
fee of 25bps, a form of revenue sharing, concluding that the GIC fees were
10bps below the "Institutional Median." *See, e.g.,* 2015-2017 Northern Trust
Fourth Quarter Review. Northern Trust completely missed the spread fees,

which were as much as 200 bps in excess of the market rate for the Plan. Because of this, the information provided to AutoZone to monitor the GIC and to participants to make their fund choices was incomplete and misleading. This was grossly incompetent.

122.    The consequence of failing to monitor the cost of the stable value product was particularly significant in the case of the AutoZone plan. Prudential, the stable value provider, was also the investment platform provider and the supplier of the GoalMaker product, which Prudential applied in a self-dealing manner to steer Plan participants to Prudential products. General account stable value funds can be tremendously profitable for the issuing insurance company because of the spread. The excessive spread in this case resulted in a windfall to Prudential, whose compensation AutoZone and Northern Trust had a legal duty to monitor, but a duty AutoZone and Northern failed to discharge in spectacular fashion.

123.    On the basis of the excessive spread fees alone, the Prudential stable value fund was an imprudent investment which should have been removed from the Plan. Not only were participants charged excessive fees, but they also lost the opportunity to invest their money in asset classes that delivered higher returns. The $50 to $100 million in participants' retirement savings that GoalMaker allocated to the Prudential stable value fund during the class period would have been invested in funds with substantially higher returns in a plan that was prudently managed.

## 2.    *Failure to Submit RFP's*

124.    A plan with a $100 million stable value fund has considerable bargaining power in the marketplace.  There are any number of stable value products available to plans with a $100 million stable value fund that are simply not available to plans with funds of a smaller size.

125.    To take advantage of this bargaining power, AutoZone, through Northern Trust, should have submitted requests for proposal to stable value fund providers.  Products from any number of providers were available with better products, lower fees, and higher crediting rates.

126.    Other plans with stable value assets of this size have bid out their stable value funds and obtained better products.  For example, the Vision Service Plan, comparable to AutoZone, had bid out its Prudential general account stable value fund to obtain a superior product with higher crediting rates in the three percent range.  To obtain better rates, all that AutoZone had to do was ask.[33]

---

[33] Prior to filing this complaint, Plaintiffs issued a subpoena to Prudential requesting, among other documents, the crediting rates offered by Prudential in response to requests for proposals for stable value funds by other similarly situated plans. Prudential, despite having received millions of spread fees from this Plan, refused to comply with the subpoena, in violation of its obligation under Rule 34, Fed. R. Civ. P. Plaintiffs reserve the right to seek appropriate relief to remedy this contemptuous conduct.  A subpoena was issued to Vision Service Plan, which provided information showing that VSP, under similar circumstances, obtained substantially better crediting rates from Prudential through the request for proposal process.

127.    AutoZone did not make a regular practice of submitting requests for proposal for the stable value fund, or for that matter, recordkeeping and other services. In fact, in the August 9, 2016 Investment Committee Meeting, the participants acknowledged that AutoZone had not issued a request for proposal in five years, despite the fact that prudent plan sponsors submit requests for proposal at least every three years. Indeed, AutoZone did not issue a request for proposal until 2017.[34] Thus, AutoZone was not able to take advantage of better rates. Northern Trust, which advised AutoZone, should have known better.

### 3.    *Northern Trust Designated the Wrong Benchmark for the Stable Value Fund*

128.    One reason AutoZone and Northern Trust failed to recognize the underperformance of the stable value fund was that they were using the wrong benchmark to measure the performance of the fund.

129.    The benchmark Northern Trust designated to measure the performance of the stable value fund, the 90-Day T-Bill, was the wrong benchmark. It showed the stable value fund as outperforming its benchmark, when the fund was consistently underperforming appropriate benchmarks.

---

[34] When AutoZone did submit requests for proposal, AutoZone learned that it could reduce fees by a third or more. Regrettably, AutoZone did not obtain more favorably pricing for the stable value fund as part of this process. AutoZone has not provided the minutes of the subcommittee that considered the recordkeeping proposal. AutoZone eventually realized that it would need to restructure the Plan's investment menu and service provider payment mechanisms.

51

130.   The 90-Day T-Bill is an appropriate benchmark for a money market fund, which invests in short term securities with an average duration of approximately 60 days.  The money market funds for which the 90-Day T-Bill is appropriate are the retirement plan equivalent of checking accounts.

131.   Stable value funds, on the other hand, typically invest in securities with higher credit risk with an average duration of three to five years. The five-year constant duration treasury index, which Willis Towers used, is a more appropriate benchmark.  Better still is the Hueler index which is specific to stable value funds. Other appropriate benchmarks in this case are general account stable value funds offered to other similarly situated plans.

132.   Northern Trust, by designating the 90-day T-Bill, was covering up the below market crediting rates and excessive spread fees.  On any number of occasions, Northern Trust advised AutoZone that the Prudential GIC was performing in accordance with expectations. This advice was neither accurate nor competent.

133.   Upon Northern Trust's termination, Willis Towers immediately identified the Prudential GIC as an underperforming investment option.  Willis Towers benchmarked the performance of the Prudential GIC against a five-year constant maturity treasury index and determined that "[p]erformance [was] below peer median for 5-years through 2018."  To Plaintiff's knowledge, AutoZone has yet to issue a request for proposal for the stable value fund.

### 4.  *Failure to Diversify*

134.  The funds invested in the Prudential stable value account also were not adequately diversified.  The risk and return characteristic of the fund depended entirely on the creditworthiness and rates declared by a single entity, Prudential.

135.  ERISA § 1104(a)(1)(C) provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

136.  The Prudential stable value fund is not diversified.  The Prudential GIC is a contract, a piece of paper, subject to the single entity credit risk of Prudential, as the issuer of the contract.  The return of the investment depends on crediting rates set at the discretion of a single provider, Prudential.  The crediting rate, set by Prudential alone, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.

137.  Following the high-profile failure or near failure of a number of stable value providers during the credit crisis of 2008-9, the trend among fiduciaries in large plans is to avoid general account stable value funds because of credit risk concerns and to select more diversified stable value products.

138.  There may be circumstances under which it may clearly be prudent not to diversify the assets of a plan invested in a stable value fund, but this is not such a case.  Here, Prudential pocketed more than 200 basis points

in excess fees and failed to provide the rate of return that would ordinarily compensate for the Plan's failure to fully diversify its investments.

139.    Thus, the Prudential stable value fund was imprudent and should have been removed from the Plan.

## C.    Northern Trust's High-Fee Actively Managed Strategy

140.    The stable value fund was not the only high-fee, severely under-performing fund in the AutoZone Plan.  GoalMaker also shoveled assets into a series of high-fee, underperforming funds, to the exclusion of prudent, low cost index funds.  The GoalMaker funds included proprietary Prudential funds that paid investment management fees to Prudential, Prudential separate accounts that paid service fees to Prudential, and non-Prudential mutual funds that made revenue share payments to Prudential.  The additional fees charged by these funds were not justified by realistically evaluated return expectations.  Thus, the selection and retention of these funds was imprudent.  The process used by AutoZone and Northern Trust was imprudent because it did not rely on an honest evaluation of the merits of the funds themselves, but on the need to pay revenue share to Prudential.  This was a fee-driven, not an investment policy driven, fund selection process that was manifestly imprudent.

### 1.    *High Investment Management Fees*

141.    The single largest category of fees in AutoZone's case were investment management fees, whether the spread fees of the stable value fund

or the investment management fees of the mutual funds and sub-advised separate accounts.  In the case of mutual funds, the fees are disclosed as part of an investment's expense ratio.  The separate sub-accounts are insurance products structured much like a separate account stable value fund, where the insurance company owns the assets.  The fee structure for sub-account products is less transparent than for mutual funds.  Subaccounts also charge the equivalent of an investment management fee, plus additional wrap fees, contract charges, and the like. In AutoZone's case, the investment management fees were excessive compared to low-cost benchmark fund alternatives, as shown in Figure 3:

**Figure 3:** Investment Management Fees of AutoZone Funds and Benchmarks

| Plan Fund | Mgmt. Fee | Benchmark Fund | Mgmt. Fee |
|---|---|---|---|
| **GoalMaker** | | | |
| Prudential GIC Autozone✷ | 2.05% | GIC Comparables | - |
| | | | |
| _Prudential Separate Accounts:_ | | | |
| Pru Jennison Growth Z | 0.90 | Vanguard Russell 1000 Growth Index I | 0.06 |
| PIMCO Total Return | 0.41 | Vanguard Intermediate-Term Corp Bond Index Inst'l | 0.06 |
| Eagle Mid Cap Growth | 0.71 | Vanguard Mid-Cap Growth Index Adm | 0.07 |
| QMA Mid Cap Value | 0.71 | Vanguard Mid-Cap Value Index Inv | 0.18 |
| _Separate Account Weighted Average_ | **0.81** | | **0.07** |
| | | | |
| _Mutual Funds_ | | | |
| Loomis Sayles Value Class Y | 0.48 | Vangurd Russell 1000 Value Index | 0.05 |
| Delaware Value Inst'l | 0.49 | Vangurd Russell 1000 Value Index | 0.07 |
| Lord Abbett Fundamental Equity A | 0.57 | Vanguard Russell 1000 Value Index | 0.05 |
| Baron Small Cap Fund Institutional | 0.90 | Vanguard Small Cap Growth Index Inst'l | 0.05 |
| Boston Partners Small Cap Value II Inst'l | 1.05 | Vanguard Russell 2000 Value Index Inst'l | 0.05 |
| Target Small Cap Value | 0.49 | Vanguard Russell 2000 Value Index Inst'l | 0.01 |
| American Europacific Growth R4 | 0.50 | Vanguard International Growth Adm | 0.31 |
| Nationwide Geneva MidCap Growth Inst'l | 0.83 | Vanguard Mid-Cap Growth Index Adm | 0.07 |
| Wells Fargo Small Company Growth R6 | 0.90 | Vanguard Small Cap Growth Index Inst'l | 0.05 |
| Loomis Sayles Core Plus Bond A | 0.38 | Vanguard Total Bond Market Index Inst'l | 0.03 |
| Loomis Sayles Core Plus Bond N | 0.39 | Vanguard Total Bond Market Index Inst'l | 0.03 |
| _Mutual Fund Weighted Average_ | **0.57** | | **0.12** |
| | | | |
| **Excluded from GoalMaker** | | | |
| _Index Funds:_ | | | |
| | | | |
| Vanguard Developed Markets Index Adm | 0.08 | Vanguard Developed Markets Index Adm | 0.06 |
| Vanguard Total Stock Market Index Inst'l | 0.04 | Vanguard Total Stock Market Index Inst'l | 0.03 |
| Vanguard Total Bond Market Index Inv | 0.15 | Vanguard Total Bond Market Index Inv | 0.17 |
| Vanguard Total Bond Market Index Adm | 0.06 | Vanguard Total Bond Market Index Adm | 0.04 |
| _Weighted Average_ | **0.05** | | **0.05** |

✷ This includes the spread and rate level fees.

142.    Even putting the stable value fund aside, it is clear that the cost of the GoalMaker funds were substantially more expensive (often by a factor of _10 or more_) than readily available low-cost index funds in the same asset classes.  In AutoZone's case, these fees were wasted because AutoZone did not have a viable process for monitoring them. There was no performance-

based justification or other reason for AutoZone to waste plan participants' retirement savings on these additional fees.

### 2.     *Transaction Costs: Hidden Fees*

143.   The GoalMaker funds were expensive not only because of the investment management fees but also because of transaction costs, which AutoZone did not have a viable methodology to monitor.

144.    Transaction costs result from the purchase and sale of investments such as stocks and bonds by mutual fund companies.  These costs are not included in a fund's expense ratio; however, the SEC requires a fund to disclose its brokerage fees and "turnover ratio," a measure of how frequently a fund's assets are bought and sold.  The GoalMaker funds' average transaction costs were in the range of 80-95 bps per 100% of fund turnover,[26] which is material to the fund's performance.

145.   AutoZone warned employees that, "Excessive trading can harm a fund's performance and the retirement security of long-term investors. Mutual fund companies and other providers of retirement investment products

---

[26]  Roger Edelen, Richard Evans, and Gregory Kadlec, "Shedding Light on 'Invisible' Costs: Trading Costs and Mutual Fund performance," Financial Analyst Journal 68:1 (CFA Institute 2013); see also Mark M. Carhart, "On Persistence in Mutual Fund Performance," The Journal of Finance (March 1997) (estimating 95 basis points costs per 100% of turnover); Busse, Jeffrey A. and Chordia, Tarun and Jiang, Lei and Tang, Yuehua, "Transaction Costs, Portfolio Characteristics, and Mutual Fund Performance," (October 13, 2019), Management Science, 67(2). No competent investment professional would dispute that funds with higher turnover ratios generate more transaction costs. Estimates vary based on the time period in question and the type of fund.

have rules prohibiting this practice in order to protect the interests of all investors." AutoZone's investment platform provider, Prudential, represented that it had taken steps to control trading costs, stating, "The Excessive Trading Monitoring Program is part of Prudential's ongoing commitment to help all our investors grow and protect their wealth. The program is designed to identify participants who are engaging in excessive trading of one plan investment for another plan investment and to stop such trading. Visit www.prudential.com/online/retirement for more information."

146.    This representation was false.  The funds selected by GoalMaker had high turnover ratios and high trading and market impact costs. The funds GoalMaker excluded had low trading costs.  The following chart demonstrates the difference in the turnover ratio of the high cost GoalMaker funds and the low-cost funds excluded from GoalMaker:

**Figure 4:**   Turnover Ratios of AutoZone Funds

| Plan Fund | Turnover | Benchmark | Turnover |
|---|---|---|---|
| **GoalMaker:** | | | |
| *Prudential Stable Value:* | | | |
| Prudential GIC Autozone | | - | |
| | | | |
| *Prudential Separate Accounts:* | | | |
| Pru Jennison Growth Z | 40 | Vanguard Russell 1000 Growth Index I | 20 |
| PIMCO Total Return | 728 | Vanguard Intermediate Term Corporate Bond In | 65 |
| Eagle Mid Cap Growth | 44 | Vanguard Mid-Cap Growth Index Adm | 31 |
| QMA Mid Cap Value | 78 | Vanguard Mid-Cap Value Index Inv | 25 |
| | | | |
| *Mutual Fund* | | | |
| Pru Jennison Growth A | 40 | Vanguard Russell 1000 Growth Index I | 20 |
| Loomis Sayles Value Class Y | 27 | Vangurd Russell 1000 Value Index | 19 |
| Delaware Value Fund Institutional Class | 20 | Vangurd Russell 1000 Value Index | 19 |
| Lord Abbett Fundamental Equity Fund Class A | 92 | Vanguard Russell 1000 Value Index | 19 |
| Baron Small Cap Fund Institutional | 29 | Vanguard Small Cap Growth Index Fund Inst'l | 30 |
| Boston Partners Small Cap Value II Inst'l | 40 | Vanguard Russell 2000 Value Index Fund  Inst'l | 23 |
| Target Small Cap Value | 70 | Vanguard Russell 2000 Value Index Fund  Inst'l | 37 |
| American Europacific Growth R4 Fund | 35 | Vanguard International Growth Adm | 24 |
| Nationwide Geneva MidCap Growth Fund Inst'l | 14 | Vanguard Mid-Cap Growth Index Adm | 31 |
| Wells Fargo Small Company Growth R6 | 54 | Vanguard Small Cap Growth Index Fund Inst'l | 30 |
| Loomis Sayles Core Plus Bond Class A | 181 | Vanguard Total Bond Market Index Fund Inst'l | 71 |
| Loomis Sayles Core Plus Bond Class N | 181 | Vanguard Total Bond Market Index Fund Inst'l | 71 |
| | | | |
| **Excluded from GoalMaker** | | | |
| *Index Funds:* | | | |
| Vanguard Developed Markets Index Adm | 3 | Vanguard Developed Markets Index Adm | 3 |
| Vanguard Total Stock Market Index Fund Inst'l | 3 | Vanguard Total Stock Market Index Fund Inst'l | 3 |
| Vanguard Total Bond Market Index Inv | 71 | Vanguard Total Bond Market Index Inv | 71 |
| Vanguard Total Bond Market Index Adm | 71 | Vanguard Total Bond Market Index Adm | 71 |

147.   The GoalMaker funds had substantially higher trading costs than both non-GoalMaker funds and index fund alternatives.  The cost impact of this turnover is difficult to evaluate without more information, but it is clear AutoZone did not heed its own warnings about the effects of excessive trading, and the impact on participants and their retirement savings was material.  Equity funds, for example, can suffer as much as 70bps of additional trading and market impact costs per 100% of annual turnover, depending on the type of fund.  Debt funds tend to have a higher turnover, because bonds must be replaced as they mature, but the impact of high turnover is significant here as well.

148.    By way of example, the equity fund with the highest turnover cost on the AutoZone investment menu is the Prudential QMA Mid-Cap Value fund, a sub-advised Prudential separate account. The fund has an average turnover ratio of 78%, which is high for a value fund.  The fund research firm Morningstar criticized the fund's approach because of the additional costs generated by the high turnover.[35] The fund's performance did not justify these additional costs, as the fund  consistently underperformed both broad market indices and low-cost index fund benchmarks.

### 3.    *The Fees Chasing Excess Returns*

149.    In AutoZone's case, there is no question that the additional costs AutoZone incurred, often more than 10 times the costs of the index fund approach, were substantial.

150.    The difference between the money that AutoZone spent on investment management fees on these funds compared to the amount AutoZone would have spent had AutoZone merely chosen a low-fee index fund alternative, invested in the same asset class, is shown in the following chart:

---

[35] *See* Morningstar Analyst Report, June 26, 2019, Linda Abu Mushrefova, "PGIM Mid-Cap QMA Value:  An undifferentiated, high-turnover, quant-driven approach aimed at uncovering attractively valued stocks."  The report characterizes the commission cost from the high-turnover approach as excessive.

**Figure 5:**   Fees Chasing Excess Returns.



| Fees: | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|
| Plan | 3.3 | 3.5 | 4.0 | 4.4 | 4.9 | 4.6 | 4.6 | 29.3 |
| Benchmark | 0.4 | 0.4 | 0.4 | 0.4 | 0.5 | 0.4 | 0.5 | 3.0 |
| Excess | -2.9 | -3.1 | -3.6 | -4 | -4.4 | -4.2 | -4.1 | -26.3 |

151.   AutoZone wasted a substantial amount of plan participants' re-
tirement savings, $26.2 million (before compounding), chasing excess re-
turns. AutoZone had a fiduciary duty to determine whether these substantial
additional costs were in fact justified by realistically evaluated return expec-
tations.

### 4.    *Active Management Was A Risky Bet In The Designated Asset Classes*

152.    While it is not imprudent *per se* to pursue an active management investment strategy, the clear consensus is that active management is a low percentage bet in domestic U.S. markets and the markets of developed foreign countries.[36]

153.    There are systemic reasons why some markets are suitable for active management and others are not.  Active management relies on exploiting market inefficiencies (*e.g.*, identifying an undervalued stock), but many of the major capital markets in which mutual funds invest are highly efficient. In these asset classes, there are few, if any, inefficiencies to exploit. As explained in the Restatement:

> Economic evidence shows that, from a typical investment perspective, the major capital markets of this country are highly efficient, in the sense that available information is rapidly digested and reflected in the market prices of securities. . . .  Empirical research supporting the theory of efficient markets reveals that in such markets skilled professionals have rarely been able to identify underpriced securities (that is, to outguess the market with respect to future return) with any regularity.  In fact, evidence shows that there is little correlation between fund managers' earlier successes and their ability to produce above-market returns in subsequent periods.

Restatement (Third) of Trusts § 90 General Note on Comments e through h.

---

[36] *See* Mark M. Carhart (1997), *On Persistence in Mutual Fund Performance*, The Journal of Finance, Vol. 52, No. 1. (Mar., 1997), pp. 57-82.

Readily available empirical data demonstrates that, over time and across market sectors, the majority of actively managed funds consistently fail to outperform the market.

154.    The markets in which AutoZone / Northern Trust peer groups invested were markets in which active management were a low percentage bet. Requiring the use of actively managed funds on the assumption that funds competitive within their peer groups would outperform the market was imprudent.

155.    S&P Global research shows that, as of June 30, 2020, 63% of actively managed U.S. large-cap funds underperformed the S&P 500 index annually, 71% underperformed on a three-year basis and 78% underperformed on a five-year basis.[37]  Those numbers reflect fund performance on an aggregated basis; the results for individual funds in these peer groups are worse. S&P Global reports that of the top half of domestic equity funds in 2015, only 3.84% maintained that status annually through 2019, significantly below what random chance would predict.  Of the top quarter of those funds in 2015, a mere 0.18% maintained that performance over the next four years, again below random chance.[38]

---

[37] SPIVA, *supra*, at https://www.spindices.com/spiva/#/reports/regions.

[38] *Id.* (at Persistence Scorecard tab).

156.    S&P Global data (*see* **Schedule B-1 and B-2)** also shows that, both before and during the class period, actively managed funds in the peer groups designated by AutoZone and Northern Trust consistently underperformed their own chosen benchmarks.[39]   *Schedule B-2* compares, year by year, the performance of actively managed funds to their passively managed counter-parts (represented by the index). *Schedule B-1* shows the performance over one-to-fifteen-year periods as of December 31, 2019.[40]   As is readily apparent from *Schedules B-1* and *B-2*, while some active fund managers in some asset classes and peer groups outperform their benchmarks sometimes, the large majority fail (*see Schedule B-2*, "Percentage Underperforming" column).   Re-markably few funds in these peer groups are consistently successful in beat-ing the market *net of fees*.

157.    For example, in the Mid-Cap Value asset class, 97% of the average actively, managed funds underperformed the benchmark index and index fund alternatives over a 15-year period. To generate excess returns, a fund would need to be in the top 3%.   This was not true of the GoalMaker funds. Thus the mid-cap funds that AutoZone invested in lost money by comparison to index funds.

---

[39] Mutual funds are regulated by SEC, which requires mutual funds to designate a broad market index against which the fund's performance may be measured.   An index so designated by a mutual fund is commonly referred to as the fund's "benchmark" or "benchmark index."

[40] The data shown in *Schedules B-1* and *B-2* covers the years during class period and, in the case of the 10-Yr and 15-Yr data, the years leading up to the class period.

158.   This resulted in the comment at the September 11, 2015 invest-ment Committee meeting, "Active Management is not working for Mid or Large Cap (pages 32 and 33)," and a discussion about active and passive man-agement. Regrettably, Northern Trust which received substantial investment management fees from the actively managed funds in the pension plan tried to focus the Committee's attention on considerations other than the prudence of the investment options.

159.   One of the first things AutoZone did after terminating Northern Trust was to replace the line-up of high-fee actively managed funds with low-cost passively managed index funds. This is a clear admission that AutoZone knew that spending money on active managers chasing excess returns was a mistake.  It was many years late in coming to this conclusion, due in part to the conflicted advice given by Northern Trust.

### 5.    *The GoalMaker Funds Consistently and Severely Underperformed*

160.   There are actively managed funds with substantial additional costs that can be justified by realistically evaluated return expectations.  In

these cases, the substantial additional costs must be justified by above-market returns that cover or exceed the additional costs[41]—that is, the fund's returns net of fees must be greater than the returns of the index and low-cost index fund benchmarks.

161.    It is exceedingly difficult to distinguish the managers that actually have the skill to beat the market net of costs from the ones that are merely lucky.[42] As Warren Buffet observed in a 2014 letter to shareholders, "There are a few investment managers, of course, who are very good – though in the short run, it's difficult to determine whether a great record is due to luck or talent.  Most advisors, however, are far better at generating high fees than they are at generating high returns. In truth, their core competence is salesmanship."[43]

162.    AutoZone was not up to the task of implementing a high-cost, high-risk investment strategy. ERISA's prudent investor standard required

---

[41] *See, e.g.,* Ken Kam, "Top 3 Funds that Beat Their Benchmarks the Most Over a Decade," Forbes (Jul 5, 2019) (evaluating the past performance of various S&P mutual funds that (by luck or skill) out-performed benchmarks indices and index funds after all fees).  No opinion is expressed whether the manager of any funds achieved these returns as the result of luck or skill.

[42] Eugene F. Fama and Kenneth R. French, "Luck versus Skill in Mutual Fund Returns," The Journal of Finance 1933 (October 2010) ("This suggests that buried in the results are fund managers with more than enough skill to cover costs, and the lucky among them pull up the extreme right tail of the net return $t(\alpha)$ estimates. Unfortunately, these good funds are indistinguishable from the lucky bad funds that land in the top percentiles of the $t(\alpha)$ estimates but have negative true $\alpha$.").  Fama received the 2013 Nobel Prize in Economics.

[43] Warren Buffett, 2014 - Berkshire Hathaway Shareholder Letter, p.19.

AutoZone to have a prudent methodology for ensuring participants' money was spent wisely – that is, AutoZone had to demonstrate that the Plan and the participants would be compensated for the additional costs by a justifiable expectation of additional returns – net of fees – over what participants could have earned simply by investing in low-cost index funds.

163.   The following chart tracks the underperformance of AutoZone's high-cost funds relative to the performance of low-cost Vanguard index funds:

**Figure 6:**   Relative Asset-Weighted Returns of AutoZone Funds and Vanguard Benchmark through Dec. 31, 2019 (in basis points)[44]

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **GoalMaker** | | | | | | | | |
| Prudential Stable Value | -345.08 | -152.02 | 22.52 | -134.39 | -225.9 | 84.7 | -361.78 | -241.28 |
| *Prudential Separate Accounts* | | | | | | | | |
| Pru Jennison Growth Z | 36.2 | -36.88 | 82.13 | -142.77 | 94.46 | 5.6 | -58.49 | 295.09 |
| PIMCO Total Return | -5.07 | -32.11 | -4.26 | 0 | 0 | 0 | 0 | 0 |
| Eagle Mid Cap Growth | 0 | 0 | 0 | -0.03 | 8.94 | -1.17 | 0.96 | 9.59 |
| QMA Mid Cap Value | -0.04 | 1.05 | -3.7 | 5.1 | -4.29 | -6.86 | -5.36 | -6.26 |
| *Mutual Funds* | | | | | | | | |
| Loomis Sayles Value Class Y | 27.46 | -26.71 | -4.82 | 0 | 0 | 0 | 0 | 0 |
| Delaware Value Fund Int'l Class | 0 | 0 | 0 | -31.8 | 0.38 | 74.77 | -85.16 | -34.23 |
| Lord Abbett Fundamental Equity Class A | 35.91 | -57.99 | 0 | 0 | 0 | 0 | 0 | 0 |
| Baron Small Cap Fund Inst'l | -0.74 | -19.1 | -20.78 | -3.29 | 0 | 0 | 0 | 0 |
| Boston Partners Small Cap Value II Inst'l Class | 0 | 0 | 0 | 6.52 | -12.6 | -24.5 | 28.32 | -23.9 |
| Target Small Cap Value Fund | 6.88 | 9.76 | 2.58 | 0 | 0 | 0 | 0 | 0 |
| American Europacific Growth R4 | -41.27 | 41.2 | -4.00 | -16.33 | -169.61 | -38.84 | -61.96 | -492.59 |
| Nationwide Geneva MidCap Growth Inst'l | -0.9 | -6.58 | 3.43 | 0 | 0 | 0 | 0 | 0 |
| Wells Fargo Small Company Growth R6 | 0 | 0 | 0 | 0 | -9.45 | 15.96 | -47.78 | -49.35 |
| Loomis Sayles Core Plus Bond Class A | 0 | 0 | 0 | 47.91 | 0 | 0 | 0 | 0 |
| Loomis Sayles Core Plus Bond Class N | 0 | 0 | 0 | 0 | 18.67 | -5.35 | 3.21 | 30.96 |
| **Excluded from GoalMaker** | | | | | | | | |
| *Index Funds:* | | | | | | | | |
| Vanguard Developed Markets Index Admiral | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vanguard Total Stock Market Index Inst'l | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vanguard Total Bond Market Index | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Portfolio Return** | -286.64 | -279.39 | 73.1 | -269.08 | -299.38 | 104.31 | -588.07 | -511.98 |

164.   A fiduciary with a prudent process would have had an investment policy statement that established the criteria for evaluating the performance of the funds against their respective benchmarks.   Using this criteron, the

---

[44] The returns shown are asset-weighted, with weights corresponding to year end values shown on the Plan's form 5500 reports filed with the Department of Labor. The performance of the Prudential GIC is benchmarked against VBAIX, to reflect the fact that a prudent fiduciary would not have made the same allocations as GoalMaker.

Plan would have been able to determine whether the additional costs of the actively managed funds were justified by a reasonable expectation of additional returns.   Here, they clearly were not.   The performance of the GoalMaker funds, net of fees, was consistently negative.  In a well-managed plan, these funds would have been identified and removed for failure to satisfy the performance criteria of the investment policy statement.

165.   While AutoZone did not have a well-defined investment policy, the Committee was, nonetheless, aware that the funds were not performing in accordance with the Committee's expectations.  The notes of the May 19, 2015 meeting state, "Per Bill [of AutoZone], whether you look at 3 months or 3 years, the equities are all under-performing the index, correct? Rick [of Northern Trust] confirmed."

166.   AutoZone also received complaints from participants about the performance of the GoalMaker funds. At the May 3, 2016 meeting, "Brian [of AutoZone] stated that he gets comments from AutoZoners across the building who do not feel the NT funds are performing as well as other household names. He then posed the question, does NT feel they are meeting their fiduciary responsibilities? Tracey [of NT] stated, yes we are."

167.   It should have been clear to Northern Trust and AutoZone that the cost of the GoalMaker funds was not justified by a reasonable expectation of excess returns. The funds should have been removed from the investment menu.

6.  *A Prudent Fiduciary Would Have Replaced The High-Cost Actively Managed Funds With Index Funds*

168.   Under these circumstances, a prudent plan sponsor would have given careful *and timely* consideration to replacing the actively managed funds with index funds. [45] The logic is simple: when the funds in your plan are six times the cost of index funds and you cannot beat the market, you are better off buying into it. This results in lower fees *and* better performance.

169.   While expense ratios are not the only consideration a plan sponsor may take into account when making investment decisions, a prudent plan sponsor would have considered index funds in asset classes where the track record of index funds is superior to the track record of actively managed funds.  Plan sponsors are not required to select index funds but must consider index funds in determining the style of management that is appropriate for each of the investment options.

170.   Index funds allow investment in efficient broad markets without incurring unnecessary fees.  According to Morningstar research, in 2019 the asset-weighted average expense ratio for actively managed U.S. mutual funds

---

[45] Assuming arguendo that a prudent plan sponsor would have picked these funds to begin with.

was 0.66%, while the asset-weighted average expense ratio for passive funds was one-fifth of that, 0.13%.[46]

171.    The index fund approach to investing and controlling costs is fundamentally sound from a trust law perspective.  *See* Restatement (Third) of Trusts § 90 Reporter's General Note on Comments e through h (research supports the use of passive strategies such as index funds); *see also id.* at cmt. H(1) ("Investing in index funds that track major stock exchanges or widely published listings of publicly traded stocks is illustrative of an essentially passive but practical investment alternative to be considered by trustees seeking to include corporate equity in their portfolios.").

172.    Consideration of index funds is particularly appropriate in markets where active managers have greater difficulty in generating excess returns. Thus, the Restatement notes, "[c]urrent assessments of the degree of efficiency support the adoption of various forms of passive strategies by trustees, such as reliance on index funds." *Id.*

173.    Some investors are able to execute an active strategy successfully on a consistent basis.  Most are better off investing in safe, low-cost index funds as opposed to high-cost actively managed funds chasing excess returns. As Warren Buffet explained in a 2014 letter to shareholders, there are simply too many ways for investors, institutional and individual alike, to go wrong,

---

[46] Morningstar Manager Research, *2019 U.S. Fund Fee Study*, 1 (June 2020), https://www.morningstar.com/lp/annual-us-fund-fee-study.

"The commission of the investment sins listed above is not limited to 'the little guy.' Huge institutional investors, viewed as a group, have long underperformed the unsophisticated index-fund investor who simply sits tight for decades. A major reason has been fees: Many institutions pay substantial sums to consultants who, in turn, recommend high-fee managers. And that is a fool's game."[47]

174.    Here, the Committee and Northern Trust should have known better than to play the fool's game. NT pension fund's actively managed strategy was failing. As far back as May 19, 2015, the Committee recognized that "**Active Management is not working for Mid or Large Cap** (pages 32 and 33). NT is in the final stages of finalizing changes to these funds which should lead to lower investment management fees – new strategies. **Per Bill, whether you look at 3 months or 3 years, the equities are all underperforming the index, correct? Rick confirmed.**" (emphasis added).[48]

175.    The Committee and Northern Trust also were aware of the need to consider low-cost index funds as an alternative to the high-cost GoalMaker funds. The Committee itself clearly and directly expressed concerns that it would be appropriate to replace actively managed funds with index fund al-

---

[47] Warren Buffet, *2014 - Berkshire Hathaway Shareholder Letter*, p.19.

[48] Interestingly, this portion of the document was redacted in AutoZone's initial production on the grounds that it was "non-responsive."

ternatives. The minutes of the May 19, 2015 meeting state "Bill Giles [of Auto-
Zone] tasked Brian Campbell and Matt/Pamela/Benefits to review passive vs.
active and bring findings/recommendations to the IC in a separate or subse-
quent meeting."

176. A prudent investment advisor would have done precisely what its
client asked – to perform a thorough and comprehensive analysis of
GoalMaker fund and low-cost index fund alternatives.  Northern Trust failed
to do this, in breach of its fiduciary obligation to the Plan and its participants.

### 7.    *Northern Trust's Conflict of Interest*

177. Northern Trust had a serious conflict of interest that rendered
Northern Trust incapable of rendering objective investment advice.  Northern
Trust, because of its role as the investment manager of AutoZone's defined
benefit pension plan's actively managed funds, had a vested interest in selec-
tion and retention of actively managed funds.  Northern Trust earned approx-
imately $1 million in fees per year from the active management of the assets
of the pension plan.  Had Northern Trust advised AutoZone to give appropri-
ate consideration to index funds as alternatives to the high-cost actively man-
aged GoalMaker funds, it would have put its own considerable compensation
from the pension plan at risk.

178. This conflict of interest was made very clear to AutoZone when
AutoZone began interviewing investment advisors in 2016. As to the pension
plan, one investment advisor warned AutoZone: **"Conflict of Interest: 99% of**

**Assets are allocated in Northern Trust proprietary Funds"** and **"Total Plan costs: $1,291,962 (91% of which goes to NT).** As to the deferred compensation plan, AutoZone was warned: **"Conflict of Interest: High fee revenue sharing Funds"** and **"Conflict of Interest: High fee revenue sharing Funds."** As to the 401(k) plan for Puerto Rican employees, AutoZone was warned: **"Conflict of Interest: High fee revenue sharing Fund"** and **"Total Plan costs: $Unknown – reporting not exhaustive."** The bold and color emphasis is from the original text and the message is clear and unambiguous: Northern Trust had a massive conflict of interest that rendered Northern Trust incapable of providing objective, unbiased investment advice to the 401(k) plan regarding the use of actively managed funds.

179.   Despite these warnings, it was several years before AutoZone replaced Northern Trust.

### 8.   *The Termination of Northern Trust and the Replacement of the High Fee Funds*

180.   One of the first things AutoZone did after terminating Northern Trust was to consider low-cost index fund alternatives to the high-cost actively managed funds. AutoZone/Willis Towers Watson switched to a core line up of index funds, including index funds from Vanguard.

**D.   The Kickbacks To Prudential**

181.   The reason why GoalMaker included high fee funds and excluded low fee funds is simple. The high-fee funds selected by GoalMaker paid kick-backs to Prudential – that is, they made payments to Prudential as a result of being included in the GoalMaker lineup.  The low-fee index funds did not.

### 1.   *Northern Trust Links Investment Selection to Payments To Prudential*

182.   Northern Trust's principal duty as an investment advisor was to evaluate each of the Plan's investment options on its individual merits and to select only prudent investment options.  It is imprudent to link the selection of investment options to the fees paid to service providers.

183.   AutoZone and Northern Trust breached their fiduciary duty to act in the best interest of participants by linking the selection of investment options to the fees paid to service providers.  At the September 11, 2015 meeting, AutoZone's raised concerns about the performance of the actively managed GoalMaker funds. Northern Trust responded:

> Rick Campbell [NT] commented on the review of fund replacement and reminded the committee that previously discussed were the differences between active vs. passive management. Rick Campbell [NT] also reminded the committee that if AZ removed all active funds, they would have the issue of determining how to pay for record keeping fees that would exist because the active funds are not paying for them. Rick Campbell reminded the committee to consider not only about the performance of funds, but also the underlying issues.

This advice was simply wrong. Northern Trust was obligated, as fiduciary investment advisor to the Plan, to evaluate the GoalMaker funds and passive index fund alternatives on their merits as investments. The payment of administrative fees is a matter which must also be addressed separately on the merits. Advising a client to retain a fund that the client believes is imprudent for the purpose of paying recordkeeping fees is itself imprudent. AutoZone should have asked for competitive proposals for recordkeeping fees and treated the payment of recordkeeping fees and the selection of investments as separate and unrelated.

### 2. *Northern Trust Links Investment Selection to Payments To Prudential*

184. As it turns out, the GoalMaker funds Northern Trust encouraged AutoZone to retain paid fees in massive amounts to Prudential.

185. The following chart lists the third-party fees paid from the funds in AutoZone's investment menu:

**Figure 7**:   Fees Paid to Prudential From AutoZone Funds

| Plan Fund | Payment to Prudential |
|---|---|
| **GoalMaker :** | |
| _Stable Value_ | |
| Prudential GIC Autozone | 2.00% Spread |
| | |
| _Stock_ | |
| Pru Jennison Growth Z | 0.91% Mgt |
| Eagle Mid Cap Growth Fund | 0.71% Mgt + 0.02% Other |
| QMA Mid Cap Value Fund | 0.71% - mgmt |
| Loomis Sayles Value Class Y | - |
| Delaware Value Fund Instit'l Class | 0.25% Sub-TA |
| Lord Abbett Fundamental Equity | 0.35% 12(b)-1 + 0.17% Sub-TA |
| Baron Small Cap Fund Institutional | - |
| Boston Partners Small Cap Value II Instit'l | - |
| Target Small Cap Value Fund | 0.43% Mgt + 0.13% Other + 0.12% Addt'l Comp |
| American Europacific Growth R4 | 0.25% 12(b)-1 + 0.10% Other |
| Nationwide Geneva MidCap Growth R6 | 0.20% Sub-TA |
| Wells Fargo Small Company Growth R6 | - |
| | |
| _Bonds_ | |
| PIMCO Total Return Admin | 0.20% Add'l Comp |
| Loomis Sayles Core Plus Bond A | 0.25% 12(b)-1 + 0.16% Other |
| | |
| **Excluded from GoalMaker:** | |
| | |
| Vanguard Developed Markets Index Admiral | - |
| Vanguard Total Stock Market Index Inst'l | - |
| Vanguard Total Bond Market Index | - |

186.   With the exception of one or two bond funds only, this is a pay-to-play scheme. The selection of funds is linked to the payment of fees, directly or indirectly, to Prudential.  To be included in GoalMaker a fund had to be managed by Prudential or its affiliates or pay fees to Prudential or its affiliates.

187.   AutoZone itself grew concerned that it did not fully understand the amount of fees paid from revenue sharing. At the September 11, 2014 Com-

mittee meeting, the Committee informed Northern Trust that, "The commit-tee would like to see what AZ is paying in detail, how much revenue sharing is paid and what the participant is paying." A prudent investment advisor would immediately have provided the information needed to assess and con-trol excessive revenue share. Northern Trust did not. AutoZone should have demanded the production of the required information and terminated North-ern Trust when it was not forthcoming. AutoZone failed to do so.

### 2. *Proprietary Funds*

188.   The most significant fees Prudential received were investment management fees. These included not only the 2.05% spread fee on the Pru-dential GIC, but also management fees on the various sub-advised Prudential separate accounts, including a 0.91% management fee on Prudential Jennison Growth, a 0.71% management fee on the Eagle Mid-Cap Growth, a 0.70% man-agement fee on QMA Mid-Cap Value; and a 0.70% management fee on Target Small Cap. As previously stated, these fees were not justified based on the performance of the funds – the funds lost money by comparison to Vanguard benchmarks – and their selection and retention resulted in Prudential receiv-ing what amounted to kickbacks.

189.   As Wunderlich Securities, a potential replacement for Northern Trust, observed, "19% of Plan assets are allocated in Prudential proprietary funds," and this analysis did not include the Prudential GIC.

190.   In advising AutoZone, Northern Trust failed to take this compensation into account.  Northern Trust estimated Prudential's compensation at approximately $800 thousand to $1 million, which was already high. Northern Trust failed to mention that Prudential was receiving additional spread compensation from the GIC (of more than $1 million annually) and investment management fees from proprietary separate accounts.  This information was not made available to AutoZone until AutoZone submitted an RFP for Northern Trust's replacement.

### 3.   *Share Class*

191.   It is generally true in investment management that the larger the size of an investor's available assets, the lower the investment management fees.  Fiduciaries "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc). The cost of managing investments for a single institutional investor, such as a retirement plan, is substantially less than the cost of managing the same investments for multiple individual retail investors.  Thus, large retirement plans have substantial bargaining power to negotiate lower management fees for the same investment products.  A large plan with a viable methodology will be able to easily identify the share classes with lower expenses, which are publicly disclosed by the SEC in its online EDGAR mutual fund database.

192.   Here, AutoZone, despite having access to professional advice and the responsibility to manage a $675 million retirement plan, has repeatedly failed to invest in the lower cost share classes available to it in order to properly reduce fees and costs associated with fund management, thus breaching its fiduciary duty to the Plan and its participants.

193.   Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (i.e. sales) charges.  All share classes of mutual funds charge fees for the management of the assets of the fund.  The cost may differ, but the investment product is identical.  To be clear, the managers, investment styles, and stocks are not merely similar, but identical.

194.   The two most common types of mutual funds are retail funds and institutional funds. Retail class shares – such as class A, B, and C shares – are available to a broad spectrum of investors, including individuals, while institutional class shares – such as class I and R6 shares – are typically only sold to larger investors, including 401(k) plans.  The Department of Labor has advised that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics.  One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

195.   There also are significant differences in the expense ratios be-
tween and among the institutional share classes to which retirement plans
have access.  These differences typically appear in the mutual fund prospec-
tus descriptions, "Annual Fund Operating Expenses," relating to the invest-
ment management fees, 12b1 and sub-TA fees, and other fees.  The Annual
Fund Operating Expenses often are different for different classes of shares,
depending on the type of distribution, 12b-1, and other fees included in the
expense ratio.

196.   A problem with share classes is that they provide an opportunity
for unscrupulous service providers to take kickbacks from the mutual funds
of a Plan whose fiduciaries not paying attention.  In this case, there were a
number of funds that were not managed by Prudential but that kicked back
substantial revenue to Prudential (Delaware Value, PIMCO Total Return,
American Funds Europacific Growth, Nationwide Geneva Mid-Cap Growth,
and Lord Abbett Fundamental Equity).  These kickbacks included fees de-
scribed as: 12(b)-1, sub-TA, and other fees.

197.   A 12b-1 fee is an annual marketing or distribution fee for a mutual
fund. The 12b-1 fee is considered to be an operational expense and, as such, is
included in a fund's expense ratio.  For retirement plans, it is generally 0.25%
- 0.35% of a fund's net assets.

198.   In the early days of the mutual fund business, the 12b-1 fee was
thought to help investors. It was believed that by marketing a mutual fund,

its assets would increase and management could lower expenses because of economies of scale. This has yet to be proven. With mutual fund assets passing the $10 trillion mark and growing steadily, critics of this fee are seriously questioning the justification for using it.  Today, the 12b-1 fee is mainly used to reward intermediaries for selling a fund's shares. As a commission paid to salespersons, it is currently believed to do nothing to enhance the performance of a fund.

199.   Shareholder servicing fees are similar to 12b-1 fees, but are typically used by no-load mutual fund products.  Only service providers such as recordkeepers (not salesmen) can receive these fees, which can be used to compensate a recordkeeper for recordkeeping, annual administration, and education services.  No-load fund products can pay up to 0.25% of invested assets as a shareholder servicing fee without being required by SEC rules to call it a 12b-1 fee.

200.   Sub-transfer agency fees (sub-TA fees) are payments to a recordkeeper who holds an omnibus account at the mutual fund company. Omnibus accounting eliminates the need for the mutual fund company to maintain individual participant accounts.  Instead, participant accounts are maintained by the recordkeeper. Because this reduces the cost for the mutual fund company, the mutual fund company pays the recordkeeper a fee for this service. Typically, this fee ranges from 0.10% to 0.35% of invested assets.

201.   As shown in Figure 7 above, AutoZone, through GoalMaker, funnelled employees' retirement savings into funds that paid substantial 12b1, sub-TA, and other fees.  Through GoalMaker, AutoZone and Northern Trust excluded low cost index funds that did not pay  such fees.

202.   Retirement plans such as the AutoZone Plan can and should monitor and take advantage of volume discounts in purchasing mutual fund shares.  Low-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors such as AutoZone, which can easily meet minimum investment amounts for these share classes.  A prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan.  As stated by the SEC Office of Compliance Inspections and Examinations a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[11]

203.   Mutual funds, moreover, are not static, and share classes change over time, as lower share classes are issued.  For example, a plan may invest in an Advisor share class, the lowest cost class available at that time, only to find upon reading the prospectus of the mutual fund, that an Institutional

---

[11] "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at: https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-share-class-initiative.pdf

class has become available, at a lower cost for the same mutual fund.  A fiduciary with a prudent methodology will monitor and evaluate the share classes of the available mutual funds and have established a process to move the Plan's assets into lower cost share classes as they become available.  Regrettably, AutoZone repeatedly breached its duty of prudence by failing to monitor and select the lowest cost share class investment options.

204.   The following table summarizes the loss to the Plan by fund provider:

**Figure 8:** Loss from Selection of Wrong Share Classes through December 31, 2019

| Plan Fund | Symbol | ER | Lower Share Class | ER | Assets 2013 - 2019 | Excess Fees |
|---|---|---|---|---|---|---|
| Loomis Sayles Value Class Y | LSGIX | 0.73 | LSVNX | 0.58 | 84,414,500 | 126,622 |
| Vanguard Total Stock Market Index | VITSX | 0.04 | VSMPX | 0.02 | 283,366,681 | 34,405 |
| Pru Jennison Growth Class A | PJFAX | 0.91 | PJFZX / PJFQX | 0.68 | 486,297,030 | 1,203,827 |
| Vanguard Total Bond Market Index Inv | VBMFX / VBTLX | 0.10 | VBMPX | 0.04 | 36,088,485 | 14,767 |
| American Europacific Growth R4 | REREX | 0.84 | RERGX | 0.49 | 435,208,780 | 1,508,195 |
| PIMCO Total Return Admin | PTRAX | 0.63 | PTTRX | 0.46 | 69,302,033 | 117,813 |
| Lord Abbett Fundamental Equity Class A | LDFVX | 1.09 | LAVYX | 0.74 | 28,594,652 | 100,081 |
| Nationwide Geneva MidCap Growth Inst'l Serv | NWHYX | 1.11 | NWKAX | 0.86 | 5,117,722 | 12,794 |
| Delaware Value Fund Inst'l Class | DDVIX | 0.70 | DDZRX | 0.60 | 336,796,170 | 220,327 |
| Loomis Sayles Core Plus Bond | NEFRX | 0.79 | NERNX | 0.46 | 40,217,643 | 132,718 |
| *Excess Fees* | | | | | | **$3,471,550** |

The information supporting this calculation, fund-by-fund, is annexed to the Appendix as *Schedule D*.

205.   The American Europacific Growth Fund is one of the more egregious examples. The Plan selected the R4 version of the fund (REREX).  The REREX paid 25bps in 12b-1 fees and 10bps in sub-T/A fees to Prudential. The identical fund was available to the Plan in an R-6 share class, which paid no

12b-1 or sub-TA fees to Prudential, at an average cost of %0.49 per year over the Class Period, a difference of 0.35%.  This 0.35% difference resulted in the waste of $1.5 million in participants retirement savings over the Class Period, before compounding.

206.   The following table calculates the loss for each of the years during the Class Period for which information is available:

**Figure 9:**   Calculation of Loss from American Funds Europacific Growth R4 (REREX) from Wrong Share Class

| Years | Fund Symbol | Alt. Symbol | Assets in Plan | Fund ER | Alt. ER | ER Diff. | Excess Fees |
|---|---|---|---|---|---|---|---|
| **2013** | REREX | RERGX | 45,798,427 | 0.85 | 0.50 | 0.35 | 160,294 |
| **2014** | REREX | RERGX | 48,665,352 | 0.84 | 0.49 | 0.35 | 170,329 |
| **2015** | REREX | RERGX | 54,253,890 | 0.84 | 0.49 | 0.35 | 189,889 |
| **2016** | REREX | RERGX | 59,062,850 | 0.85 | 0.50 | 0.35 | 206,720 |
| **2017** | REREX | RERGX | 77,071,413 | 0.85 | 0.50 | 0.35 | 269,750 |
| **2018** | REREX | RERGX | 72,180,451 | 0.83 | 0.49 | 0.34 | 245,414 |
| **2019** | REREX | RERGX | 78,176,397 | 0.83 | 0.49 | 0.34 | 265,800 |
| **Total** | | | | | | | **1,508,195** |

As shown in more detail in Figure 8, above, AutoZone wasted approximately $3.4 million of Plan participants' retirement savings as a result of selecting the wrong share class of mutual funds for the Plan's investment menu. The process of selecting these funds was tainted, because the funds were selected not on the basis of their merits, but on the amount of fees paid to Prudential.

207.   Here also was a problem that AutoZone was not able to fully address until Northern Trust was replaced.

208.   At the September 11, 2015 Committee meeting, AutoZone expressed concerns about share class, but Northern Trust responded by "reminding" AutoZone it needed to consider "underlying issues" other than the performance of the funds.

209.   It was Northern Trust's responsibility to assist the Committee in selecting the appropriate share class for each of the funds in the Plan's investment menu. Northern Trust abdicated this responsibility.

210.   Upon Northern Trust's termination, Willis Towers clearly and directly advised AutoZone not to consider the fees paid to service providers in the evaluation of investment options. On October 10, 2009, Willis Towers advised AutoZone that, "**Best practice is to break down the relationship between plan investments and fees;**" "**Move to lowest cost share class investment vehicles where practical;**" "**Disaggregate administrative fees from investment fees;**" and, "**Consider adopting a Fee Policy Statement (procedural prudence).**"   Here again, the emphasis, bold and underline, is in the original.   That Willis Towers needed to give AutoZone this advice demonstrates that the process in place, which linked fund selection to recordkeeping fees, was imprudent.

### D.   Failure to Monitor Administrative Expenses

211.   Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high

level of service to a large defined contribution plan like the Plan and will read-
ily respond to a request for proposal. These recordkeepers primarily differen-
tiate themselves based on price, and vigorously compete for business by of-
fering the best price.

212.   The cost of recordkeeping services typically depends primarily on
the number of participants, not on the amount of assets in the participants'
accounts. Thus, the cost of providing recordkeeping services to a participant
with a $100,000 account balance is the same for a participant with $1,000 in
her retirement account. Plans with large numbers of participants can take ad-
vantage of economies of scale: a plan with 15,000 participants can negotiate
a much lower per participant fee for recordkeeping services than a plan with
1,000 participants.

213.   To monitor recordkeeping costs, a prudent fiduciary must engage
in a process called "benchmarking" to verify that the recordkeeper selected
charges no more than reasonable fees. This involves, at the very least, com-
paring the cost of the proposed recordkeeper against the costs of the leading
providers in the industry. Benchmarking is necessary both at the time a
recordkeeper is selected, to verify the initial fees are reasonable, and at regu-
lar intervals thereafter.

214.   In September of 2015, the Committee expressed some concern
that the Committee did not understand the details of the revenue sharing. The
minutes state: "The committee would like to see what AZ is paying in detail,

how much revenue sharing is paid and what the participant is paying." The Committee also recognized the need to benchmark the fees. "The committee would like a third party to benchmark this information so the committee can get back to this topic." The Committee even expressed a concern that there would be litigation. **"With the lawsuits surrounding plan fees, how would AZ respond if a litigation ever came up?** The committee would like to aim for fixed costs and transparency."

215.    In selecting a recordkeeper, a fiduciary of a large plan such as the AutoZone 401(k) Plan must solicit competitive bid proposals from a number of recordkeepers. As part of this process, the plan fiduciary should require the recordkeeper to identify not only the level of recordkeeping services and their cost but also the cost of proprietary products – that is, investments offered by the recordkeeper or its affiliates – that the Plan must select.  In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, whether from direct payments, income from stable value funds, fees from separate accounts, revenue share from mutual funds, among other sources.

216.    Here, AutoZone and Northern Trust had neglected to issue an RFP for more than 5 years. At the August 3, 2016 Committee meeting, Northern Trust "**Mentioned that an RFP (Request for Proposal) had not been done in 5 years so one needs to be done.**" When, belatedly, AutoZone issued an RFP,

AutoZone realized that administrative expenses could be reduced by more than *one-third.*

217.   Upon terminating Northern Trust, AutoZone began to monitor recordkeeping in earnest. It severed the link between investment choice and revenue sharing.  This allowed AutoZone to choose the low-cost index fund investment options it had been talking about for years *based upon AutoZone's assessment of the merits of the investment* and to evaluate the reasonableness of its recordkeeping fees *based on their merits.* Although AutoZone may have paid for fees using an asset-based formula, AutoZone monitored the fees on a per capita basis.

218.   AutoZone knew that the new fee policy would expose the errors in AutoZone's past practices. A determination was made that, "**New fee structure should mitigate claims of fiduciary liability as it will demonstrate procedural prudence.**" Although concerned about liability as a result of the change in the fee structure, AutoZone decided that it was even riskier to leave the old fee structure in place. "**After completing the recent fee structure study, continuing the existing fee structure may have more risks than changing to [a] new structure.**"

219.   AutoZone was also concerned about the manner in which the changes would be communicated to participants. "**Heightened consideration/review needed so as to not criticize past practices.**" "Emphasize the new investment platform and demonstrate that the fee structure will result

in an increase in investment performance." "Legal review of communications is recommended."

220.    These statements constitute an admission of AutoZone's liability and of the resulting losses.

221.    In this case, based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by Prudential, the Plan's participant level – 10,000 to 15,000 during the Class Period, and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan would have been no more than $40 per participant or $400,000 to $600,000 per year for the Plan (about $4.3 million total) over the six-year Class Period.  This estimate is supported by *Schedule C-1* to the *Appendix*.

222.    From 2013 to 2020, Prudential's compensation from all sources, estimated in *Schedule C-2* to the Appendix, was many multiples of this amount. Revenue share and recordkeeping payments totaled $9.1 million, and the $9.1 million amount does not include stable value fund spread fees or income from proprietary funds. The stable value fund alone generated more than $13.2 million in excess spread fees. Investment management fees from proprietary separate account funds netted Prudential an additional $3.7 million. As shown in *Schedule C-2*, Prudential's total compensation from 2013 to 2020 was more than $26 million, greatly in excess of the reasonable value of the services provided.

## V.   THE DAMAGE DONE

223.   The recovery from a trustee for imprudent or otherwise improper investments is "the difference between (1) the value of those investments and their income and other product at the time of surcharge and (2) the amount of funds expended in making the improper investments, increased (or decreased) by a projected amount of total return (or negative total return) that would have accrued to the trust and its beneficiaries if the funds had been properly invested." Restatement (Third) of Trusts, § 100 cmt. b(1) .

224.   The standard for determining the impact of underperforming mutual funds is the comparison of the investment performance of the assets of the Plan invested in high-fee funds in the plan to the investment performance that assets of the Plan would have had if invested in low-cost index funds. *Brotherston v. Putnam Invs.*, L.L.C., 907 F.3d 17 (1st Cir. 2018).  This can be estimated by taking the weighted average of the mutual funds from the plan's investment menu and using publicly available data on mutual fund returns.

225.   Based upon the information presently available, Plaintiffs estimate that the Plan participants' lost approximately $60 million of their retirement money as a result of AutoZone's mismanagement of the stable value and GoalMaker funds.  The loss can be estimated by comparing the performance of the Plan had it been prudently invested in funds in the same asset classes with reasonable fees.

91

226.   The total loss[49] estimated through September 30, 2019 was:

**Figure 10:** Total Loss through Dec. 30, 2019 (in $ US millions)



227.   The $69 million loss[50] cannot be explained by standard pricing models taking risk and return into account.  The average AutoZone mutual fund was riskier than the average index fund benchmark as measured by the standard deviation of the returns.[51]  Nor can the loss be attributed to any other

---

[49] The estimate assumes that the Form 5500s are accurate as to the plan investments and that the contributions to and deductions from the funds were made monthly and were uniform.  The estimate assumes that the contributions in 2018 were the same as in 2017. Plaintiffs reserve the right to refine the loss estimate once additional information is made available.

[50] These figures are estimates. The precise amount of the resulting loss, which is continuing and will vary with market performance, will be established at the trial of this cause.

[51] *See, e.g.,* Modigliani, Franco, "Risk-Adjusted Performance", Journal of Portfolio Management (Winter 1997) 45–54 (portfolio's excess return adjusted based on the portfolio's relative riskiness with respect to that of the benchmark portfolio). Modigliani is the recipient of the 1985 Nobel Prize in Economics.

commonly accepted risk and return factor.[52]  Simply put, the losses were the result of Autozone's breach of its fiduciary duties, not bad luck.

## IV.  CLASS ACTION ALLEGATIONS

228.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

229.   Plaintiffs seek to certify a class action on behalf of all participants and beneficiaries of the plan.  The Named Plaintiffs seek to certify and to be appointed as representatives of the following Class:

> All persons, other than Defendant, who were participants as of November 11, 2013 in Plan, including (i) beneficiaries of deceased participants who, as of November 11, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future, and (ii) alternate payees under a Qualified Domestic Relations Order who, as of November 11, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future; and (b) all persons, other than AutoZone, who have been participants or beneficiaries in either the Plan and had account balances in the Plan at any time between November 11, 2013 through the date of judgment.

230.   Named Plaintiffs are members of the Class. Excluded from the Class are (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any AutoZone or is or was a partner, officer, director, or controlling person of AutoZone; (b) the spouse or children

---

[52] This would include the application of the Fama / French factors discussed by Fama / French and Carhart, supra.

of any individual who is an officer, director or owner of 5% or more of the equity of AutoZone; (c) Plaintiffs' counsel; (d) sitting magistrates, judges and justices, and their current spouse and children; and, (e) the legal representatives, heirs, successors and assigns of any such excluded person.

231. This action meets the requirements of *Fed. R. Civ. P.*, Rule 23 and is certifiable as a class action for the following reasons:

    a.    While the precise number of Class Members is unknown to Plaintiffs at this time and can only be finally ascertained from books and records under the exclusive control of and maintained by AutoZone and/or its agents, Named Plaintiffs believe after inquiry that there are over 18,000 members of the Class located throughout the United States and that joinder of all members is impracticable; and,

    b.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because AutoZone owed fiduciary duties to the Plan and to all participants and beneficiaries, and took actions and omissions alleged herein as to the Plan, and not as to any individual participant; thus, there are effectively no individual issues. The common questions of law and fact include, without limitation:

        i.    who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

        ii.    whether the fiduciaries of the Plan discharged their duties with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use;

        iii.    whether or not the fiduciaries, prior to the time they engaged in the transactions described herein, had policies and procedures to investigate the merits of the investments and to structure the investments;

        iv.    whether or not the fiduciaries followed the policies and procedures to investigate the merits of the investments

and to structure the investments prior to making such investments;

v.  whether or not the fiduciaries had policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to high cost funds as alleged herein;

vi.  whether or not the fiduciaries followed the policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to high cost     funds as alleged herein;

vii.  whether or not the fiduciaries understood and evaluated the plan fees and expenses associated with the plan's investments;

viii.  whether or not the fiduciaries discharged their duties with respect to the plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administration of the plan;

ix.  whether or not any fiduciary knowingly participated in a breach of duty by another fiduciary;

x.  whether or not any fiduciary knowingly failed to cure a breach of duty by another fiduciary;

xi.  the losses to the Plan resulting from each breach of fiduciary duty; and,

xii.  what Plan-wide equitable and other relief should the Court impose in light of AutoZone's breach of duty.

232.  Named Plaintiffs' claims are typical of the claims of the Class because Named Plaintiffs were participants in the Plan during the time-Period at issue in this action and all participants in the Plan were harmed in the same

95

manner by AutoZone's misconduct.  The legal theories upon which Plaintiffs are proceeding are typical as well.

233.   Named Plaintiffs are adequate representatives of the Class because they were and are participants in the Plan.  Plaintiffs and all the Class Members were the subject of the same pattern and practices of equitable and Class violations, and all sustained damages arising out of the same wrongful course of conduct. AutoZone has acted or refused to act on grounds generally applicable to the Class.  Named Plaintiffs have no interest in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

234.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for AutoZone in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans, as a practical matter, would be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

235.   Therefore, this action should be certified as a class action under Fed. R. Civ. P., Rule 23(b)(1)(A) or (B).

236.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of over 18,000 participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be relatively small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Named Plaintiffs are unaware of any difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class action under Fed. R. Civ. P. Rule 23(b)(3), if it is not certified under Rule 23(b)(1)(A) or (B).

237.   Plaintiffs' counsel, Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC; James White Firm, LLC; and, Lange Clark, P.C. will fairly and adequately represent the interests of the Class, have substantial experience in class action and complex litigation, and are best able to represent the interests of the Class under Fed. R. Civ. P. Rule 23(g).

## V.  PLAN WIDE RELIEF

238.   Additionally and alternatively, Plaintiffs bring this action as Plan participants seeking Plan wide relief for breach of fiduciary duty on behalf of

the Plan. 29 U.S.C. § 1132(a)(2). AutoZone's fiduciary duty was to the Plan and the Plan itself was a victim of AutoZone's breach of its fiduciary duty; thus, Plaintiffs demand that AutoZone make good to the Plan all losses to the Plan caused by its breach of its fiduciary duty. 11 U.S.C. § 1109.  The absent Plan participants are adequately represented and the Plan participants are so numerous that the delay and expense of joining them would be oppressive and burdensome.  Plaintiffs will take adequate steps to properly act in a representative capacity on behalf of the Plan and will protect absent parties' interest as well as the interest of the judicial proceedings.

## VI.  COUNT ONE:  BREACH OF FIDUCIARY DUTY

239.   Plaintiffs adopt by reference the factual allegations of paragraphs 1 to 238.

240.   This Count allege breaches of fiduciary duty pursuant to 29 USC Section 1109,against Defendants AutoZone, the Committee, and Northern Trust in that the process by which they collectively selected, maintained, and monitored the investment options for the Plan in which Plaintiffs and the putative class participated was tainted by a lack of competence, diligence, effort, or loyalty.

241.   The scope of the fiduciary duties and responsibilities of AutoZone and Northern Trust includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable

excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. (¶¶ 31-59 *supra*).  AutoZone is directly responsible for ensuring that the Plan's fees are reasonable, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. (Id.) In order to do so, AutoZone had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses.

242.   The scope of the fiduciary duties and responsibilities of the Investment Committee (Bill Giles, Brian Campbell, Steve Beussink, Michael Womack, Kevin Williams, Kristin Wright, and Rick Smith (the "Committee"), includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. (¶¶ 31-59, supra). The Committee is directly responsible for ensuring that the Plan's fees are reasonable, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. (Id.) In order to do so, AutoZone had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses.

243.   The scope of the fiduciary duties and responsibilities of Northern Trust, as the Plan's investment advisor, includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable excess expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. (¶¶ 31 - 59, supra). Northern Trust was responsible for providing advice and making recommendations on which the management of the plan and its investment options depended. Northern Trust was an ERISA 3(21) investment advisor services for which it is compensated. Northern Trust was directly responsible for ensuring that the Plan's fees are reasonable, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. (Id.) In order to do so, Northern Trust had to have a viable, documented process and methodology for monitoring the Plan's investment and expenses, which it did not have. Additionally, Northern Trust operated under a continuous conflict of interest stemming from its role as investment manger of the AutoZone pension plan's actively managed funds, which it failed to disclose to participants.

244.   As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" Tibble, 135 S. Ct. at 1829. Thus, to state a claim upon which relief can be granted, "A plaintiff may allege that a fiduciary breached the duty of

prudence by failing to properly monitor investments and remove imprudent ones." Id.  All Defendants failed to implement a prudent process of the selection, monitoring, and retention or, as the case may be, removal of investment options. ( ¶¶ 22-120).  All Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Id.).  All Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B). All Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.  (Figure 10).

245.   Each Defendant also knowingly participated in the breaches by other plan fiduciaries, knowing that such acts were breaches, enabling the other plan fiduciaries to commit the breaches by failing to lawfully discharge its own fiduciary duties, and failed to make any reasonable efforts under the circumstances to remedy the breaches. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciaries under 29 U.S.C. § 1105(a).

246.   As a consequence of Defendants' actions, Named Plaintiffs and the Class Members were damaged, including without limitation, suffering monetary losses.

## VII.  PRAYER FOR RELIEF

247.   For these reasons, Named Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

a.   Find and declare that AutoZone, the Committee, and Northern Trust, have breached its fiduciary duties as described above;

b.   Find and adjudge that AutoZone, the Committee, Northern Trust and the other Plan fiduciaries are personally, jointly and severally liable to make good all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

c.   Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated, including, without limitation, lost investment opportunity;

d.   Order AutoZone, the Committee, and Northern Trust to provide an accounting necessary to determine the amounts each must make good to the Plan under § 1109(a);

e.   Surcharge against AutoZone, the Committee, and Northern Trust in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

f.   Enjoin AutoZone, the Committee, and Northern Trust from the use of the GoalMaker program until and unless a prudently methodology for selecting and monitoring the GoalMaker funds has been implemented;

g.   Certify the Class, appoint Named Plaintiffs as class representative, and appoint Wiggins, Childs, Pantazis, Fisher

& Goldfarb, LLC, James White Firm, LLC, and Lange Clark, P.C. as Class Counsel;

h.    Award to the Named Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

i.    Order the payment of interest to the extent it is allowed by law; and

j.    Grant other equitable, legal, to the extent available, or remedial relief as the Court deems appropriate to ensure that the Plan is managed by AutoZone and the other Plan fiduciaries in a manner consistent with their obligations under ERISA.

/s/ James H. White, IV
James H. White, IV
Counsel for Plaintiffs

OF COUNSEL:

JAMES WHITE FIRM, LLC
Landmark Center | STE 600
2100 1st Ave North
Birmingham, Alabama 35203
(205) 383-1812
james@whitefirmllc.com

/s/ D.G. Pantazis, Jr.
D. G. Pantazis, Jr.
Counsel for Plaintiffs

OF COUNSEL:

WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500
dgpjr@wigginschilds.com

cmalmat@wigginschilds.com


/s/ Lange Clark
Lange Clark
Counsel for Plaintiffs



OF COUNSEL:

LAW OFFICE OF LANGE CLARK, P.C.
301 19th Street North
Suite 550
Birmingham, Alabama 35203
(205) 939-3933
langeclark@langeclark.com

104