# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

---

MICHAEL J. IANNONE, JR., *and*
NICOLE A. JAMES, *as plan participants,*
*on behalf of the* AUTOZONE, INC. 401(k)
Plan*, and on behalf of others similarly situated*,

      Plaintiffs,

v.                                                    Case No. 2:19-cv-02779-MSN-tmp

AUTOZONE, INC., *as plan sponsor*;
BILL GILES, BRIAN CAMPBELL, STEVE
BEUSSINK; KRISTIN WRIGHT; MICHAEL
WOMACK; KEVIN WILLIAMS; *and* RICK
SMITH, *individually and as members of the*
AUTOZONE, Inc. Investment Committee,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Plaintiffs brought this action against Defendants[1] under the Employee Retirement Income Security Act of 1974 ("ERISA"). (ECF No. 1.) Plaintiffs subsequently filed an amended Class Action Complaint on September 22, 2021, bringing one count against Defendants for breach of fiduciary duty to the AutoZone, Inc. 401(k) Plan ("Plan"). (ECF No. 85.) On December 7, 2022, this Court certified the following class:

> All persons, other than Defendants, who are or were participants as of November 11, 2013 in the Plan, and invested in any of the GoalMaker Funds including (i) beneficiaries of deceased participants who, as of November 11, 2013, were

---

[1] For purposes of this Order, "Defendants" refers to Defendant AutoZone, Inc. and Defendants Bill Giles, Brian Campbell, Steve Beussink, Kristin Wright, Michael Womack, Kevin Williams, and Rick Smith, who are members of the AutoZone investment committee. Plaintiffs also included Northern Trust Corporation and Northern Trust, Inc. as Defendants, but those Defendants did not proceed to trial and are thus not included in this Order.

receiving benefit payments or will be entitled to receive benefit payments in the future, and (ii) alternate payees under a Qualified Domestic Relations Order who, as of November 11, 2013, were receiving benefit payments or will be entitled to receive benefit payments in the future.

Excluded from the Class are (a) any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any AutoZone or is or was a partner, officer, director, or controlling person of AutoZone; (b) the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of AutoZone; (c) Plaintiffs' counsel; (d) sitting magistrates, judges and justices, and their current spouse and children; and, (e) the legal representatives, heirs, successors and assigns of any such excluded person.

(*See* ECF No. 239. *See also* ECF No. 205 at PageID 4842–43.)

The Court held a bench trial from October 23–31, 2023. Plaintiffs were represented by James H. White, IV, Lange Clark, D.G. Pantazis, Jr., and Eric Sheffer; and Defendants were represented by Brian T. Ortelere, Abbey M. Glenn, John S. Golwen, Mathew J. McKenna, and Samuel Block. During the trial, the Court heard in-court testimony from seven witnesses and the deposition testimony of two witnesses.

The first witness was Brian Campbell ("Mr. Brian Campbell"), AutoZone's Corporate Representative. He became the Chair of the AutoZone Investment Committee ("Committee") in 2021 and testified on behalf of all the AutoZone Defendants. (ECF No. 392 at PageID 23199, 23203.)

Next, the Court heard from Richard Campbell ("Mr. Rick Campbell"), Northern Trust's Corporate Representative. Though presently retired, Mr. Rick Campbell served as the "primary contact" at Northern Trust (the ERISA 3(21) advisor) for the Committee and led the quarterly Committee meetings. (ECF No. 404 at PageID 23625 & 23636.)

2

The third witness was Plaintiffs' expert Wendy Dominguez[2], president and co-founder of investment advising firm Innovest Portfolio Solutions, LLC.  (ECF No. 407 at PageID 23750.) She offered her conclusions related to Defendants' prudence in managing the Plan.  (*Id.* at PageID 23759.)

The Court then heard from Plaintiffs' second expert[3] Christopher Tobe ("Mr. Tobe"), an independent investment consultant who is also associated with the Hackett Robertson Tobe Group. (ECF No. 410 at PageID 23938.)  He testified about the Prudential Guaranteed Income Fund ("the GIF")—a general fixed annuity offered in the Plan—as well as Defendants' monitoring of it.  (*Id.* at PageID 23967 & 23973.)

Next, Plaintiffs called Dr. Robert E. Brooks ("Dr. Brooks"), president of consulting company Financial Risk Management and former finance professor at the University of Alabama. (ECF No. 412 at PageID 24139.)  He was admitted as an expert in finance for the purposes of offering testimony related to damages.  (*Id.* at PageID 24146.)

Following the close of Plaintiff's proof, Defendants offered Mr. Philip Suess ("Mr. Suess"), who was admitted as an expert to testify about the Committee's process and decisions regarding the Plan's investment options.  (ECF No. 414 at PageID 24331.)

---

[2] Ms. Dominguez was admitted as an expert witness at trial without objection.  (ECF No. 407 at PageID 23756.)  Prior to trial, however, she was limited to opinions about the prudence of Defendants' actions (as opposed to whether those actions constituted a breach of their fiduciary duties) and her opinions on recordkeeping fees were excluded prior to trial.  (ECF No. 338 at PageID 22546–48 & 22555.)

[3] Mr. Tobe was admitted as an expert in the stable value field without objection.  (ECF No. 410 at PageID 23952.)  Prior to trial, his opinions concerning the "spread" Prudential earned on the GIF, comparisons of other retirement plan's crediting rates to the crediting rate of the GIF, and proper benchmarking to measure the crediting rate of the GIF were excluded.  (ECF No. 338 at PageID 22566–74.)

The final witness was Defendants' damages expert Dr. Russell R. Wermers, Director of the Center for Financial Policy at the University of Maryland.  (ECF No. 414 at PageID 24461.)  He testified about Plaintiffs' allegations of injury related to the Plan's inclusion of the GIF and Prudential's asset allocation tool GoalMaker.  (*Id.* at PageID 24472.)

During trial, the Court also heard portions of deposition testimony from the depositions of Mr. Tobe, Dr. Brooks, Mr. Brian Campbell, Ms. Pamela Samuels-Kater, Mr. Richard Campbell, Mr. Steve Beussink, Mr. Bill Giles, and Mr. Anton Tansil.  (*See* ECF Nos. 416, 417 & 418.)  Ms. Samuels-Kater worked within AutoZone's Human Resources Department.  (ECF No. 390-1 at PageID 23118.)  Mr. Beussink was a member of the Committee from 2013 to 2021, and Mr. Giles was a member from 2013 to 2020.  (ECF No. 390-1 at PageID 23118.)  Mr. Tansil worked at Prudential, which provided recordkeeping and other services for the Plan during the class period.  (*Id.*)

## MOTION UNDER FED. R. CIV. P. 52(c)

Plaintiffs' claims at trial related to Defendants' monitoring of, or failure to monitor, (1) the Plan's recordkeeping fees, (2) the GIF's crediting rate, and (3) the fees and expenses of GoalMaker.  (ECF No. 392 at PageID 23141–42.)  At the close of Plaintiffs' proof, Defendants moved for judgment on partial findings under Fed. R. Civ. P. 52(c) as to two of these claims—those involving recordkeeping fees and GoalMaker—in addition to what Defendants viewed as a separate claim related to Defendants' monitoring of the Plan's share classes.  (ECF No. 412 at PageID 24294.)  According to Defendants, these claims were due to be dismissed because Plaintiffs failed to put on proof of causation or damages related to them.  (*Id.* at PageID 24295.)  Defendants did not move for judgment on Plaintiffs' claim related to the GIF; rather, they stated

on the record that "those are not the focus of this motion" and expressly reserved their arguments on the GIF for the merits. (*Id.*)

In response, Plaintiffs conceded that, based on an earlier ruling of the Court, *see* discussion *infra* Part I.A–B, they had not been able to put on evidence of loss associated with the recordkeeping fees and allowed that dismissal of that claim was thus appropriate. (ECF No. 412 at PageID 24301.) Because they did not understand themselves to be bringing a stand-alone claim as to share classes, Plaintiffs were also not necessarily opposed to dismissal of such a claim.[4] (*Id.* at PageID 24302.) But Plaintiffs did object to Defendants' representation that they had not put on proof of causation or loss with regard to GoalMaker. (*Id.* at PageID 24305.)

Given parties' apparent agreement, the Court granted Defendants' Rule 52(c) Motion as it pertained to Plaintiffs' claims about recordkeeping fees and share class. (ECF No. 414 at PageID 24322.) It reserved ruling on the Motion as to the GoalMaker claim. (*Id.* at PageID 24323.)

## <u>PRELIMINARY ISSUES</u>

## I.    MOTIONS IN LIMINE

The Court reserved ruling on Defendants' Motions in Limine after hearing oral argument on them at the pre-trial conference.[5] While a couple of these Motions were resolved—directly or indirectly—within the context of particular evidence at trial, the issues raised within these Motions sometimes affected other evidence as well. For the sake of clarity, and because some objections

---

[4] Plaintiffs would have preferred that the Court wait to rule on the Rule 52 Motion until the end of trial. (ECF No. 412 at PageID 24301.) They also clarified that this concession did not apply to testimony they had elicited about share classes that was relevant to their remaining claims. (*Id.* at PageID 24302.)

[5] Plaintiffs did not file any motions in limine.

related to these Motions were taken under advisement but not resolved at trial, the Court sets forth

its rulings on each of the Motions.

> **A.  Motion in Limine to Exclude Dr. Brooks' Testimony Regarding Recordkeeping Fee Loss ("First Motion in Limine," ECF Nos. 370 & 371)**

Defendants moved to preclude Dr. Brooks from testifying about purported losses from the

Plan's payment of recordkeeping fees.  (ECF No. 371 at PageID 22822.)  Given the Court's ruling

on Defendants' Motion under Fed. R. Civ. P. 52(c), this Motion appears, at first blush, moot.  But

the Court granted the Rule 52(c) Motion as to recordkeeping fees because it essentially granted

Defendants' First Motion in Limine during trial.  Thus, the Court sets forth the context for its

decision to grant the relief requested in that Motion.

The sole basis for this Motion was the fact that Dr. Brooks reached his loss calculations as

to recordkeeping fees by comparing the cost the Plan paid in recordkeeping fees to the cost Ms.

Dominguez opined was "reasonable"—an opinion the Court excluded prior to trial.  (*Id.* at PageID

22823.)  Defendants further forecasted in their First Motion in Limine that Plaintiffs could not use

a different figure than the one Ms. Dominguez used because Dr. Brooks did not address one in his

report and because none of Plaintiffs' other expert witnesses opined about what a reasonable

recordkeeping fee might be.  (*Id.* at PageID 22824.)  Plaintiffs framed Defendants' request as a

second bite at the apple, arguing that the Chief Magistrate Judge already denied them this relief in

ruling on the parties' *Daubert* Motions.  (ECF No. 379 at PageID 22898.)  They also argued that

the *Daubert* Order was not so broad as to bar Dr. Brooks from relying on testimony that Ms.

Dominguez might present at trial concerning a reasonable recordkeeping fee.  (*Id.* at PageID

22900.)

At the pretrial conference, the Court determined after hearing argument from parties that

this Motion would best be resolved at trial with the benefit of Dr. Brooks's testimony for context.

(ECF No. 383, Minute Entry.)  Sure enough, it became clear during that testimony that, while the methodology set forth in Dr. Brooks's report had not changed, the "loss input" for his calculations related to recordkeeping fees was, in fact, different.  Put simply, Plaintiffs and Dr. Brooks had responded to the *Daubert* Order's exclusion of Ms. Dominguez's "loss input" by substituting her value for one that appeared in a 2017 Report from Defendants' outside ERISA counsel ("the Mazursky Memorandum").  (ECF No. 398 at PageID 23430; ECF No. 412 at PageID 24186.)  In the Mazursky Memorandum—provided as part of Defendants' 2017 Request for Proposal ("RFP") process—outside counsel advised that the recordkeeping fee Defendants were paying was "uncompetitive" and referenced a proposed fee from T. Rowe Price that was lower.  (ECF No. 407 at PageID 23823–24.)  Since Dr. Brooks could not use Ms. Dominguez's figure as a "reasonable" recordkeeping fee, he instead used the T. Rowe Price proposal.  (ECF No. 412 at PageID 24186.)

Plaintiffs were adamant that this change was merely the application of basic math within the confines of Dr. Brooks's methodology (to which Defendants had no objection).  (*See, e.g.*, ECF No. 412 at PageID 24190.)  But Defendants pointed out that the decision to use the T. Rowe Price proposal as the "reasonable" fee value was itself an expert opinion that neither Ms. Dominguez nor any other expert ever offered[6], and which required disclosure in compliance with the Federal Rules of Civil Procedure.  (*Id.* at PageID 24189 & 24191.)  Defendants observed, for example, that the T. Rowe Price proposal was merely one bid submitted in a 2017 RFP, which called into question why it was a proper comparator to the recordkeeping fees Defendants were paying in other years during the class period.  (*Id.* at PageID 24189.)

---

[6] Plaintiffs pointed out that Ms. Dominguez did refer to the T. Rowe Price proposal in her expert report "as a basis to show that the recordkeeping fees were unreasonable . . . ."  (ECF No. 412 at PageID 24195.)  Significantly, however, Ms. Dominguez used a different amount (which was ultimately excluded) in opining about what constituted a "reasonable" recordkeeping fee.

For the reasons Defendants expressed, the Court sustained Defendants' objection to Dr. Brooks's testimony as it related to damages arising from Defendants' recordkeeping fees. (ECF No. 412 at PageID 24210.) In doing so, it granted the relief requested in Defendants' First Motion in Limine.

### B.    Motion in Limine to Exclude Non-Expert Calculations of Recordkeeping Fees and Loss ("Second Motion in Limine," ECF Nos. 370 & 372)

This Motion was closely related to the First. In it, Defendants argued that Plaintiffs lacked any admissible expert testimony related to the alleged loss stemming from excessive recordkeeping fees because Ms. Dominguez's opinion was inadmissible, and Dr. Brooks relied only on her opinion in calculating loss. (ECF No. 372 at PageID 22829.) Thus, they sought an order foreclosing Plaintiffs' Counsel from offering their own calculations in lieu of expert testimony on any loss related to recordkeeping fees. (*Id.*) They foresaw Plaintiffs attempting to compensate for their lack of expert testimony through the use of (1) a "summary of information from the Plan's 408(b) disclosures and Form 5500s" created by Plaintiffs' Counsel and (2) bids submitted by potential recordkeepers during the 2017 RFP. (*Id.* at PageID 22829–34.) Plaintiffs responded that Defendants' Second Motion in Limine was premature because "there is nothing before the Court to restrict" and argued that the Court and parties could explore the admissibility of the referenced items at trial if necessary. (ECF No. 379 at PageID 22901–02.)

At trial, Plaintiffs attempted to move into evidence through Ms. Dominguez a demonstrative exhibit in chart form that contained (1) a number of markers for recordkeeping fees taken from the Plan's 408(b)(2) disclosures ("the blue markers"); (2) a single marker for the recordkeeping fee Defendants were paying in 2017, which was pulled from the Mazursky Memorandum ("the red marker"); and (3) other markers for the bids offered by potential recordkeepers during the 2017 RFP process, also taken from the Mazursky Memorandum ("the

8

yellow and green markers"). (ECF No. 407 at PageID 23840–41.) Upon questioning from Counsel, it became clear that the blue markers were actually "basis point calculation[s]" Ms. Dominguez performed by taking the relevant dollar amounts from the 408(b)(2)s and dividing them "by the asset values at the time on the 408(b)(2) to come up with an asset-based fee." (*Id.* at PageID 23846.) Additionally, Ms. Dominguez confirmed that the yellow and green markers were also the product of calculations she performed in an effort to inflate the two bids from potential recordkeepers during the 2017 RFP to show what they "could have been" across time. (*Id.* at PageID 23848–49, 23852.)

The Court admitted the exhibit for identification purposes only and reserved ruling on Defendants' objections to it. (*Id.* at PageID 23845 & 23851.) The Court later sustained Defendants' objections to very similar information Plaintiffs attempted to introduce through Dr. Brooks's testimony, however, and Plaintiffs ultimately conceded the issue of loss related to excessive recordkeeping fees. (*See* discussion *supra* Part I.A on ECF Nos. 370 & 371.) Thus, in addition to the fact that the data points on the demonstrative exhibit are clearly products of expert calculations, the claim to which they are relevant (recordkeeping fees) is no longer at issue. (*See* discussion *supra* on Motion Under Fed. R. Civ. P. 52(c).) The Second Motion in Limine is thus moot.

### C.    Motion in Limine to Exclude Evidence and Argument of Pre-Class Period Conduct ("Third Motion in Limine," ECF Nos. 370 & 373)

In this Motion, Defendants asked that the Court "exclude evidence of decisions made by the [Committee], and other events, that occurred on or before November 13, 2013" because "[s]uch evidence is time-barred under [ERISA]." (ECF No. 373 at PageID 22837.) Most notably, Defendants explained that, with respect to GoalMaker, the initial selections of investments for that service (which included the GIF) were made in 2009 and 2010—years outside of the applicable

statute of repose.  (*Id.* at PageID 22838–39.)  Relatedly, Defendants argued that evidence going to show that they inadequately investigated the GIF before including it in the Plan was inadmissible because it was time-barred and based solely on deposition testimony from someone without personal knowledge of the initial selection of the GIF.  (*Id.* at PageID22839–41.)  In response, Plaintiffs argued that the Court could distinguish between evidence offered to show liability and evidence offered for context.  (ECF No. 379 at PageID 22884–89.)  In addition, they noted that a statute of limitations bars stale claims—not evidence outside the statute of limitations that is relevant to timely claims.  (*Id.* at PageID 22885.)

At trial, the Court granted this Motion for purposes of admitting evidence to establish liability and denied it insofar as the proffered evidence was being used for permissible purposes under the rules (such as for context).  (ECF No. 412 at PageID 24283.)  The Third Motion in Limine was therefore granted in part and denied in part.

### D.    Motion in Limine to Exclude Evidence and Argument Relating to Remedial Measures ("Fourth Motion in Limine," ECF Nos. 370 & 374)

Defendants' Fourth Motion in Limine requested exclusion of evidence and argument about subsequent measures the Committee implemented in connection with the Plan, such as the decisions to eliminate revenue sharing, to replace GoalMaker with passively-managed Vanguard target date index funds, to substitute Fidelity for Prudential as its recordkeeper, and to replace the GIF with a Fidelity stable value fund.  (ECF No. 374 at PageID 22853.)  Defendants argued that, under Federal Rule of Evidence 407, Plaintiffs could not use these changes to show culpable conduct.  (*Id.* at PageID 22853.)  Plaintiffs objected to the exclusion of such evidence on the grounds that Defendants should be held responsible for their actions, that Plaintiffs had injunctive relief claims relevant to post-Complaint conduct, that the conduct "creates a feasibility and

impeachment issue abdicating the Rule 407 exclusion," and that the Court could apply Rule 407 appropriately. (ECF No. 379 at PageID 22890.)

At the pretrial conference, Plaintiffs' Counsel indicated that evidence Defendants considered "remedial measures" evidence was primarily relevant to its injunctive relief claim, particularly as it related to the current status of the GIF in the Plan and its crediting rate. As Counsel for Defendants agreed that Plaintiffs could ask Defendants' fact witnesses about those issues, the Court posited, without ruling definitively, that the referenced evidence may go more to weight than admissibility. In any event, it turned out that this Motion arose on multiple occasions during trial. Having considered the parties' arguments, the Court **GRANTS** the Motion in part and **DENIES** it in part. Under Fed. R. Evid. 407, evidence of subsequent remedial measures "that would have made an earlier injury or harm less likely to occur" is inadmissible to prove, as relevant here, negligence or culpable conduct. However, such evidence is admissible for impeachment "or—if disputed—proving ownership, control, or the feasibility of precautionary measures." Fed. R. Evid. 407. To the extent the Court refrained from ruling directly at trial on this Motion, the Court grants it insofar as it requests exclusion of evidence to prove Defendants breached their fiduciary duties, but denies it to the extent it asks the Court to exclude evidence offered to contest claims that certain measures could not be taken or to impeach.

E.    **Motion in Limine to Exclude Evidence Relating to AutoZone Inc.'s Internal Investment Portfolio ("Fifth Motion in Limine," ECF Nos. 370 & 375)**

In this Motion, Defendants moved to exclude evidence of the way AutoZone managed the "portfolio of investments that appear on the company's balance sheet." (ECF No. 375 at PageID 22860.) Defendants expected that Plaintiffs would attempt to use this evidence to argue that AutoZone managed those investments differently than it did the Plan, which they considered inappropriate and irrelevant given the different natures of those "enterprises." (*Id.* at PageID

11

22860–61.)  Plaintiffs argued that relevance is a low bar and contended that evidence, for example,

that AutoZone had an Investment Policy Statement ("IPS") for its internal portfolio but not for the

Plan, is relevant to the claim that Defendants were imprudent in carrying out their fiduciary

responsibilities to the Plan.  (ECF No. 379 at PageID 22896–97.)

As expected, Plaintiffs attempted to introduce at trial evidence that AutoZone had an IPS

for its internal investment portfolio, to which Defendants objected.  (ECF No. 392 at PageID

23226.)  The Court overruled Defendants' objection on the grounds that it went more to weight

than admissibility.  (*Id.* at PageID 23227–28.)  Thus, this Motion is **DENIED**.

## II.     "NORTH OF 3% EMAIL"

Parties fought one another at trial about the admissibility of a particular email drafted by

Anton Tansil, a representative at Prudential.  In fact, parties also raised this email at summary

judgment, evidenced by the fact that the Chief Magistrate Judge directly addressed it in his Report

and Recommendation ("Report") on parties' Motions for Summary Judgment.  (ECF No. 380.)

The Report's summary provides as follows:

> On March 18, 2019, in the early stages of this Plan review, Anton Tansil of
> Prudential emailed [Ms.] Samuels-Kater of AutoZone about "another more
> competitive stable value option." (*Id.*; ECF No. 297 at PageID 19590.) This email
> stated: "Your current SV rate (1.7%) is lower than market rates. We can swap out
> your current SV [stable value] fund for another more competitive stable value
> option which is yielding a gross rate of north of 3%. This is something we have
> been wanting to do for some time now." (ECF No. 289-5 at PageID 15464; ECF
> No. 303 at PageID 21689; ECF No. 251-21, Tansil email to Samuels-Kater
> 3/18/2019.) During Tansil's deposition, he testified that this email was actually
> referring to the Prudential Stable Value fund, a synthetic stable value product that
> had a "much higher" risk profile and a different investment strategy than the GIF,
> and did not have a guaranteed minimum crediting rate. (ECF No. 268 at PageID
> 8173.)

(ECF No. 380 at PageID 22930.)   The Chief Magistrate Judge addressed this email again in

considering Defendants' arguments against Plaintiffs' GIF-related claims, specifically their claim

that the Committee breached its fiduciary duties in failing to replace the GIF with the stable value option referenced in Mr. Tansil's email. (*Id.* at PageID 23030.) In finding that Plaintiffs had not created a genuine issue of material fact as to this particular claim, the Chief Magistrate referenced the fact that Mr. Tansil's deposition testimony undeniably showed that he was offering as an alternative a synthetic stable value fund "that had a much higher risk than the GIF and did not have a guaranteed minimum crediting rate." (*Id.* at PageID 23032.) Thus, there was insufficient evidence on which to grant summary judgment against Defendants on the decision not to go with the option Mr. Tansil mentioned. (*Id.*)

At trial, the Plaintiffs sought to introduce this email to demonstrate that the email itself did not contain the qualifiers referenced in the Report. (ECF No. 398 at PageID 23362.) Defendants objected on the grounds that the Chief Magistrate Judge had foreclosed Plaintiffs from using the email in his Report, and Plaintiffs had not challenged the Report. (*Id.*) Perhaps because they had already agreed to the admissibility of the email,[7] Defendants ultimately abandoned their objection, and the Court thus overruled it. (*Id.* at PageID 23365.) Having further reviewed the record, the Court affirms that the email is admissible, but clarifies that it is of little value to the question of Defendants' wisdom in not choosing the alternative Mr. Tansil referenced in his email for the reasons the Chief Magistrate Judge stated in his Report. Thus, the Court will not consider it in assessing Plaintiffs' claims that Defendants breached their fiduciary duties in not switching to the potential option referenced in Mr. Tansil's email.

---

[7] As Defendants stated at trial, they had agreed to the list of "Joint Exhibits" prior to issuance of the Report. (*See* ECF No. 398 at PageID 23363.) But as Plaintiffs correctly noted, Defendants had not raised any objection to the admission of the Joint Exhibit list earlier that day. (*Id.* at PageID 23364.)

The Court agrees with Plaintiffs, however, that the email could still be relevant notwithstanding its otherwise minimal probative value.  As Plaintiffs observed at trial, Defendants did not know the specifics of the alternative option when they received the email.  Evidence that Defendants did not, for example, inquire into what Mr. Tansil indicated was a potentially more competitive stable value option could be relevant to Plaintiffs' fiduciary duty claim.  The Court will therefore consider the email within such a context should it be appropriate.

## DISCUSSION

As discussed, remaining for the Court are Plaintiffs' claims concerning the GIF and GoalMaker.  Plaintiffs contend that, as to the GIF, Defendants "fail[ed] to monitor the crediting rate of the [GIF] stable value investment option, to bid out the GIF, [] to negotiate a higher crediting rate, or to ensure the GIF was adequately diversified."  (ECF No. 390 at PageID 23109.)  With regard to GoalMaker, Plaintiffs allege that Defendants "fail[ed] to timely replace GoalMaker (which steered participants into high-cost, revenue sharing investment options)."  (*Id.*)  While Plaintiffs did not intend to bring a stand-alone claim as to revenue sharing, the Court considers that issue where relevant to the remaining claims in this case.

## I.    UNDISPUTED FACTS[8]

### A.    The AutoZone 401(k) Plan

1. AutoZone sponsors the AutoZone, Inc. 401(k) Plan ("Plan"), a defined contribution retirement plan. The Plan is funded through employee contributions and contributions from AutoZone.

---

[8] These facts come from parties' Statement of Uncontested Facts, attached as Exhibit A to the Pretrial Order.  (ECF No. 390-1.)  The Court did not omit those facts related to recordkeeping because it includes facts that relate to Plaintiffs' claims regarding Defendants' monitoring of the GoalMaker and the GIF.

2. Prudential Retirement Insurance and Annuity Company ("Prudential") has provided recordkeeping and administrative services for the Plan.

3. The Plan was established and is maintained under a written document in accordance with 29 U.S.C. § 1102(a).

4. The class period is November 11, 2013, through the date of judgment ("Class Period").

5. From the beginning of the Class Period to December 31, 2021, the Plan had between 13,000 and 22,000 participants, and between $317,000,000 and $890,000,000 in total assets.

**B.    The AutoZone Investment Committee and its Advisors**

6. AutoZone is the Plan's corporate sponsor. AutoZone appointed the AutoZone Investment Committee ("Committee") to manage and oversee the Plan.

7. The Committee's responsibilities were memorialized in a charter.

8. The following persons served as Committee members: Bill Giles (2013 - 2020), Brian Campbell (2006 - present), Steve Beussink (2013 - 2021), Kristen Wright (2014 - 2021), Michael Womack (2013 - 2015), Rick Smith (2016 - 2021), Kevin Williams (2017 - 2018), Duane Findley (2021- present), Matt Harmon (2021 - present), Joyce Johns (2021 - present), and Denise McCollough (2021 - present).

9. Members of the AutoZone Human Resources department, including Pamela Samuels-Kater and Matt Harmon, provided support to the Committee and carried out the day-to-day administration of the Plan, among other responsibilities.

10. At the beginning of the Class Period, Northern Trust served as the Plan's ERISA 3(21) investment advisor pursuant to an Investment Advisory Agreement (IAA). Northern Trust resigned effective June 30, 2018. The last Committee meeting Northern Trust attended was the August 23, 2018 meeting. Rick Campbell was Northern Trust's primary representative.

11. Willis Towers Watson Investment Services ("WTW") replaced Northern Trust as the Plan's ERISA 3(21) investment advisor on January 11, 2019.

12. Segal Marco Advisors ("Segal Marco") replaced WTW as the Plan's ERISA 3(21) investment advisor on October 1, 2021.

13. The Committee held regular meetings and kept minutes of those meetings. The materials for the meetings typically included the meeting agenda, the minutes from the prior meeting, reports made by the investment advisor (Northern Trust, WTW, and Segal Marco), and quarterly reports from the Plan's recordkeeper, among other documents. In a typical meeting packet, the agendas set forth the topics for consideration at the meetings. The minutes from the prior meeting typically were submitted for approval.

14. The Committee met on the following dates from the beginning of the Class Period through March 21, 2023:

| November 22, 2013 | August 23, 2018 | November 12, 2020 |
|---|---|---|
| February 12, 2014 | November 13, 2018 | November 24, 2020 |
| May 8, 2014 | March 21, 2019 | May 21, 2021 |
| August 19, 2014 | May 2, 2019 | August 17, 2021 |
| November 18, 2014 | August 16, 2019 | September 8, 2021 |

| February 17, 2015 | October 10, 2019 | October 25, 2021 |
| May 19, 2015 | November 14, 2019 | December 15, 2021 |
| September 11, 2015 | January 8, 2020 | May 10, 2022 |
| November 17, 2015 | February 14, 2020 | June 1, 2022 |
| February 19, 2016 | February 21, 2020 | July 6, 2022 |
| May 3, 2016 | April 7, 2020 | August 26, 2022 |
| August 9, 2016 | April 30, 2020 | September 8, 2022 |
| November 8, 2016 | May 8, 2020 | October 3, 2022 |
| February 21, 2017 | June 10, 2020 | October 24, 2022 |
| May 9, 2017 | July 8, 2020 | December 7, 2022 |
| August 1, 2017 | July 28, 2020 | December 8, 2022 |
| November 30, 2017 | August 14, 2020 | January 5, 2023 |
| February 6, 2018 | October 8, 2020 | January 13, 2023 |
| May 17, 2018 | October 12, 2020 | March 21, 2023 |

### C.    Disclosures

15. AutoZone filed Form 5500 reports on an annual basis. The Form 5500 reports provided information on the balances of the Plan's investment options at the beginning and end of each year, contributions made during the Plan year, service provider information, and other information.

16. AutoZone provided participants with 29 C.F.R. § 2550.404a-5 participant disclosures. The 404(a)(5) participant disclosures provided information

regarding the Plan's investment options, their expense ratios, costs, and investment returns, including performance against benchmarks.

17. At periodic intervals during the Class Period, Prudential provided to AutoZone disclosures pursuant to 29 C.F.R. § 2550.408b-2. The 408(b)(2) disclosures provided information regarding Prudential's estimated direct and indirect compensation, investment balances, net expense ratios, the fees and expenses of the Plan's investment options, and revenue sharing, among other information.

**D.    The Plan's Investment Options**

18. During the Class Period, the Plan offered a menu of investment options.

19. An investment's expense ratio is the cost paid by plan participants to invest in that fund, expressed as a percentage of the fund's average net assets. For instance, a participant who invests $1,000 in a fund with an expense ratio of 0.50% pays an annual fee of $5.00 ($1,000 x 0.0050). Sometimes expense ratios are expressed as "basis points," which are $1/100^{th}$ of a percent. A 0.50% expense ratio equates to 50 basis points.

20. From the beginning of the Class Period to March 23, 2021, GoalMaker was the Plan's qualified default investment alternative. GoalMaker was an asset allocation service furnished by Prudential. AutoZone selected the funds utilized by GoalMaker.

21. From the beginning of the Class Period until September 1, 2023, the Plan offered the Prudential Guaranteed Income Fund ("GIF") as the Plan's stable value option.

22. During the Class Period, the GIF's stated guaranteed minimum crediting rate was 1.5%. The amount credited to participants was net of an "asset charge." From the beginning of the Class Period until July 1, 2020, the GIF had an asset charge of 25 basis points. The GIF paid Plan participants a crediting rate that was fixed for six-month intervals.

23. Effective September 1, 2023, Prudential was replaced by Fidelity Investments ("Fidelity") as the Plan's recordkeeper.

**E.    Recordkeeping**

24. From June 1, 2010, to September 1, 2023, Prudential served as the Plan's recordkeeper. AutoZone selected Prudential following an RFP.

25. Northern Trust was not involved in the selection of Prudential.

26. AutoZone entered into an Administrative Services Agreement ("ASA") with Prudential on June 1, 2010. The ASA was amended on July 26, 2012, July 1, 2016, July 1, 2020, and March 5, 2021. Changes to the Plan's recordkeeping and administrative fees were typically memorialized in expense schedules.

27. In 2012, 2013, and 2015, Fiduciary Benchmarks, Inc. issued reports comparing the Plan's recordkeeping and administrative fees to a "Benchmark Group" of other plans.

28. In 2016, the Committee conducted a Request for Information ("RFI"), soliciting information from potential service providers about recordkeeping services and investment advisory services.

29. In 2017, the Committee conducted an RFP for recordkeeping services with the assistance of outside counsel Mazursky Constantine, LLC ("Mazursky").

Northern Trust was not involved in the 2017 RFP process. Mazursky provided

a memorandum titled the "Selection of Recordkeeper" dated December 1, 2017.

The Committee decided to retain Prudential as the Plan's recordkeeper.

30. Mutual funds may be offered in different share classes. Depending on the fund

and the share class, revenue may be shared with service providers.

31. Effective July 1, 2020, revenue sharing was eliminated from the Plan.

32. In 2022, the Committee issued an RFP for recordkeeping services, assisted by

Segal Marco.

33. Effective September 1, 2023, Fidelity became the Plan's recordkeeper,

replacing Prudential.

## II.    FINDINGS OF FACT

### A.    Plan History

34. An investment menu was designed for the Plan prior to Northern Trust's

appointment as advisor to the Plan. (ECF No. 404 at PageID 23648–49.)

35. That menu included revenue sharing. (*Id.* at PageID 23635.)

36. When Northern Trust was retained as the Plan's advisor, it was not engaged to

review or redesign the existing investment lineup and did not do so. (*Id.* at

PageID 23647–49.)

### B.    Committee Process

37. The Committee's charter listed the Committee's responsibilities as to the Plan,

which included, among other things, "monitor[ing] the investment performance

of benefit plan funds for compliance against preestablished benchmarks." (ECF

No. 392 at PageID 23201.)

38. Mr. Brian Campbell has been a member of the Committee and regularly attended its meetings since approximately 2006.  (ECF No. 392 at PageID 23203.)

39. Mr. Brian Campbell received a Bachelor of Arts degree in economics from Duke University and a Master in Business Administration degree from the University of Chicago.  (ECF No. 398 at PageID 23443.)

40. Mr. Brian Campbell became Chair of the Committee sometime between December of 2021 and January of 2022.  (ECF No. 392 at PageID 23203; 23212–13.)

41. Prior to Committee meetings, Northern Trust sent Defendants paper copies of their investment presentations, which Mr. Brian Campbell distributed to Committee members for them to review before each meeting.  (ECF No. 398 at PageID 23504.)

42. Mr. Brian Campbell reviewed and annotated the advisor's notes and set the agenda for the meeting.  (ECF No. 398 at PageID 23475.)

43. At the Committee meetings, each advisor to the Plan (Northern Trust, Willis Towers Watson, and Segal Marco) provided a presentation that included a capital markets review, a discussion of the current funds in the Plan and their performance, and any decisions the Committee needed to make (e.g., to replace options offered in the Plan).  (ECF No. 398 at PageID 23491–92; ECF No. 404 at PageID 23559–60 & 23576.)

44. Each investment advisor (Northern Trust, Willis Towers Watson, and Segal Marco) compiled a "report card" of the performance of the funds in the Plan for each Committee meeting.  (ECF No. 398 at PageID 23506–08.)

45. Occasionally, the Committee put an investment option on a watchlist for closer review.  (ECF No. 398 at PageID 23511.)

46. Ms. Samuels-Kater regularly took notes (or minutes) of Committee meetings, which occurred on a quarterly basis.  (ECF No. 392 at PageID 23208–09 & 23239.)

47. These minutes reflected a summary of the Committee meetings rather than a complete transcript of them.  (ECF No. 392 at PageID 23235; ECF No. 404 at PageID 23563.)

48. The Committee relied upon its investment advisors for advice, wisdom, and best practices.  (ECF No. 392 at PageID 23212.)

49. The final authority for decisions regarding the Plan rested with the Committee. (ECF No. 404 at PageID 23637–38; ECF No. 398 at PageID 23500–02.)

50. Northern Trust did not consider itself responsible for monitoring recordkeeping compensation.  (ECF No. 404 at PageID 23644–45.)

51. Northern Trust did, however, provide commentary on a third party's ("Fiduciary Benchmarks") review of recordkeeping compensation.  (ECF No. 404 at PageID 23646.)

52. The Committee reviewed all of the Plan's funds and expenses (including expense ratios) on a quarterly basis. (ECF No. 392 at PageID 23242 & 23250; ECF No. 404 at PageID 23568–69 & 23572.)[9]

53. The Committee reviewed Form 5500s on an annual basis. (ECF No. 392 at PageID 23242.)

54. During the transition of investment advisor from Northern Trust to Willis Towers Watson in 2018–2019, the Committee held one meeting at which there was no investment advisor present. (ECF No. 390-1 at PageID 23119; ECF No. 392 at PageID 23239; ECF No. 398 at PageID 23548.)

55. The Plan's advisors and outside Counsel trained the Committee on its fiduciary duties. (ECF No. 392 at PageID 23226; ECF No. 404 at PageID 23584; Joint Exhibit 67 at 35.)

56. On April 7, 2010, Northern Trust provided an outline of what an Investment Policy Statement ("IPS") might include. (ECF No. 404 at PageID 23643; Joint Exhibit 602 at 11–17.)

57. On November 2, 2016, Mr. Richard Campbell advised Mr. Beussink in an email that Northern Trust recommended an IPS. (ECF No. 404 at PageID 23655; Joint Exhibit 615 at 1.)

---

[9] Plaintiffs' Counsel presented Mr. Brian Campbell with the minutes of a number of Committee meetings and asked him to identify where the minutes referenced discussion of recordkeeping fees, investment fees, expense ratios, the GIF, the share class, the 408(b)(2) disclosures, or the Form 5500s. Mr. Brian Campbell generally conceded that these exact words often did not appear explicitly in the meeting minutes, but testified that the Committee discussed "all 12 accounts" "in every meeting." (ECF No. 398 at PageID 23345.)

58. The Committee did not adopt a formal, written IPS for the Plan until January 25, 2022.  (ECF No. 392 at PageID 23215.)

59. The Committee reviewed revenue sharing fees and the fees paid to the fund managers on a quarterly basis.  (ECF No. 392 at PageID 23218.)

60. The Committee understood that it had a duty to monitor share classes so it had the most advantageous share class.  (ECF No. 392 at PageID 23231.)

61. The Committee believed that its investment advisors (Northern Trust, Willis Towers Watson, and Segal Marco) continually reviewed the Plan's funds to determine whether any were eligible for a change in share class.  (ECF No. 392 at PageID 23296.)  The fund managers would tell the Committee when its investments were reaching a threshold that could unlock a different share class with lower fees.  (*Id.* at PageID 23231.)

62. Eligibility for a different share class was not discussed at every Committee meeting.  (ECF No. 392 at PageID 23294–95.)

**B.    The GIF**

63. The GIF was one of the largest investments (and perhaps the largest) in the Plan, with a balance of approximately $100 million as of August 1, 2023.  (ECF No. 392 at PageID 23241.)

64. Northern Trust monitored the GIF and benchmarked it every quarter.  (ECF No. 404 at PageID 23714.)

65. Northern Trust never advised the Committee that the GIF was a poor investment option or advised that the Committee remove the GIF from the Plan.  (ECF No. 404 at PageID 23715.)

66. Northern Trust did not have concerns about Prudential's solvency during its time as advisor to the Plan.  (ECF No. 404 at PageID 23716.)

67. At the March 21, 2019 Committee meeting, Prudential discussed with the Committee the GIF "and its performance under its benchmark."[10]  (ECF No. 398 at PageID 23340.)

68. The GIF charged 25 basis points in revenue sharing.  (ECF No. 398 at PageID 23355.)

69.  From June 21, 2016 through December 31, 2016, the net crediting rate for the GIF (after deduction of a 25 basis point asset charge) was 1.3%.  (ECF No. 398 at PageID 23356.)

70. As of July 1, 2022, the net crediting rate for the GIF was 2.90%.  (ECF No. 398 at PageID 23371.)

71. AutoZone itself never attempted to negotiate a better crediting rate for the GIF.  (ECF No. 398 at PageID 23360.)

72. Mr. Brian Campbell did not believe that the GIF's crediting rate could be renegotiated.  (ECF No. 404 at PageID 23600–01.)

73. Neither AutoZone itself nor its investment advisors ever issued an RFP for the GIF until 2022.  (ECF No. 398 at PageID 23360.)

---

[10] Parties read this language—taken from the minutes of the March 21, 2019 Committee meeting—in different ways.  Plaintiffs read it to refer to how the GIF was "underperforming" its benchmark, while Defendants read it to simply connote discussion of the GIF's performance relative to its benchmark.  (*See, e.g.*, ECF No. 398 at PageID 23341.)  The Court does not find resolving this dispute necessary since Plaintiffs elicited testimony about this language as evidence that this was only the first or second time the Committee discussed the GIF since November 22, 2013, and not necessarily as evidence that the GIF was, in fact, underperforming.

74. In March of 2019, Mr. Anton Tansil sent Ms. Samuels-Kater an email indicating there may be a "more competitive" stable value option than the GIF, but this information was not presented before the Committee. (ECF No. 398 at PageID 23368.)

75. On August 23, 2018, Northern Trust advised the Committee that the GIF had performed at or above its benchmark in 2015, 2016, and 2017, and under its benchmark during the first two quarters of 2018. (Joint Exhibit 52 at 17; ECF No. 404 at PageID 23580.)

76. Northern Trust selected the 90 Day T-Bill for the GIF's benchmark. (Joint Exhibit 52 at 18; ECF No. 404 at PageID 23581.)

77. On March 21, 2019, Willis Towers Watson advised the Committee that the GIF was underperforming relative to its benchmark in the three-month, year-to-date, 1-year, 3-year, and 5-year periods. (ECF No. 398 at PageID 23359; Joint Exhibit 55 at 9.)

78. Willis Towers Watson selected the 5-year Treasury average for the GIF's benchmark. (ECF No. 404 at PageID 23581; Joint Exhibit 67 at 23.)

79. On August 16, 2019, Willis Towers Watson recommended that the Committee retain the GIF "for now pending education on the range of capital preservation options. If decision reached to retain stable value as capital preservation option, conduct search to determine if [the GIF] is most appropriate strategy for AutoZone." (ECF No. 404 at PageID 23580; Joint Exhibit 67 at 17.)

80. Segal Marco advised that, as of March 31, 2022, the GIF was performing favorably compared to its benchmark in the 1-year, 3-year, 5-year, 7-year, and 10-year periods.  (Joint Exhibit 118 at 34; ECF No. 404 at PageID 23588.)

81. Segal Marco selected the 90 Day T-Bill for the GIF's benchmark.  (Joint Exhibit 118 at 34; ECF No. 404 at PageID 23588.)

82. The Plan began offering a stable value option from Fidelity—the Managed Income Portfolio Number II ("MIP")—in September of 2023 in place of the GIF.  (ECF No. 398 at PageID 23373 & 23381.)

83. Under the GIF contract, Defendants are not permitted to move funds from the GIF into the MIP.  (ECF No. 398 at PageID 23552; ECF No. 404 at PageID 23616; Trial Exhibit 912.)

84. Individual participants in the Plan may, however, move funds out of the GIF.  (ECF No. 404 at PageID 23616.)

85. As of October 23, 2023, there was $119,700,000 in the GIF.  (ECF No. 404 at PageID 23611; Trial Exhibit 910.)

86. Unlike the GIF, the MIP does not have a guaranteed minimum crediting rate.  (ECF No. 398 at PageID 23384.)

87. As of September 2023, the net crediting rate of the MIP was 2.20% and the net crediting rate for the GIF was 1.50%.  (ECF No. 398 at PageID 23383 & 23384.)

88. Plan participants could move money into the MIP at any time without penalty beginning September 15, 2023.  (ECF No. 398 at PageID 23397 & 23405.)

89. Plan participants were informed of their ability to move funds to the MIP through email and/or postal mail.  (ECF No. 398 at PageID 23404.)

90. As of October 23, 2023, there was $119,700,000 in the GIF.  (ECF No. 398 at PageID 23399.)

91. When Fidelity replaced Prudential as the Plan's recordkeeper, at least three of the Plan's twelve funds were changed out in addition to the GIF.  (ECF No. 398 at PageID 23403.)

**C.    GoalMaker**

92. Target-date funds are a common alternative to asset-allocation services like GoalMaker, and the Committee specifically compared GoalMaker to target-date funds during its 2015 review.  (ECF No. 398 at PageID 23470–71; ECF No. 398 at PageID 23408–09.)

93. Prior to Northern Trust's appointment as advisor to the Plan, Defendants had worked with a third-party consultant and Prudential to build an investment menu to meet revenue sharing objectives.  (ECF No. 404 at PageID 23629–30.)

94. Northern Trust did not advise Defendants about the funds selected for GoalMaker.  (ECF No. 404 at PageID 23629–30.)

95. As the Qualified Default Investment Alternative ("QDIA") for the Plan, GoalMaker was where participants' money was invested in the absence of a participant selecting a different investment.  (ECF No. 398 at PageID 23469.)

96. All of the funds in GoalMaker were actively-managed funds.  (ECF No. 398 at PageID 23406.)

97. Actively-managed funds typically carry higher ratios than comparable passive managed index funds because active strategies incur additional research and trading costs.  (ECF No. 404 at PageID 23604–06.)

98. To assess whether those fees and expenses were justified, Northern Trust evaluated whether an active fund's net-of-fee returns were in excess of its benchmark's excess returns.  (ECF No. 404 at PageID 23682–83.)

99. From September 1, 2009, through June 30, 2018, Northern Trust concluded that the investment management fees of the Plan were reasonable.  (ECF No. 404 at PageID 23714, 23633, & 23686–87.)

100. Northern Trust advised the Committee about the tradeoffs between active and passive management and recommended offering both options.  (ECF No. 404 at PageID 23605–06; Joint Exhibit 27 at 38 & 40.)

101. One consideration Northern Trust discussed with the Committee was the ability of active funds to cover the recordkeeping fees through revenue sharing.  (ECF No. 404 at PageID 23606; Joint Exhibit 27 at 41.)

102. If the Plan changed to an all-passive lineup, the Committee would need to decide how to handle recordkeeping fees, since there would be no revenue sharing to pay them.  (ECF No. 404 at PageID 23660.)

103. Northern Trust advised against revenue sharing because that practice was becoming a target of litigation.  (ECF No. 404 at PageID 23678 & 23690.)

104. The elimination of revenue sharing would have permitted the Plan to move to lower cost share classes.  (ECF No. 404 at PageID 23675.)

105. An investment's fees reduces returns.  (ECF No. 398 at PageID 23462.)

106. An investment's performance should therefore be assessed net of fees because returns are based on the net of fees amount.  (ECF No. 404 at PageID 23568.)

107. At the Committee meeting held May 19, 2015, Mr. Bill Giles (the CFO of AutoZone) asked Mr. Brian Campbell and Ms. Samuels-Kater to review the passive and active funds in the Plan, including a review of GoalMaker versus target date funds, and report back to the Committee. (ECF No. 398 at PageID 23408–09.)

108. Northern Trust conducted that review. (ECF No. 398 at PageID 23409.)

109. Northern Trust advised the Committee about the results of that review at the September 11, 2015 Committee meeting, at which Northern Trust indicated that the Plan's performance was "mixed" and "struggle[d] with actively managed funds." (ECF No. 398 at PageID 23414.)

110. Northern Trust also recommended that the Committee eliminate revenue sharing and decide how to pay recordkeeping fees, either through payment by the Plan sponsor or by Plan participants. (ECF No. 404 at PageID 23669; Joint Exhibit 34 at 8.)

111. At the May 3, 2016 Committee meeting, Mr. Richard Campbell from Northern Trust stated that Northern Trust would not have recommended adopting revenue sharing as a practice and that revenue sharing was not common anymore. (ECF No. 398 at PageID 23421.)

112. As of May 2016, Prudential was receiving $700,000 to $800,000 in revenue sharing. (ECF No. 398 at PageID 23423.)

113. On February 3, 2017, Mr. Rick Campbell sent Mr. Beussink an email that referenced the potential elimination of revenue sharing. (ECF No. 404 at PageID 23676, Joint Exhibit 619 at 1.)

114. GoalMaker was eliminated from the Plan on December 1, 2020.  (ECF No. 398 at PageID 23434.)

115. GoalMaker was ultimately replaced by Vanguard target funds as the Plan's QDIA following a 2020 RFP.  (ECF No. 398 at PageID 23470–71.)

116. Target date funds are used to optimize returns as participants approach the year of their retirement.  (ECF No. 398 at PageID 23470.)

117. Investment fees were charged through each fund's expense ratio, which was netted from returns and borne by participants.  (ECF No. 407 at PageID 23766–67.)

118. Plan participants' account balances were, on average, relatively small.  (ECF No. 398 at PageID 23455.)

119. As participants age, they tend to migrate to lower risk investments.  (ECF No. 398 at PageID 23455.)

## III.    CONCLUSIONS OF LAW

To establish a breach of fiduciary duty claim under ERISA, a plaintiff must prove by a preponderance of the evidence that "(1) the defendant is a plan fiduciary; (2) the defendant breached its fiduciary duty; and (3) the breach resulted in harm to the plaintiff." *Chelf v. Prudential Ins. Co. of Am.*, 31 F.4th 459, 464 (6th Cir. 2022) (citing *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449, 454 (6th Cir. 2002)).  "ERISA plan fiduciaries must discharge their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Hughes v. Northwestern Univ.*, 595 U.S. 170, 172 (2022) (quoting 29 U.S.C. § 1104(a)).  "Derived from the law of trusts, the duty of prudence requires plan

administrators to select initial investment options with care, to monitor plan investments, and to remove imprudent ones." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448 (6th Cir. 2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015)).  At the same time, courts "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," as "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs." *Hughes, 595 U.S.* at 177.

It is undisputed that Defendants were fiduciaries of the AutoZone 401(k) Plan, so the Court's analysis focuses on whether Defendants breached their fiduciary duties of prudence in the monitoring of the Plan's investments—specifically the Prudential Guaranteed Income Fund and the GoalMaker program—and, if so, whether any such breach caused losses to the Plan.

**A.    Plaintiffs Failed to Prove that Defendants Breached Their Fiduciary Duties**

**i.    Defendants Maintained a Prudent General Process**

"Trust law informs the duty of prudence, as 'an ERISA fiduciary's duty is derived from the common law of trusts.'"  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015)).   "Bedrock trust principles establish that '[w]hether the trustee is prudent in the doing of an act depends upon the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question.'"  *Id.* at 1164.   The prudence inquiry focuses on process, not results.  *Id.* at 1166; *see also Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 182 (4th Cir. 2023).   The record here shows a regular, structured review of the Plan's investments with the assistance of independent advisors.  The Committee met on a quarterly cadence for years, received advanced meeting materials, and discussed capital markets, fund performance, fees, and recommended actions at each meeting.  (ECF No. 398 at PageID 23491–92; ECF No. 404 at

PageID 23559–60, 23576.)  Each advisor prepared written "report cards" evaluating performance and fees for every fund.  (ECF No. 398 at PageID 23506–08.)  Minutes were prepared by Ms. Samuels-Kater and reflected summaries of deliberations and decisions.  (ECF No. 392 at PageID 23208–09, 23235; ECF No. 404 at PageID 23563.)  The Committee's Charter charged it to monitor investment performance against benchmarks, and the Committee relied on its advisors' expertise in doing so.  (ECF No. 392 at PageID 23201, 23212.)  Committee members had relevant training and experience, including fiduciary training from advisors and outside counsel.  (ECF No. 392 at PageID 23225; ECF No. 404 at PageID 23584; Joint Ex. 67 at 35.)

Plaintiffs point to the absence of an IPS until January 25, 2022, and to the brevity of minutes.  (ECF No. 392 at PageID 23215–17; ECF No. 404 at PageID 23563–64.)  But ERISA does not require a written IPS, and the lack of one does not establish imprudence where the fiduciaries otherwise follow a prudent review process.  *See, e.g.*, *Falberg v. Goldman Sachs Grp., Inc.*, No. 19 Civ. 9910, 2022 WL 4280634, at *11 (S.D.N.Y. Sep. 14, 2022), *aff'd*, No. 22-2689-CV, 2024 WL 619297 (2d Cir. Feb. 14, 2024)*; see also Taylor v. United Techs. Corp.*, No. 3:06CV1494, 2009 WL 535779, at *10 (D. Conn. Mar. 3, 2009).  Indeed, Plaintiffs here "do[] not point to any evidentiary basis for concluding that a prudent fiduciary would have *necessarily* adopted an IPS, as opposed to relying on another form of deliberative process for selecting and reviewing investments."  *Falberg v. Goldman Sachs Grp., Inc.*, No. 22-2689-CV, 2024 WL 619297, at *3 (2d Cir. Feb. 14, 2024) (emphasis added).  Nor must minutes be verbatim to evidence prudent deliberation.  *Falberg*, 2022 WL 4280634, at *12.  The Committee is not a court, nor need it be expected to behave like one to show prudent conduct.  The record here demonstrates consistent monitoring, documentation, and thorough reliance on expert advice.

Defendants argued that the Court's inquiry may begin and end with a finding that they employed a prudent process and relied on their consultants.  (ECF No. 392 at PageID 23179.)  The Court does not read the law so narrowly.  *See Davis v. Magna Int'l of Am., Inc.*, 2023 WL 3821807, at *11 (E.D. Mich. June 5, 2023) (indicating that "[t]he existence of a deliberative process does not alone resolve the issue [of prudence]").  A deficient or nonexistent deliberative process may be sufficient to show imprudence, but even where a process exists, fiduciaries can act imprudently by failing to follow it or by disregarding plainly prudent recommendations arising from it.  *Id.* (citing *Sacerdote v. New York Univ.*, 9 F.4th, 95, 111 (2d Cir. 2021)).  The Court therefore addresses Plaintiff's specific challenges to Defendants' monitoring of the GIF and GoalMaker.[11]

> ii.    **Plaintiffs Did Not Show that Defendants Acted Imprudently in Monitoring the GIF.**

Plaintiffs contend Defendants imprudently failed to (1) bid out or replace the GIF sooner, (2) negotiate a higher crediting rate, and (3) address the GIF's characteristics—general account, liquidity limits, minimum guarantee.  They also rely on a March 2019 email from Prudential's Anton Tansil suggesting a "more competitive" stable-value alternative "north of 3%."

The GIF was the Plan's stable value option from the start of the class period through August 2023.  (ECF No. 398 at PageID 23373; *see also* Joint Exhibit 909.)  It guaranteed a 1.50% minimum crediting rate, net to participants after a 25 basis points asset charge; in late 2016, the rate was 1.30%, and as of July 1, 2022, it was 2.90%.  (ECF No. 398 at Page ID 23355–56, 23371.)

---

[11] The Court recognizes that there is language from the Sixth Circuit that could suggest a prudent process is sufficient—on its own—to overcome a fiduciary breach claim.  *See Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 384, 388 (6th Cir. 2015) (employing a "prudent-process standard" and finding that the plaintiff had not shown a genuine issue as to the duty of prudence "[g]iven the prudent process in which [the defendant] engaged").  But the Court does not read that case to go as far as Defendants need here.  Indeed, the *Pfeil* Court's language, somewhat obviously, requires that the process in fact be employed.  *See id.* at 384 & 388.

Northern Trust monitored the GIF quarterly, benchmarked it, had no solvency concerns about Prudential, and never recommended removal. (ECF No. 404 at PageID 23714–16, 23581; Joint Ex. 52 at 18.) In August 2018, Northern Trust reported the GIF had met or exceeded its benchmark—a 90-day T-Bill metric—in 2015–2017 and lagged in early 2018. (ECF No. 404 at PageID 23580–81; Joint Ex. 532 at 17.) In 2019, though, upon replacing Northern Trust as investment advisor, WTW used a five-year Treasury metric and observed underperformance over several trailing periods, recommending the Committee retain the GIF "for now" pending education on capital-preservation options and, if stable value were retained, to conduct a search. (ECF No. 398 at PageID 23359; ECF No. 404 at PageID 23580–81; Joint Ex. 55 at 9; Joint Ex. 67 at 17, 23.) Segal, however, later reported the GIF was performing favorably against its benchmark over multiple horizons. (ECF No. 404 at PageID 23588; Joint Ex. 118 at 34.)

The Committee ultimately transitioned to MIP in September 2023, consistent with the advisors' suggestion to survey the market. (ECF No. 398 at PageID 23373, 23381.) Under the GIF contract, a plan-level transfer to MIP was prohibited, but individual participants were permitted to move balances at any time and were informed of that ability. (ECF No. 404 at PageID 23616; ECF No. 398 at PageID 23397, 23404–05, 23552.) As of trial, approximately $119.7 million remained in the GIF. (ECF No. 404 at PageID 23611; *see also* Trial Exhibit 910.)

Measured against the governing standard, Plaintiffs have not shown imprudence. While "pointing to an alternative course of action, say another fund the plan might have invested in, will often be necessary to show a fund acted imprudently," that comparison is not sufficient. *CommonSpirit Health*, 37 F.4th at 1166. Rather, "these claims require evidence that an investment was imprudent from the moment the administrator selected it, that the investment became imprudent over time, or that the investment was otherwise clearly unsuitable for the goals of the

35

fund based on ongoing performance." *Id.* As was mentioned at trial, a stable value option balances yield and capital preservation; fiduciaries are not required to chase the highest yield if doing so increases risk. *See, e.g.*, *Barchock v. CVS Health Corp.*, 886 F.3d 43, 49–50 (1st Cir. 2018). Here, the GIF provided a 1.50% floor, and the advisors consistently monitored and benchmarked the fund, reported results, and recommended a measured review rather than immediate replacement. Neither does the 2019 "north of 3%" email establish imprudence; the Committee did not receive it, and Mr. Tansil clarified he was referring to a synthetic stable value product *with a higher risk profile and no guaranteed floor*. (ECF No. 380 at PageID 22930–31.) Endorsing the Eighth Circuit's view of such comparisons, the *CommonSpirit Health* Court explained that when "two general investment options 'have different aims, different risks, and different potential rewards that cater to different investors[,] [c]omparing apples and oranges is not a way to show that one is better or worse than the other.'" *CommonSpirit Health*, 37 F.4th at 1166 (quoting *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020)); *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018). ERISA does not require fiduciaries to substitute a higher-risk product for a guaranteed option based on a market email the Committee did not see. *See CommonSpirit Health*, 37 F.4th at 1165–66.

Nor have Plaintiffs shown Defendants failed to negotiate reasonably. Mr. Campbell understood the GIF rate to be set by contract and non-negotiable, and Plaintiffs identified no evidence to the contrary. (ECF No. 404 at PageID 23600–01; ECF No. 398 at PageID 23360.) Instead, Defendants addressed the larger fee structure by eliminating revenue sharing by July 1, 2020, increasing transparency, and enabling the use of lower-cost share classes. (ECF No. 392 at PageID 23218; ECF No. 404 at PageID 23675, 23591.) On this record, continuing the GIF until the 2022–2023 transition, while monitoring performance and considering alternatives, falls within

the range of prudent fiduciary judgment. *See DiFelice v. United States Airways*, 497 F.3d 410, 424 (4th Cir. 2007) ("Whether a fiduciary's actions are prudent cannot be measured in hindsight."). Accordingly, Plaintiffs did not prove that Defendants acted imprudently in monitoring the GIF.

> **iii.    Plaintiffs Did Not Show that Defendants Acted Imprudently in Monitoring GoalMaker.**

Plaintiffs also contend that Defendants imprudently allowed GoalMaker—the Plan's default until late 2020—to steer participants into higher-cost, actively managed funds rather than lower-cost index funds or target date funds, and that Defendants should have eliminated revenue sharing and adopted an index-based QDIA earlier.

The record shows that the Committee evaluated active versus passive strategies beginning in 2015, including a specific request from CFO Bill Giles to review "GoalMaker versus target date funds," and Northern Trust performed and presented that analysis.  (ECF No. 398 at PageID 23404–09, 23414, 24393.)  All GoalMaker funds were actively managed, and Northern Trust assessed whether each active fund's net-of-fee returns exceeded its benchmark's returns.  (ECF No. 398 at PageID 23406; ECF No. 404 at PageID 23682–83.)  Northern Trust advised the Committee on tradeoffs between active and passive management and recommended offering both, while also counseling that revenue sharing was disfavored and should be eliminated.  (ECF No. 404 at PageID 23605–06, 23678–79, 23690; *see also* Joint Ex. 27 at 38, 40–41.)  The Committee recognized that if it moved to an all-passive lineup, it would have to decide how to pay recordkeeping fees without revenue sharing.  (ECF No. 404 at PageID 23660.)  During 2016 and 2017, the Committee explored alternatives through an RFI and RFP for recordkeeping, with counsel's assistance, and eventually eliminated revenue sharing effective July 1, 2020.  (ECF No. 404 at PageID 23669, 23675–76; ECF No. 398 at PageID 23421–23.  *See also* Joint Ex. 34 at 8;

Joint Ex. 619 at 1.)  The Committee then removed GoalMaker on December 1, 2020, and adopted

Vanguard target-date funds as the QDIA in early 2021.  (ECF No. 398 at PageID 23423, 23470–

71; ECF No. 404 at PageID 23601–04.)

Plaintiffs' own experts reinforced that their GoalMaker theory rested on fee differentials

rather than net-of-fee performance.  Ms. Dominguez confirmed she performed "basis point" fee

calculations and did not present a net-of-fee performance analysis of the GoalMaker lineup against

her passive comparators, and Dr. Brooks described a methodology that applied a fee differential

rather than demonstrating that participants would have earned more net of fees in an available

prudent alternative.  (ECF No. 407 at PageID 23846, 23848, 23852; ECF No. 412 at PageID 24186;

ECF No. 404 at PageID 23568.)  That testimony undercuts Plaintiffs' proof of loss and causation,

which in this Circuit requires a net-of-fee performance showing rather than fees alone.

*CommonSpirit Health*, 37 F.4th at 1167–68 (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325

F. App'x 31, 33 (2d Cir. 2009)) (requiring plaintiffs to show that "fees were excessive *relative to

the services rendered*").

Under Sixth Circuit precedent, offering actively managed funds with higher expense ratios

than index funds does itself establish imprudence; fiduciaries may reasonably offer a mix of active

and passive options and make measured changes over time.  *CommonSpirit Health*, 37 F.4th at

1165–68 (commenting that "the absence of any actively managed funds suited for risk-tolerant

investors would be imprudent").  The Court also does not find sufficient "serious signs of distress"

to support Plaintiffs' imprudence claim.  *See id.* at 1168 (quoting *Griffin v. Flagstar Bancorp, Inc.*,

492 F. App'x 598, 604–05 (6th Cir. 2012) (identifying an exemplar case of alleged imprudence

when an investment's "value fell from $14.95 to $0.68 per share").  Here, the Committee

monitored fees and performance net-of-fees, received and followed expert advice, and executed

38

substantial changes—eliminating revenue sharing and replacing the QDIA with index-based target-date funds—within a reasonable period once recordkeeping arrangements and lineup structure were aligned. (ECF No. 404 at PageID 23568, 23675, 23682–83; ECF No. 398 at PageID 23434–35, 23470–71.) Plaintiffs did not identify a specific fund that persistently and materially underperformed net-of-fees such that a prudent fiduciary would have removed it earlier, nor did they show that the timing of Defendants' changes fell outside the range of reasonable fiduciary judgment. (ECF No. 398 at PageID 23414–23; ECF No. 404 at PageID 23682–83.) Accordingly, Plaintiffs did not prove that Defendants acted imprudently in monitoring GoalMaker.

### iv.    Plaintiffs Have Not Shown Imprudence in the 2017 RFP

Plaintiffs further argue that the 2017 recordkeeping RFP was imprudent because Northern Trust did not lead it. But the record shows the Committee, with assistance from outside ERISA counsel, Mazursky Constantine, conducted the 2017 RFP, received competitive bids, and used the resulting analysis—including the "Selection of Recordkeeper" memorandum—to evaluate Prudential's compensation and fee structure. (ECF No. 398 at PageID 23430; ECF No. 407 at PageID 23824; 23840–49; *see also* ECF No. 372 at PageID 22829–34.) Northern Trust was not responsible for monitoring recordkeeping compensation and did not lead the RFP, but it did comment on third-party benchmarking. (ECF No. 404 at PageID 23644–46.) ERISA did not require Defendants to assign the RFP to their investment advisor, and relying on specialized counsel for the recordkeeping RFP was not unreasonable. (ECF No. 404 at PageID 23644–46; ECF No. 398 at PageID 23430.) The RFP process, together with later action eliminating revenue sharing, reflects prudent attention to fees. (ECF No. 404 at PageID 23675–76; ECF No. 398 at PageID 23421–23423.)

### B.    Causation and Loss

Even if Plaintiffs had shown a breach, they were required to prove losses to the Plan "resulting from" that breach.  29 U.S.C. § 1109(a); *see also Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 863 (6th Cir. 2017) (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)) (indicating that "a plaintiff must show a causal link between the failure to investigate [an investment's merits] and the harm suffered by the plan").  Plaintiffs did not present a credible model of losses tied to the GIF or to GoalMaker's fees.  As to the GIF, Plaintiffs did not show that a prudently available alternative with comparable risk characteristics would have produced higher net returns; indeed, the 2019 "north of 3%" product lacked a guaranteed floor and had higher risk. (ECF No. 380 at PageID 22930–31.)  As to GoalMaker, Plaintiffs largely compared fees rather than net performance, and did not demonstrate that participants would have accumulated more had the Plan adopted index funds earlier, accounting for performance and implementation timing. (ECF No. 404 at PageID 23568, 23669, 23675; ECF No. 407 at PageID 23846, 24848, 23852; ECF No. 412 at PageID 24186, 24190.)  "[C]ourts require a[n] . . . apples-to-apples comparison" when evaluating fees.  *Parker v. GKN N. Am. Servs., Inc.*, No. 21-12468, 2022 WL 3702072, at *5 (E.D. Mich. Aug. 26, 2022).  ERISA does not treat higher fees, standing alone, as loss where performance and risk must also be weighed.  *CommonSpirit Health*, 37 F.4th at 1167–68.  On this record, Plaintiffs failed to prove loss and causation.

### C.    Conclusion

ERISA demands prudence, not perfection.  The Committee met regularly, reviewed performance and fees with professional advisors, documented its work, and made reasoned changes—including eliminating revenue sharing and replacing GoalMaker with index-based target-date funds—within a prudent timeframe.  Plaintiffs have not proven that Defendants

breached their fiduciary duties in monitoring either the GIF or GoalMaker, nor have they shown plan losses caused by any alleged breach. Judgment will be entered for Defendants on the remaining claims.

For the reasons stated above, the Court finds in favor of Defendants on Plaintiffs' remaining ERISA claims concerning the Prudential Guaranteed Income Fund and GoalMaker. The Clerk is **DIRECTED** to enter judgment for Defendants on those claims. Cost may be taxed in accordance with law.

**IT IS SO ORDERED**, this 30th day of September 2025.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE